IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| FEDERAL DEPOSIT INSURANCE CORPORATION, as a separate and distinct Receiver of Bank USA, N.A., California National Bank, Citizens National Bank of Teague, Madisonville State Bank, North Houston Bank, Pacific National Bank, Park National Bank, and San Diego National Bank, | ) ) ) ) ) ) ) ) ) ) | |
| | ) | No. 14 C 4307 |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| FBOP CORPORATION, *et al.*, | ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OPINION AND ORDER

JAMES F. HOLDERMAN, District Judge:

On June 10, 2014, the Federal Deposit Insurance Corporation ("FDIC-R"), as a separate and distinct receiver for eight failed banks, filed a complaint against the banks' former parent company, defendant FBOP Corporation ("FBOP"), as well as FBOP's Trustee-Assignee and a number of FBOP's creditors to determine the ownership of a multi-million dollar tax refund currently residing in escrow. (Dkt. No. 1.) On August 12, 2014, the FDIC-R filed an amended complaint ("Amended Complaint") (Dkt. No. 35 ("Am. Compl.")) seeking, among other relief, a judgment avoiding security interests that FBOP granted to two of its creditors, defendants JPMorgan Chase Bank, N.A. ("JPMC") and BMO Harris Bank N.A. ("BMO"), because the security interests were actual or constructive fraudulent transfers under Illinois and federal law. The FDIC-R's Amended Complaint also asks the court to impose a constructive trust on any

portion of the tax refund FBOP has already provided to its creditors, including JPMC and BMO. JPMC and BMO have moved to dismiss (Dkt. Nos. 36, 40) the fraud claims against them (Counts IX through XIV) and the FDIC-R's "claim" for a constructive trust (Count XXIV) pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons stated below, JPMC's and BMO's motions (Dkt. Nos. 36, 40) are granted in part and denied in part.

## FACTUAL BACKGROUND

This lawsuit concerns the ownership of $275.6 million in tax refunds generated by eight different banks,[1] all of which failed after the Banks' holding company, FBOP, implemented a strategy in 2007 causing the Banks to invest in the housing market. The Banks bought preferred stock issued by Fannie Mae and Freddie Mac (collectively, the "Government Sponsored Enterprises" or "GSEs"), bonds issued by Washington Mutual Bank ("WaMu"), and other securities backed by commercial real estate loans. (Am. Compl. ¶ 142.) The timing of FBOP's bet on the housing market could not have been worse—a housing crisis would soon grip the nation—and FBOP's belief that the GSEs' stock was guaranteed by the federal government proved to be incorrect. (*Id.*) On July 30, 2008, Congress passed the Housing and Economic Recovery Act of 2008, establishing the Federal Housing Finance Agency ("FHFA") as the regulator of the GSEs and empowering FHFA to serve as conservator to the GSEs when necessary to preserve their financial health. *See* Pub. L. No. 110-289, 122 Stat. 2653 (2008). On September 6, 2008, following the GSEs' unsuccessful efforts to raise much needed capital in the

---

[1] The banks are Bank USA, N.A., California National Bank, Citizens National Bank of Teague, Madisonville State Bank, North Houston Bank, Pacific National Bank, Park National Bank, and San Diego National Bank (collectively, the "Banks").

private markets, FHFA placed the GSEs into conservatorship and suspended dividend payments on common and preferred shares. The GSEs' share prices fell to nearly zero.[2]

The Banks, along with the GSEs' other stockholders, suffered massive losses. By the end of September 2008, the Banks had recognized a combined investment loss of approximately $838 million on their GSE preferred stock, written down the value of their WaMu-issued bonds by at least $99 million, and suffered additional losses on their other commercial real estate investments. (Am. Compl. ¶¶ 147-48.) On October 30, 2009, as a result of the 2008 investment losses and the recession that followed, the Banks' chartering authorities—the Office of the Comptroller of Currency ("OCC") and the Texas Department of Banking ("TDB")—closed the Banks and appointed the FDIC-R as receiver for the Banks. (*Id.* ¶ 1, 40-44.)

FBOP remained in existence as a legal entity, albeit as a bank holding company without subsidiary banks. During the two years following the Banks' failure, FBOP received approximately $275.6 million in tax refunds (the "Tax Refunds") attributable to taxes paid by the Banks during the 2004-2009 tax years. (Am. Compl. ¶¶ 124-31.) FBOP did not return the Tax Refunds to the Banks or to the FDIC-R. Instead, at the urging of its creditors and in exchange for financial benefits to FBOP insiders, FBOP asserted ownership over the Tax Refunds and pledged its asserted rights to its various creditors to the detriment of the original taxpayers: the Banks. (*Id.* ¶¶ 345, 346, 358, 385, 388.) The FDIC-R objected to FBOP's actions and demanded that FBOP transfer the Banks' Tax Refunds to the FDIC-R. FBOP refused, and the ownership of the Tax Refunds is now the subject of this lawsuit.

---

[2] Preferred stockholders were not formally "wiped out," although that issue remains the subject of litigation. *See Perry Capital LLC* v. *Lew*, 2014 WL 4829559 (D.D.C. Sept. 30, 2014) (dismissing preferred stockholders' claims against the U.S. Treasury Department). Here, it is sufficient to note that FHFA's decision destroyed the value of the Banks' GSE preferred stock.

I.      Pre-Failure Tax Arrangement between FBOP and the Banks

On October 31, 2007, FBOP and the Banks entered into an agreement to allocate consolidated federal and state income tax liabilities (the "2007 Tax Allocation Agreement"). (Am. Compl. ¶ 238.) The purpose of the 2007 Tax Allocation Agreement was to allow FBOP and the Banks to continue filing taxes as a consolidated group, as they had done since 2004, with FBOP acting as the Banks' agent for filing tax returns, paying taxes, and seeking refunds. (*Id.* ¶¶ 59, 60, 239, 241.) Since 2004, each Bank had paid its own tax liability by transferring funds to FBOP. FBOP then transferred the Banks' tax payments to the IRS. (*Id.* ¶ 65.) FBOP likewise transferred any tax refunds attributable to Banks' earnings back to the Banks upon receiving the refunds from the IRS. FBOP and the Banks envisioned the same arrangement under the 2007 Tax Allocation Agreement and, until the Banks failed in 2009, all of the parties acted as though the Banks' tax refunds belonged to the Banks, not FBOP. (*Id.* ¶¶ 242-43, 378.)

The same understanding applied to deferred tax assets, which are assets derived from a financial institution's ability to generate tax deductions through operating losses. When banks are profitable and earn income, they pay income taxes. (*Id.* ¶ 132.) When they are unprofitable, they generate net operating losses ("NOLs"). (*Id.*) Banks can "carry back" NOLs to offset income earned (and taxes paid) in the previous two tax years and receive an overpayment refund from the IRS for those two tax years. In some circumstances, such as the 2008 financial crisis, NOLs are so large that they exceed income earned in the previous two years. In those cases, banks can "carry forward" the remaining NOLs to offset income earned in future tax years. But because the utility of "carry forward" NOLs depends in part on future income, banks may only recognize a percentage of "carry forward" NOLs in their Tier 1 capital ratios. (*Id.* ¶¶ 133-34,

156-57.) The Tier 1 capital ratio compares shareholder equity to risk-adjusted assets and is often used by regulators to measure an institution's financial strength.

Consistent with FBOP's and the Banks' larger tax scheme, the Banks treated deferred tax assets—when such assets existed—as their own. (Am. Compl. ¶ 139.) FBOP apparently understood the same, because in coordinating the Banks' policies for calculating their individual capital ratios, FBOP treated the Banks' deferred tax assets as property of the Banks. (*Id.* ¶ 136.) The understanding persisted even after the Banks suffered massive GSE-related losses and the prospect of sizable deferred tax assets became apparent.[3] Throughout 2008 and 2009, as FBOP sought special treatment for the Banks' deferred tax assets as a means of keeping the Banks capitalized and staving off seizure, FBOP repeatedly told the OCC that the Banks' deferred tax assets, including the right to claim tax refunds, belonged to the Banks—not FBOP. (*Id.* ¶¶ 163, 166-68.) FBOP made the same representation when it applied for TARP funds in 2008. (*Id.* ¶¶ 169-71.) And in each quarterly "call report," a type of financial health report banks must submit to regulators under 12 U.S.C. § 1817(a)(3), each Bank—under the direction of FBOP—claimed ownership of its respective deferred tax assets through October 2009. (*Id.* ¶¶ 172-233.)

II. <u>The Banks' Failure and the Aftermath</u>

In June 2009, eight months after FHFA placed the GSEs into conservatorship, FBOP and the Banks remained open but were struggling to meet the demands of creditors and regulators. On June 19, 2009, one of those creditors, JPMC, filed a collection action against FBOP seeking payment of an overdue loan. (Am. Compl. ¶¶ 325, 334); *see also JPMorgan Chase Bank, N.A.* v.

---

[3] On October 3, 2008, Congress passed the Emergency Economic Stabilization Act of 2008, 12 U.S.C. § 5201 *et seq.*, in part to mitigate the fallout from the GSEs' failures. Among other measures, the Stabilization Act authorized financial institutions to offset GSE-related investment losses against ordinary income—rather than capital gains—for tax purposes.

*FBOP Corp.*, No. 09 C 3720 (N.D. Ill.). JPMC acted as the agent for a syndicated lending group that made revolving loans to FBOP under a longstanding credit agreement. (*Id.*) FBOP failed to make a payment by the due date, causing JPMC to accelerate the payment terms and effectively call in the entire $247.6 million loan. (Am. Compl. ¶¶ 182, 326.)

FBOP's financial woes extended to its owner as well. On September 30, 2009, Michael Kelly ("Kelly"), FBOP's President and sole shareholder, caused FBOP to lend him $6.5 million at an interest rate of 3.25% per year. (*Id.* ¶¶ 335-36.)

Around the same time, in the fall of 2009, FBOP was attempting to convince the Banks' regulators, the OCC and TDB, to refrain from seizing the Banks until President Obama signed the Workers, Homeowners, and Business Assistance Act of 2009 ("WHBAA"). The WHBAA eventually extended the two-year limitation on "carry back" NOLs to five years for banks and other institutions whose losses stemmed from the GSEs' failures. If FBOP's Banks had survived long enough to take advantage of the WHBAA's extended "carry back" allowance, FBOP contends that its NOLs would have provided an additional $200 million to support the Banks' capital ratios and potentially avoid seizure. (Am. Compl. ¶¶ 122, 128.) But the OCC and TDB ultimately refused FBOP's request to wait. The regulators seized the Banks on October 30, 2009—one week before President Obama signed the WHBAA—and appointed the FDIC-R as receiver. (Am. Compl. ¶¶ 42, 44.) At the time of the Banks failure, and probably well before, FBOP was insolvent with no ability to pay its creditors. (*Id.* ¶ 7.)

On February 8, 2010, another one of FBOP's creditors—BMO—sued FBOP in the Circuit Court of Cook County, Illinois seeking payment of a $43.6 million debt arising out of FBOP's aborted acquisition of PFF Bank & Trust ("PFF B&T") in 2008. (*Id.* ¶ 328.) In June 2008, FBOP entered into an agreement to acquire PFF B&T from its parent company, PFF

Bancorp, Inc. ("PFF Bancorp"). (*Id.*) FBOP agreed as part of the purchase to assume a roughly $44 million debt PFF Bancorp owed to BMO, but only if PFF Bancorp could not repay the debt itself by June 16, 2009. (*Id.* ¶ 330; Dkt. No. 68 at 2.) On November 21, 2008, PFF B&T failed and FBOP terminated the acquisition agreement. (Am. Comp. ¶¶ 331-32.) FBOP likewise refused to assume PFF Bancorp's debt to BMO after PFF Bancorp failed to repay the debt itself by the June 16, 2009 deadline.

Although FBOP had been insolvent since the Banks failed in October 2009, its financial condition hit rock bottom in the summer of 2010. First, on July 19, 2010, Judge Guzman struck all of FBOP's affirmative defenses to JPMC's federal collection action, leaving FBOP with no plausible basis to avoid its $247.5 million debt to JPMC. *See JPMorgan Chase Bank*, No. 09 C 3720 (Dkt. No. 80). Second, on August 2, 2010, the Illinois state court granted BMO a judgment against FBOP in the amount of $43.3 million. (Am. Compl. ¶ 340.)

III.   FBOP's and FBOP's Creditors' Plan to Mitigate Losses

By October 2010, FBOP owed its unsecured creditors nearly $390.8 million: $247.5 million to JPMC, $43.3 million to BMO, and $100 million to holders of FBOP's subordinated debt ("Sub-Debt Holders"). (Am. Comp. ¶¶ 334, 340, 357.) FBOP had been insolvent since the Banks failed in 2009 and admitted in a February 2010 filing that it had to no ability "to restructure and survive." (Dkt. No. 70 at 2 n.2.). Faced with the likelihood of a fractional recovery, FBOP, JPMC, and BMO entered into various settlement agreements (the "Settlement Agreements") granting JPMC and BMO liens on all of FBOP's assets, including FBOP's future tax refunds. (Am. Compl. ¶¶ 484, 502.) The liens secured JPMC's and BMO's claims at the expense other creditors, but did not, on their own, hold much value; FBOP had little in the way of assets outside of its seized Banks. The real value of the liens arose from FBOP's pursuit of the

seized Banks' prospective Tax Refunds following the execution of the Settlement Agreements, which FBOP undertook at JPMC's and BMO's "encouragement." (*Id.* ¶ 385, 388.). Although FBOP had never previously asserted ownership over the Banks' deferred tax assets—and had represented the opposite to the Banks' regulators as recently as one week before the Banks failed—it retained a measure of control because any tax refunds resulting from the Banks' NOLs would have to flow through the Banks' tax agent: FBOP.

The purpose of FBOP's claim to the Banks' Tax Refunds was to divert the Tax Refunds from the FDIC-R and bring them into the pool of money available to FBOP's creditors. (Am. Compl. ¶ 381.) Once the Tax Refunds became part of the creditors' pool, the liens would ensure that JPMC and BMO received first access to the Tax Refunds. The FDIC-R, by contrast, would merely hold a subordinate (and ultimately worthless) claim against FBOP for the value of the diverted Tax Refunds. (*Id.* ¶ 380.)

FBOP, in exchange for the liens and its efforts to claim the Banks' Tax Refunds, received the following: (i) JPMC agreed to acquire and forgive the $6 million Kelly lent himself on behalf of FBOP; (ii) JPMC and BMO permitted FBOP to pay approximately $13.7 million in deferred compensation owed to former officers of the Banks and FBOP; and (iii) JPMC and BMO waived any potential claims they had against Kelly and FBOP's former officers. (Am. Compl. ¶¶ 351-53; Dkt. No. 70 at 4.)

On January 10, 2011, FBOP brought the Sub-Debt Holders into the fold with similar forbearance and settlement agreements (the "Sub-Debt Agreements"). (*Id.* ¶ 356.) The Sub-Debt Agreements purport to grant the Sub-Debt Holders liens on certain assets, including the Banks' Tax Refunds. (*Id.* ¶ 358.) And unlike the JPMC and BMO Settlement Agreements, the Sub-Debt Agreements explicitly memorialize FBOP's obligation to "use commercially reasonable efforts

to minimize the value of any payments made to the FDIC-Receiver on account of its interest in the Bank Tax Refund[s]." (*Id.* ¶ 359.) Although the Sub-Debt Holders remain subordinate to JPMC and BMO, JPMC and BMO have agreed to reserve up to $10,150,000 for the Sub-Debt Holders if FBOP successfully retains the Tax Refunds. (Dkt. No. 70 at 4.) By early 2011, FBOP and its creditors had erected a web of settlement agreements, the effect of which was to ensure that JPMC, BMO, and the Sub-Debt Holders—not the FDIC-R—would receive the Tax Refunds if FBOP were successful in asserting ownership.

On September 28, 2011, FBOP, as agent for the Banks and with the FDIC-R's consent, submitted to the IRS a Form 1120X for each of the carryback years to claim the Banks' Tax Refunds. (Am. Compl. ¶ 128.) On September 30, 2011, two days later, FBOP and the FDIC-R entered into an escrow agreement, under which the Tax Refunds will remain in an escrow account until the ownership can be resolved. (*Id.* ¶¶ 414-423.) The FDIC-R later learned that on March 12, 2010, the IRS issued an overpayment refund to FBOP for the Banks' 2009 estimated tax payment in the amount of $10,303,000. (Am. Compl. ¶¶ 28, 116.) Although the FDIC-R believes that the $10,303,00 overpayment refund belongs to the Banks, FBOP has refused to place the overpayment refund into the escrow account.[4] On June 10, 2014, following the parties unsuccessful attempts to resolve the dispute through good faith settlement discussions, (*id.* ¶ 14), the FDIC-R followed this lawsuit to adjudicate the ownership of the Tax Refunds. FBOP's two largest creditors, JPMC and BMO, have now moved to dismiss the FDIC-R's claims against them.

---

[4] For purposes of this opinion, the term "Tax Refunds" includes all tax refunds allegedly attributable to the earnings of the Banks, including the $10 million overpayment refund.

## LEGAL STANDARD

Under the Federal Rules of Civil Procedure, a complaint need contain only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The complaint must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley* v. *Gibson*, 355 U.S. 41, 47 (1957)). Although "detailed factual allegations" are not required, "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly,* 550 U.S. at 555. The complaint must "include sufficient facts 'to state a claim for relief that is plausible on its face.'" *Cole* v. *Milwaukee Area Tech. Coll. Dist.*, 634 F.3d 901, 903 (7th Cir. 2011) (quoting *Justice* v. *Town of Cicero*, 577 F.3d 768, 771 (7th Cir. 2009)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009). In ruling on a Rule 12(b)(6) motion, the court "construe[s] the . . . [c]omplaint in the light most favorable to Plaintiff, accepting as true all well-pleaded facts and drawing all possible inferences in his favor." *Cole*, 634 F.3d at 903.

The FDIC-R's allegations of fraud also trigger Rule 9(b). Under Rule 9(b), a plaintiff must plead the "circumstances constituting fraud" with particularity. These circumstances include "the identity of the person who made the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." *Vicom, Inc.* v. *Harbridge Merch. Servs., Inc.*, 20 F.3d 771, 777 (7th Cir. 1994). In other words, a plaintiff must allege "the who, what, when, where, and how." *Wigod* v. *Wells Fargo Bank, N.A.*, 673 F.3d 547, 569 (7th Cir. 2012) (citations and quotations omitted).

ANALYSIS

I.  Avoidance of Actual Fraudulent Transfers (Counts IX, X, XI, XII)

In Counts IX, X, XI, and XII, the FDIC-R brings four "claims"—two against JPMC and two against BMO—for avoidance of actual fraudulent transfers under Illinois and federal law. In reality, as the FDIC-R acknowledges in its response to JPMC's and BMO's motions to dismiss, the FDIC-R has a single "claim for relief" against each defendant arising out of FBOP's granting of security interests—the liens—to JPMC and BMO pursuant to the settlement of their respective lawsuits. The Seventh Circuit has made clear that "[o]ne set of facts producing one injury creates one claim for relief, no matter how many laws the deeds violate." *N.A.A.C.P.* v. *American Family Mut. Ins. Co.*, 978 F.2d 287, 292 (7th Cir. 1992); *see also Bartholet* v. *Reishauer A.G. (Zurich)*, 953 F.2d 1073, 1078 (7th Cir. 1992). The FDIC-R's decision to splice its claim into separate counts for each different theory of liability—a problem that afflicts the entire Amended Complaint, not just the "counts" at issue here—is a hallmark of code pleading that is not consistent with the Federal Rules of Civil Procedure's "claim for relief." *N.A.A.C.P.*, 978 F.2d at 292; *see also FDIC* v. *Coleman Law Firm*, 862 F. Supp. 2d 833, 834 (N.D. Ill. 2012) (Shadur, J.) (explaining the difference between federal and Illinois pleading rules).

The improper pleading is only a minor issue here because, as the parties themselves concede, federal and Illinois law on fraudulent transfers are nearly identical and the court need not conduct separate analyses. *See also In re Lancelot Investors Fund, LP*, 451 B.R. 833, 838 (N.D. Ill. 2011) (Cox, B.J.) (noting Illinois has adopted the Uniform Fraudulent Transfer Act ("UFTA") which was enacted to track federal bankruptcy law). Under both 740 ILCS § 160/5(a)(1) and 12 U.S.C. § 1821(d)(17), a party seeking to avoid a transfer of an interest in the debtor's property must show that the debtor made the transfer "with actual intent to hinder,

delay, or defraud" another creditor. *See also* 11 U.S.C. § 548(a)(1)(A).[5] Accordingly, to survive a motion to dismiss, the FDIC-R must plausibly allege that FBOP granted JPMC and BMO the liens with the actual intent to hinder, delay or defraud another creditor.

Because direct evidence of fraudulent intent is often elusive, a plaintiff can meet its pleading burden by alleging facts that support certain "badges of fraud." *In re Lancelot Investors Fund, LP*, 451 B.R. at 838. These badges of fraud include:

> (1) whether the debtor was insolvent at the time of the transfer or became insolvent as a result of the transfer; (2) whether the debtor retained control of the asset; (3) whether the transfer was to a family member; (4) whether the transfer was prior to debtor incurring a substantial debt; (5) whether the transfer was substantially all of debtor's assets; (6) whether the debtor received consideration for the transfer; (7) whether the transfer was disclosed or concealed; (8) whether the debtor made the transfer before or after being threatened with suit by creditors; and (9) whether the debtor absconded.

*Grede* v. *Bank of New York Mellon*, 441 B.R. 864, 881 (N.D. Ill. 2010) (Zagel, J.), *rev'd in part sub nom. In re Sentinel Mgmt. Grp., Inc.*, 728 F.3d 660 (7th Cir. 2013) (internal citations omitted).

Although the parties dispute whether the FDIC-R has alleged two or eight badges of fraud, neither side dwells on the issue or the badges in general, which the Seventh Circuit has described as "unfortunate legal cliché[s] that . . . can exercise a mesmerizing force on lawyers and judges." *Brandon* v. *Anesthesia & Pain Mgmt. Assoc., Ltd.*, 419 F.3d 594, 599 (7th Cir. 2005). Instead, JPMC and BMO argue that the liens FBOP granted them were "inevitable" considering JPMC's pending collection action and BMO's state court judgment, and that the

---

[5] The FDIC-R brings its federal claims, Counts X and XII, under 12 U.S.C. § 1821(d)(17). Section 1821(d)(17) authorizes the FDIC-R's fraudulent transfer claim as receiver for the Banks. In testing the sufficiency of allegations in support of Section 1821(d)(17) claims, however, courts rely on case law evaluating actual fraudulent transfer claims under Section 548(a)(1)(A). *See, e.g.*, *Jahn* v. *FDIC*, 828 F. Supp. 2d 305, 312 (D.D.C. 2011).

mere preference of JPMC and BMO over other creditors, including the FDIC-R, does not raise an inference of fraud. The FDIC-R, by contrast, argues that the Seventh Circuit's decision in *In re Sentinel Management Group, Inc.*, 728 F.3d 660 (7th Cir. 2013) directly applies to the instant case and precludes a finding for JPMC and BMO at the motion to dismiss stage.

In *Sentinel*, an investment manager, Sentinel, represented to clients that at all times it would hold their funds in segregated accounts as was required under the Commodity Exchange Act, 7 U.S.C. § 1 *et seq. Sentinel*, 728 F.3d at 663. Despite its representation, Sentinel moved $88 million in government securities from segregated accounts into a "lienable" account to satisfy a demand by its major creditor, BNY Mellon ("BNY"), for additional collateral in support of BNY's loan to Sentinel. *Id.* at 665. Sentinel eventually filed for bankruptcy, BNY filed a claim as the only secured creditor, and the trustee sued BNY to avoid Sentinel's transfers of securities from segregated accounts into the lienable account. *Id.* at 666. At trial, the district court found that Sentinel had "robbed Peter . . . to pay Paul" when it pledged segregated client funds as collateral for BNY's loans and that Sentinel did so at a time when the company was insolvent. *Id.* at 667. Nevertheless, the district court held that Sentinel's actions did not show actual intent to hinder, delay, or defraud creditors because the transfers were (i) an attempt to stay in business and (ii) because BNY gave significant value in exchange for the pledged client funds. *Id.*

The Seventh Circuit reversed, rejecting the district court's conclusion that an improper transfer made only as "a desperate attempt to stay in business," was insufficient to meet the standard for actual fraudulent transfer. *Id.* at 667. Even after accepting the district court's finding that the primary purpose of Sentinel's transfer was to survive as a company, rather than to render the funds unavailable to clients, the Seventh Circuit held that Sentinel "should have seen this as a

natural consequence of its actions." *Id.* at 667. Accordingly, the Seventh Circuit concluded that by pledging its clients assets as collateral for its own loan, thus exposing its clients to a risk of loss of which they were unaware, Sentinel demonstrated an actual intent to hinder, delay, or defraud its clients. *Id.* at 667-68.

The Seventh Circuit's holding in *Sentinel* is directly applicable to the facts alleged in the FDIC-R's Amended Complaint, which the court must accept as true as this stage of the case. FBOP, like Sentinel, improperly pledged others' assets to satisfy its own creditors. In *Sentinel*, those assets were (supposedly) segregated client funds; in this case, the assets were the Tax Refunds that FBOP repeatedly represented to regulators as belonging to the Banks. FBOP, as the Banks' designated tax agent, controlled those assets much like Sentinel controlled its clients' funds. And FBOP used its position as the Banks' tax agent to improperly pledge the Tax Refunds to satisfy its own debts, much like Sentinel pledge its clients' assets to meet BNY's collateral demand. FBOP and its creditors erected a web of liens and side agreements to benefit all of FBOP's creditors except the FDIC-R, and subsequently conspired to subject the Banks' Tax Refunds to the provisions of the liens and side agreements, rather than immediately transferring the Tax Refunds to the Banks as FBOP had done in the past. Furthermore, unlike Sentinel, FBOP did not pledge the Banks' Tax Refunds as part of a desperate attempt to stay in business. FBOP had been insolvent for nearly one year by the time FBOP granted the liens to JPMC and BMO, and the Settlement Agreements expressly called for FBOP to be liquidated following the distribution funds to its creditors. FBOP's motivation, according to the Amended Complaint, was to grant its creditors access to the Banks' Tax Refunds in exchange for the creditors' agreement to forgive the $6.5 million Kelly caused FBOP to loan him and to pay certain deferred compensation benefits to FBOP insiders.

JPMC's and BMO's arguments that they "inevitably" would have obtained the same liens had FBOP not entered into the Settlement Agreements is irrelevant to the court's determination of whether the FDIC-R has sufficiently alleged that FBOP acted with actual fraudulent intent. There was no suggestion in *Sentinel* that BNY's lien on Sentinel's assets was improper. In *Sentinel*, the fraud arose from Sentinel improperly subjecting its clients' assets to BNY's otherwise valid lien on Sentinel's assets. Here, the fraud arises from FBOP improperly subjecting the Banks' Tax Refunds to the JPMC's and BMO's otherwise valid liens on FBOP's assets.

Accordingly, under the Seventh Circuit's recent decision in *Sentinel*, FBOP's pledging of the Banks' Tax Refunds to JPMC and BMO, the natural consequence of which was to render the Tax Refunds unavailable to the rightful owner of the Tax Refunds, the Banks' receiver, constitutes actual intent to hinder, delay, or defraud the FDIC-R. JPMC's and BMO's motions to dismiss the FDIC-R's actual fraudulent transfer claims, as pled in Counts IX, X, XI, and XII, must be denied.

II.     Avoidance of Constructive Fraudulent Transfers

In Counts XIII and XIV, the FDIC-R brings an additional claim, pled as two separate counts under 740 ILCS § 160/5 and 740 ILCS § 160/6, against BMO for avoidance of constructive fraudulent transfers under Illinois law. Under Section 160/5, a plaintiff alleging constructive fraudulent transfer must sufficiently allege that the debtor made the transfer or obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation. 740 ILCS § 160/5. Section 160/6 applies only to claims arising before an allegedly fraudulent transfer and includes the additional requirement that the debtor must be insolvent at the time of the transfer or become insolvent as a result of the transfer. 740 ICLS § 160/6.

As discussed above, the FDIC-R has alleged that FBOP pledged the Banks' Tax Refunds to JPMC and BMO in October 2010, nearly one year after FBOP became insolvent with no ability to restructure or survive. The only question that remains is whether FBOP received reasonably equivalent value in exchange for the lien granted to BMO. "Whether 'reasonably equivalent value' has been given is typically a question of fact." *Wachovia Secs., LLC* v. *Neuhauser*, 528 F. Supp. 2d 834, 859 (N.D. Ill. 2007) (Kendall, J.) (citing *In re Zeigler*, 320 B.R. 362, 374 (Bankr. N.D. Ill. 2005)); *see also In re Image Worldwide, Ltd.*, 139 F.3d 574, 577 (7th Cir. 1998) (recognizing that determination of reasonable equivalence will depend on facts of each individual case). Although there is no fixed formula for assessing reasonable equivalence, other courts have used the following factors: "(1) whether the value of what was transferred is equal to the value of what was received; (2) the market value of what was transferred and received; (3) whether the transaction took place at arm's length; and (4) the good faith of the transferee." *Neuhauser*, 528 F. Supp. 2d at 860 (citing *Image Worldwide*, 139 F.3d at 577).

Here, the FDIC-R has alleged that the only possible value BMO offered to FBOP in exchange for the lien was its agreement to forbear against PFF Bancorp, which owed BMO a $44 million debt that FBOP ill-advisedly assumed as part of its failed PFF B&T acquisition, but only if PFF Bancorp were unable to pay the debt itself. BMO won a judgment against FBOP in Illinoi state court, but FBOP's Settlement Agreement with BMO expressly states that BMO may seek to recover its $44 million from both FBOP and PFF Bancorp. Accordingly, any assessment of the value of BMO's forbearance must include a factual determination of BMO's ability to recover from both FBOP and PFF Bancorp. Although there are a number of other factors the court must consider in determining reasonable equivalence, the example discussed above illustrates why such a determination is not appropriate at the motion to dismiss stage: assessing reasonable

equivalence is an exercise in valuation that relies heavily on facts the court—and often the parties—do not yet have before fact discovery has been undertaken. BMO's motion to dismiss the FDIC-R's claim for constructive fraudulent conveyance in Counts XIII and XIV is therefore denied.

III.     Constructive Trust

In Count XXIV, the FDIC-R asks the court to impose a constructive trust on any portion of the Tax Refunds FBOP may have already provided to JPMC, BMO, and the other defendants. JPMC and BMO argue, correctly, that a constructive trust "is a remedy, and not a claim, and therefore cannot stand as a separate cause of action." *3Com Corp.* v. *Electronics Recovery Specialists, Inc.*, 104 F. Supp. 2d 932, 942 (N.D. Ill. 2000) (Moran, J.) (collecting cases). The FDIC-R concedes that a constructive trust is a remedy, not a claim, but objects to its dismissal as a separate claim without any explanation. Insofar the FDIC-R alleges constructive trust as a separate claim in Count XXIV, that count is dismissed against every defendant in this case. As a potential remedy, however, constructive trust survives.

## CONCLUSION

For the reasons explained above, JPMC's motion to dismiss [36] is granted as to Count XXIV and denied as to Counts IX and X. BMO's motion to dismiss [40] is granted as to Count XXIV and denied as to Counts XI, XII, XIII, and XIV. Count XXIV is dismissed against each defendant. The parties are encouraged to continue their ongoing settlement negotiations and to continue focusing their discovery efforts on facts that might aid their settlement discussions. The case is set for a report on the status of discovery and settlement on 4/21/2015 at 9:00 a.m.

ENTER:

*James F. Holderman*
JAMES F. HOLDERMAN
District Judge, United States District Court

Date: March 31, 2015