**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| FEDERAL DEPOSIT INSURANCE, CORPORATION, *as a separate and distinct Receiver of Bank USA, N.A., California National Bank, Citizens National, Bank of Teague, Madisonville State Bank, North, Houston Bank, Pacific National Bank, Park National Bank, and San Diego National Bank,* | ) ) ) ) ) ) ) ) ) |
| PLAINTIFF, | ) ) |
| vs. | ) ) |
| FBOP CORPORATION; PATRICK D. CAVANAUGH, *of High Ridge Partners, Inc., not individually, but solely as Trustee-Assignee under FBOP Corporation's Trust Agreement and Assignment for the Benefit of Creditors*; JPMORGAN CHASE BANK, N.A., *as Agent*; BMO HARRIS BANK, N.A., *as successor in interest to M&I Marshall & Ilsley Bank*; ORE HILL HUB FUND LTD.; CANYON BALANCED MASTER FUND, LTD.; CANYON GRF MASTER FUND, L.P.; MARINER TRICADA CREDIT STRATEGIES MASTER FUND, LTD.; PMT CREDIT OPPORTUNITIES FUND LTD.; PROSPECT MOUNTAIN FUND LIMITED; STRUCTURED CREDIT OPPORTUNITIES FUND II, LP; and GORDON C. WATSON, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| DEFENDANTS. | ) ) |

Case No. 14 CV 4307
Judge Thomas M. Durkin

_____

| | |
|---|---|
| PENSION BENEFIT GUARANTY CORPORATION, | ) ) |
| PLAINTIFF-INTERVENOR, | ) ) ) |
| vs. | ) ) ) |

Case No. 14 CV 4307
Judge Thomas M. Durkin

FBOP CORPORATION; PATRICK D. )
CAVANAUGH *of High Ridge Partners, Inc.,* )
*solely in his capacity as Trustee-Assignee under* )
*FBOP Corporation's Trust Agreement and* )
*Assignment for the Benefit of Creditors*; )
FEDERAL DEPOSIT INSURANCE )
CORPORATION, *as Receiver for Bank USA, N.A.,* )
*California National Bank, Citizens National* )
*Bank of Teague, Madisonville State Bank,* )
*North Houston Bank, Pacific National Bank,* )
*Park National Bank, and San Diego National* )
*Bank*; WELLS FARGO BANK, N.A., *as escrow* )
*agent pursuant to the escrow agreement among* )
*the Federal Deposit Insurance Corporation,* )
*FBOP Corporation and Wells Fargo Bank, N.A.,* )
)
DEFENDANTS. )

# MEMORANDUM OPINION AND ORDER

INTRODUCTION

STANDARD OF REVIEW

BACKGROUND

     **A.**     THE RISE AND FALL OF FBOP AND THE BANKS

     **B.**     THE CORPORATE DEBT OF FBOP AND THE PERSONAL DEBT OF ITS CHAIRMAN

     **C.**     THE $10.3 MILLION IN NON-ESCROWED REFUNDS

     **D.**     FBOP'S SETTLEMENT OF ITS UNSECURED CREDITORS' CLAIMS

     **E.**     THE $265.3 MILLION IN ESCROWED REFUNDS

     **F.**     CURRENT LITIGATION

DISCUSSION

**I.**     CHOICE OF LAW

**II.**     RULES OF CONTRACT INTERPRETATION

III. **THE FBOP DEFENDANTS' RULE 12(c) MOTION FOR JUDGMENT AS A MATTER OF LAW ON COUNTS I-II**

    A. **THE "DEFAULT" RULE REGARDING OWNERSHIP OF TAX REFUNDS**

        1. **ILLINOIS LAW: TAX REFUNDS OF JOINT FILERS BELONG TO THE TAXPAYER WHO PAID THE TAXES**

        2. **THE *BOB RICHARDS* CASE**

        3. **FEDERAL COMMON LAW ARGUMENT**

        4. ***UNITED DOMINION* ARGUMENT**

        5. **UNJUST ENRICHMENT ARGUMENT**

    B. **THE TAA**

        1. **SURROUNDING CIRCUMSTANCES SUPPORT THE DEFAULT TAX REFUND OWNERSHIP RULE**

        2. **THE TAA DOES NOT CLEARLY REPUDIATE THE DEFAULT TAX REFUND OWNERSHIP RULE**

            a. **TAX ALLOCATION AND PAYMENT PROVISIONS**

            b. **DEBTOR-CREDITOR TERMINOLOGY**

            c. **ABSENCE OF TRUST PROVISIONS**

            d. **PRINCIPAL-AGENT ISSUE**

        3. **THE TAA AFFIRMATIVELY REFLECTS A CONTRACTUAL INTENT TO MAINTAIN THE DEFAULT TAX REFUND OWNERSHIP RULE**

            a. **NO LESS FAVORABLE PRINCIPLE**

            b. **THE 1998 POLICY STATEMENT**

        4. **PAROL EVIDENCE ISSUES**

IV. **THE FDIC'S RULE 12(c) MOTION FOR JUDGMENT AS A MATTER OF LAW ON COUNTS I-II**

**V.**   **THE FBOP DEFENDANTS' RULE 12(c) MOTION ON THE FDIC'S ALTERNATIVE LEGAL AND EQUITABLE CLAIMS—COUNTS III-IV**

**VI.**   **THE FBOP DEFENDANTS' RULE 12(c) MOTION ON THE FDIC'S CLAIMS TO RECOVER THE NON-ESCROWED REFUNDS—COUNTS XIX-XXII**

**VII.**   **THE FBOP DEFENDANTS' RULE 12(c) MOTION ON PBGC'S INTERVENOR COMPLAINT**

**CONCLUSION**

## INTRODUCTION

This litigation involves a dispute over $265.3 million in tax refunds currently being held in escrow (the "Escrowed Refunds"). An additional $10.3 million in tax refunds not held in escrow also are at issue (the "Non-Escrowed Refunds"). The Federal Deposit Insurance Corporation ("FDIC") claims entitlement to the tax refunds[1] by virtue of its appointment as the separate receiver[2] for each of eight failed banks,[3] which the FDIC alleges earned the income, paid the taxes, and sustained the losses from which the tax refunds are derived. Defendant FBOP Corporation ("FBOP") is the parent company of the Banks, and received the refunds from the Internal Revenue Service ("IRS") as the appointed agent for a consolidated tax group

---

[1] The general term "tax refunds" will be used to refer to both the Escrowed Refunds and the Non-Escrowed Refunds.

[2] The parties use the designation "FDIC-R" to indicate that the FDIC is acting in its receivership capacity, as opposed to its corporate capacity. *See Miller v. Fed. Deposit Ins. Corp.,* 738 F.3d 836, 838 n.1 (7th Cir. 2013) ("[i]t is well-settled that the FDIC operates in two separate and legally distinct capacities, each with very different responsibilities") (internal quotation marks and citation omitted).

[3] The eight banks (hereinafter "the Banks") include Bank USA, N.A., California National Bank, Citizens National Bank of Teague, Madisonville State Bank, North Houston Bank, Pacific National Bank, Park National Bank, and San Diego National Bank.

4

consisting of itself and its subsidiary corporations (the Banks and approximately 80 non-banking subsidiaries) (hereinafter the "Consolidated Group").[4] As will be explained in more detail later, FBOP became insolvent and assigned all of its assets, including whatever interest it may have had in the tax refunds, to the Trustee of the FBOP Corporation Trust Agreement and Assignment for the Benefit of Creditors (hereinafter the "Assignment") for the purpose of applying the property or proceeds thereof to the payment of FBOP's debts. FBOP and the Trustee (collectively referred to as the "FBOP Defendants") claim ownership of the tax refunds pursuant to an agreement between FBOP and the Banks concerning the allocation of tax liabilities and benefits among members of the Consolidated Group (hereinafter the "TAA" or the "Agreement").

---

[4] A consolidated tax group consists of affiliated corporations that have elected to file their tax returns as a consolidated group, subjecting the entire group to one annual tax liability. *See* 26 U.S.C. §§ 1501-1504; 26 C.F.R. § 1.1502-75. "Those who file consolidated returns are 'treated as a single entity for income tax purposes as if they were, in fact, one corporation.'" *Exxon Corp. v. United States*, 785 F.2d 277, 280 (Fed. Cir. 1986)) (citation omitted). Losses in one company can be offset against profits in another for purposes of computing this tax liability. 26 C.F.R. § 1.1502-21; *see Superintendent of Ins. of N.Y. v. First Cent. Fin. Corp. (In re First Cent. Fin. Corp.),* 269 Bankr. 481, 488-89 (Bankr. E.D.N.Y. 2001) ("Net operating loss carryback is a form of income averaging that permits a taxpayer to use current losses to reduce taxable income in prior years. If a consolidated group has net operating losses ('NOLs') to offset income earned in the previous taxable years, the consolidated group as a whole will be entitled to a refund of taxes paid on those years . . . ."), *aff'd,* 377 F.3d 209 (2d Cir. 2004). The group's parent corporation files the return, pays the tax, receives any refunds, and deals with the IRS generally. *See* 26 C.F.R. § 1.1502-77(a), (c) & (d). Members of the consolidated group other than the parent are prohibited for the most part from representing themselves separately with the IRS, *id.,* § 1.1502-77(e), but nevertheless remain severally liable for the entire amount of the tax, *id.,* § 1.1502-6(a).

The TAA sets forth the applicable rules to which, prior to FBOP's insolvency, FBOP and the Banks agreed for allocating the tax benefits and burdens of the Consolidated Group. It is assumed for purposes of the present motions that the TAA obligated FBOP to distribute the tax savings represented by the tax refunds to the Banks. The issue to be decided is whether the Banks' entitlement to those tax savings is a property right or a contractual right. If the Banks have a property right, then FBOP must turn the tax refunds over to the FDIC.[5] If the Banks' right is contractual, however, then the tax refunds now belong to the Trustee, as the assignee of FBOP, who is charged with distributing them among FBOP's creditors.[6]

The FDIC and the FBOP Defendants have presented the ownership issue through cross-motions for partial judgment on the pleadings under Federal Rule of Civil Procedure 12(c). For the reasons that follow, the Court holds that the Banks' right to receive the tax refunds is a property right. Therefore, the FBOP Defendants' motion for partial judgment on the pleadings is denied. Although the Court holds that the Banks have property rights in the tax refunds, the Court cannot tell from the parties' arguments if a disputed issue of fact exists over whether the TAA required FBOP to distribute the entire amount of the Escrowed Refunds to the Banks, and whether the Banks paid the entire amount of the original taxes that led

---

[5] *See* 12 U.S.C. § 1821(d)(2)(A)(i) (providing that the FDIC, "as receiver, and by operation of law, succeeds to—(i) all rights, titles, powers, and privileges of the insured depository institution . . . and the assets of the institution").

[6] *See generally* Bogert, THE LAW OF TRUSTS AND TRUSTEES § 22 (explaining that certain cases may require a decision whether an agent, who is employed to collect choses in action owned by the principal and to remit those sums collected to the principal, was a trustee of the sums held or a debtor of the principal).

to the Escrowed Refunds. Therefore, the Court will withhold ruling on the FDIC's cross-motion for partial judgment on the pleadings until the parties file a joint report regarding the question of whether the FDIC's Rule 12(c) motion must be converted to a summary judgment motion for purposes of determining the amount of the Escrowed Refunds to which the Banks, given their property rights as set forth herein, are entitled.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(c) permits a party to move for judgment on the pleadings after the parties have filed the complaint and answer. *See Buchanan-Moore v. Cnty. of Milwaukee*, 570 F.3d 824, 827 (7th Cir. 2009). The primary function of a Rule 12(c) motion is to "dispos[e] of cases on the basis of the underlying substantive merits of the parties' claims and defenses as they are revealed in the formal pleadings." Wright & Miller, FEDERAL PRACTICE AND PROCEDURE, § 1367 (3d ed.) (citing *Alexander v. City of Chicago*, 994 F.2d 333 (7th Cir. 1993)). The parties disagree over whether the applicable standard for their Rule 12(c) motions is the Rule 12(b)(6) standard for motions to dismiss or the Rule 56 standard for motions for summary judgment. Which standard applies "is often a point of confusion in many civil cases." *West v. Phillips*, 883 F. Supp. 308, 313 n.1 (S.D. Ind. 1994). In *United States v. Wood*, 925 F.2d 1580, 1581 (7th Cir. 1991) (per curiam), the Seventh Circuit held that a motion for judgment on the pleadings should be analyzed according to the same standard as a motion to dismiss. But in *Alexander*, the Seventh Circuit held that the Rule 12(b)(6) standard should be applied only where the defendant "use[s] a

rule 12(c) motion after the close of the pleadings to raise various rule 12(b) defenses regarding procedural defects." 994 F.2d at 336. Where a party "use[s] rule 12(c) in its customary application to attempt to dispose of the case on the basis of the underlying substantive merits," the court said, "the appropriate standard is that applicable to summary judgment, except that the court may consider only the contents of the pleadings." *Id.*

The Court need not choose between the motion to dismiss and summary judgment standards here because the outcome of the parties' Rule 12(c) cross-motions does not turn on that selection.[7] In either case, the Court must take "all well-pleaded allegations in the plaintiffs' pleadings to be true, and [ ] view the facts and inferences to be drawn from those allegations in the light most favorable to the plaintiffs." *Id.* In addition, applying either standard requires the Court to consider only the content of the competing pleadings, exhibits thereto, matters incorporated by reference in the pleadings, and any facts of which the district court will take judicial notice. Wright & Miller, FEDERAL PRACTICE *supra,* § 1367. The Court cannot consider matters outside these areas without converting the motion into one for summary judgment. *See* Fed. R. Civ. P. 12(d); *Omega Healthcare Investors, Inc. v. Res-Care, Inc.,* 475 F.3d 853, 856

---

[7] The Court notes, however, that in recent opinions, the Seventh Circuit has stated without qualification or citation to *Alexander* that the proper standard for a Rule 12(c) motion is the motion to dismiss standard. *See, e.g., BBL, Inc. v. City of Angola,* 809 F.3d 317, 325 (7th Cir. 2015) ("A motion for judgment on the pleadings under Rule 12(c) of the Federal Rules of Civil Procedure is governed by the same standards as a motion to dismiss for failure to state a claim under Rule 12(b)(6). A motion to dismiss under Rule 12(b)(6) doesn't permit piecemeal dismissals of parts of claims; the question at this stage is simply whether the complaint includes factual allegations that state a plausible claim for relief.") (internal quotation marks and citations omitted).

n.3 (7th Cir. 2007). In addition, a Rule 12(c) motion is appropriate only when "it is clear that the merits of the controversy can be fairly and fully decided in this summary manner." Wright & Miller, FEDERAL PRACTICE AND PROCEDURE, § 1369 (3d ed.). Thus, if it appears that discovery is necessary to fairly resolve a claim on the merits, then the motion for judgment on the pleadings must be denied. *Id.; see also Alexander*, 994 F.2d at 336 ("We will not affirm the granting of the City's 12(c) motion unless no genuine issues of material fact remain to be resolved").

## BACKGROUND

The Amended Complaint, including reasonable inferences therefrom, and matters of which the Court can take judicial notice, show the following facts.

### A.     THE RISE AND FALL OF FBOP AND THE BANKS

FBOP is a privately held financial holding company headquartered in Illinois. From 1990 through sometime in 2007, FBOP successfully acquired troubled financial institutions at attractive prices, resolved the acquired institutions' problems, and integrated them into the organization. As a result of this strategy, FBOP at one time owned, in addition to its nonbank holdings, six national banks and two state banks operating in California, Illinois, Arizona, and Texas (the Banks).

Beginning in the fourth quarter of 2008, the Banks' (and, as a result, FBOP's) economic fortunes took a turn for the worse. Prior to that time, FBOP had implemented a strategy to cause the Banks to heavily invest in the preferred stock of Fannie Mae and Freddie Mac as well as in securities and corporate bonds of Washington Mutual Bank (WAMU). In the third quarter of 2008, Fannie Mae and

Freddie Mac were placed into conservatorship and WAMU failed. As a result, the Banks recognized a combined loss of approximately $838 million on their Fannie Mae and Freddie Mac investments, and wrote down their holdings of WAMU bonds by another $99 million. In addition, FBOP had caused the Banks to focus much of their lending activity in the commercial real estate market, and the value of those loans declined precipitously when the real estate market crashed in the same time period. The net effect of these events was to cause the Banks to become severely undercapitalized. In mid-November 2008, FBOP applied for federal funding under the Troubled Asset Recovery Program ("TARP") in an effort to relieve the Banks' financial stress. While FBOP's application for TARP funds was pending, however, the condition of the Banks declined even further, which led federal regulators[8] to determine in the Fall of 2009 that the Banks were no longer able to meet regulatory approval standards. The Banks were placed into receivership, with the FDIC being appointed the separate and independent receiver for each on October 30, 2009.

### B. THE CORPORATE DEBT OF FBOP AND THE PERSONAL DEBT OF ITS CHAIRMAN

In the months prior to the FDIC's appointment as receiver for the Banks, FBOP began experiencing financial pressure from its creditors In particular, in June 2009, Defendant JPMorgan Chase, N.A. ("JPMorgan"), acting as agent for a number of lenders that had extended unsecured credit to FBOP over the years, declared

---

[8] Five of the Banks were federally insured and thus regulated primarily by the Office of the Comptroller of Currency ("OCC"), while the other three Banks were state-chartered banks subject to federal regulation primarily by the FDIC. *See* R. 179 at 3 n.2.

FBOP in default on that debt and brought suit to recover the outstanding balance of approximately $246 million. Two months later, in August 2009, the Chairman and President of FBOP, Michael E. Kelly, withdrew money from FBOP for personal use by causing FBOP to extend a personal loan to him for approximately $6 million. In return for the loan, Kelly executed an unsecured promissory note (the "Kelly Note") in favor of FBOP, which Kelly signed as the debtor and also on behalf of FBOP in his capacity as President of FBOP. In March 2010 (after the FDIC was appointed receiver for the Banks), Defendant BMO Harris, N.A. ("BMO") brought suit against FBOP, claiming that FBOP owed BMO approximately $44 million as a result of an earlier failed attempt by FBOP to acquire another bank subsidiary that had been indebted to BMO. In addition to the debt FBOP owed to JPMorgan and BMO (its two largest creditors), FBOP also owed collectively approximately $100 million to numerous other creditors.[9] Like FBOP's debt to JPMorgan and BMO, FBOP's debt to these other creditors also was unsecured.

### C.    THE $10.3 MILLION IN NON-ESCROWED REFUNDS

Just before JPMorgan filed its lawsuit (and before the FDIC took over the Banks), on or about April 15, 2009, the Consolidated Group made an estimated quarterly tax payment to the IRS in the approximate amount of $10.3 million. This payment was made by FBOP with funds transferred to it by the Banks for the

---

[9] FBOP's additional creditors included Defendants Ore Hill Hub Fund Ltd., Canyon Balanced Master Fund, Ltd., Canyon GRF Master Fund, L.P., Mariner-Tricada Credit Strategies Master Fund, Ltd., PMT Credit Opportunities Fund Ltd., Prospect Mountain Fund Limited, Structured Credit Opportunities Fund II, LP, and Gordon C. Watson.

specific purpose of paying the Banks' share of the 2009 quarterly estimated tax payment. As it turned out, the Consolidated Group suffered a $1.12 million consolidated net operating loss in 2009. Thus, in March 2010, the IRS issued a full refund of the $10.3 million estimated tax payment. The refund was made payable to FBOP. By the time FBOP received the $10.3 million tax refund, the Banks had been closed and the FDIC had been appointed receiver. FBOP did not inform the FDIC about the Consolidated Group's tax refund, "[d]espite the fact that FBOP was in discussions with the FDIC[ ] regarding ownership of tax refunds." R. 35 (¶ 118). At the time FBOP received the $10.3 million tax refund, both JPMorgan and BMO were pursuing collection actions against it. The FDIC alleges upon information and belief that FBOP transferred some or all of the $10.3 million tax refund to the Trustee or one or more of its creditors.

### D.  FBOP'S SETTLEMENT OF ITS UNSECURED CREDITORS' CLAIMS

Approximately six months after its receipt of the $10.3 million tax refund from the IRS, FBOP entered into settlement agreements with JPMorgan and BMO. As part of the settlement agreements, FBOP pledged all of its assets as security for the previously unsecured debt owed to those two creditors, including FBOP's rights (if any) to the $10.3 million tax refund it had received plus any other tax refunds FBOP might receive from the IRS on behalf of the Consolidated Group. In addition, Kelly promised to cooperate and assist in any efforts required to preserve the Consolidated Group's tax refunds for the benefit of JPMorgan and BMO to the exclusion of the FDIC. In return for these pledges, JPMorgan and BMO gave FBOP permission to use

cash collateral to satisfy $13.7 million in purported deferred compensation claims allegedly owed by FBOP to former officers of the Banks and high level officers of FBOP. Additionally, JPMorgan agreed to acquire the Kelly Note and then forgive the amounts owed by Kelly under that Note. This plan was to be carried out by the Trustee acquiring the Kelly Note from FBOP through the Assignment, and then transferring the Note to JPMorgan, which then was to forgive the debt.

Approximately three months after entering into the settlement agreements with JPMorgan and BMO (hereinafter the "Senior Secured Creditors"), FBOP also entered into settlement agreements with its other unsecured creditors, giving those creditors security interests in FBOP's assets that were subordinate to the security interests FBOP had granted to the Senior Secured Creditors. The settlement agreements between FBOP and these other creditors (collectively the "Sub-Debt Holders") further provided that the subordinate liens promised in the agreements would be released if the Senior Secured Creditors' liens were avoided as fraudulent transfers. Like FBOP's settlement agreements with the Senior Secured Creditors, the settlement agreements with the Sub-Debt Holders required FBOP to use commercially reasonable efforts to minimize the value of any payments made to the FDIC on account of the Banks' claimed interest in the tax refunds.

Not long after all of these settlement agreements were executed, FBOP entered into the Assignment, pursuant to which FBOP assigned its assets and property to the Trustee and granted the Trustee the power and duty, among other things, to sue or be sued, and prosecute or defend any claims existing against or in

favor of FBOP. Included in the transfer of property under the Assignment is any property interest FBOP has in the tax refunds.

### E.    THE $265.3 MILLION IN ESCROWED REFUNDS

In November 2009, Congress enacted the Worker, Homeownership, and Business Assurance Act ("WHBAA"), which extended the number of years businesses were allowed to carry back net operating losses incurred in 2008 and 2009. *Id.* (¶ 122). The Consolidated Group had a 2009 NOL of $1,120,632,424, of which $1,027,845,581 was attributable to the Banks' operating losses and $92,786,843 was attributable to losses incurred by FBOP and its non-bank subsidiaries. R. 35 (¶¶ 108-110). Thus, shortly after the FDIC was appointed as receiver for the Banks in October 2009, it began negotiations with FBOP over the filing of amended tax returns for the Consolidated Group to take advantage of the new carry-back rules.

These negotiations took place over the course of the next two years and culminated with FBOP's filing, with the knowledge and consent of the FDIC, of a 2009 consolidated federal tax return and amended consolidated federal tax returns for tax years 2004 through 2008. These consolidated tax filings were made on September 11, 2011, around the same time as FBOP and the FDIC negotiated and entered into the Escrow Agreement (dated September 30, 2011). The Escrow Agreement acknowledged that the Consolidated Group expected to receive tax refunds as a result of the September 11, 2011 tax filings, as well as possible future tax filings yet to be made. The Escrow Agreement further acknowledged that the FDIC and FBOP disagreed over who owned those anticipated tax refunds. Therefore,

the tax refunds were placed into an escrow account until the parties reached agreement or until ownership of the funds was determined by an "order or judgment of a federal court of competent jurisdiction in the Northern District of Illinois . . . which is no longer subject to appeal and for which no appeal is pending." R. 145 at 62 (¶ 1.1(x)).

The Consolidated Group's amended tax returns resulted in tax refunds in the total amount of $265,366,909.[10] The FDIC alleges that the entire amount of the tax refunds generated by the Consolidated Group's 2009 NOL is attributable to the Banks. R. 35 (¶¶ 125-126). FBOP received the $265.3 million in tax refunds from the IRS in December 2013 and January 2014, and placed them in escrow pursuant to the terms of the Escrow Agreement. The FDIC and FBOP could not agree on ownership of the Escrowed Refunds, and this lawsuit was filed.

F.    **CURRENT LITIGATION**

Discovery on the FDIC's Amended Complaint has been stayed while the FDIC and the FBOP Defendants seek a ruling from the Court on the tax refund ownership question. The parties'[11] Rule 12(c) cross-motions seek judgment on the pleadings as to the following counts:

---

[10] This aggregate amount allegedly is comprised of: (i) a $243,731,549 refund resulting from the carryback NOLs incurred by the Banks; (ii) the return of $13,108,773 in certain tax overpayments made by the Banks during the 2008 tax year; and (iii) $8,526,587 in statutory interest. It also includes any state tax refund attributable to the earnings history of the Banks. R. 35 (¶ 21).

[11] Although the Senior Secured Creditors and the Sub-Debt Holders are also parties to this case, the Court is referring only to the parties to the motions currently under consideration.

- Count I, in which the FDIC seeks a declaratory judgment that the Escrowed Refunds are the property of the FDIC "as a matter of law," and Count II, in which the FDIC seeks a declaratory judgment that the Escrowed Refunds are the property of the FDIC "under the Tax Allocation Agreement." R. 35 at 61-62. The Court interprets both the FDIC's and the FBOP Defendants' motions as seeking judgment on the pleadings as to these Counts.[12]

- Counts III through VII, in which the FDIC assumes that the TAA accords ownership rights in the Escrowed Refunds to FBOP, and then seeks alternative equitable and legal relief with regard to those Funds.[13] The FBOP Defendants, but not the FDIC, have moved for judgment on the pleadings as to these counts based on their assertion that their ownership rights to the Escrowed Refunds foreclose not only the declaratory relief sought in Counts I and II but also the FDIC's alternative claims in Counts III through VII.

- Counts XIX through XXII, in which the FDIC seeks to recover the Non-Escrowed Refunds under various legal and equitable theories.[14] Once again, the FDIC does not seek judgment on the pleadings on

[12] The FDIC's motion technically seeks judgment on the pleadings only as to Count I. *See* R. 150. It is not clear why that is the case when Counts I and II appear to be duplicative or at least involve overlapping legal and factual issues. Because those issues have been fully briefed by the parties, the Court will treat the FDIC's Rule 12(c) motion as seeking judgment on the pleadings as to both counts. *See Flora v. Home Fed. Sav. & Loan Ass'n*, 685 F.2d 209, 212 (7th Cir. 1982) (citing *Pofe v. Cont'l Ins. Co. of N.Y.*, 161 F.2d 912 (7th Cir. 1947)).

[13] Specifically, the FDIC seeks a declaration that: (1) the TAA is unenforceable against the FDIC pursuant to 12 U.S.C. § 1823(e) (Count III); (2) the TAA is unenforceable against the FDIC because it violates Sections 23A and 23B of the Federal Reserve Act, 12 U.S.C. § 371c and § 371c-1 (Count IV); (3) a resulting trust should be recognized in favor of the FDIC (Count V); (4) a mutual mistake occurred entitling the FDIC to rescission and/or reformation of the TAA (Count VI); and (5) a constructive trust should be recognized in favor of the FDIC based on FBOP's alleged false statements to, or concealment of information from, the Banks and their federal banking regulators regarding the effect of the TAA, which induced the Banks to enter into the TAA (Count VII).

[14] The theories under which the FDIC seeks to recover the Non-Escrowed Refunds include: (1) conversion and/or restitution (Count XIX); (2) "money had and received" and/or restitution (Count XX); (3) unjust enrichment/restitution (Count XXI); and (4) breach of fiduciary duty/breach of trust (Count XXII).

these counts, *see* R. 166 at 6 n.2, while the FBOP Defendants do. The FBOP Defendants argue that the Court should enter judgment against the FDIC on its claims to recover the Non-Escrowed Refunds because, just like the Escrowed Refunds, the FBOP Defendants, not the Banks, are the owners of those refunds.

As shown by the above, the FBOP Defendants' Rule 12(c) motion seeks to deliver a fatal blow to virtually all of the FDIC's claims in the Amended Complaint, with Count VIII being the only claim left standing.[15] The FDIC, on the other hand, has brought a targeted motion for judgment on the pleadings, which, if successful, would render moot not only the FDIC's alternative claims based on a ruling that FBOP is the owner of the tax refunds, but also the FDIC's claims not currently before the Court against the Senior Secured Creditors and the Sub-Debt Holders to declare those parties' security interests in the tax refunds void under theories of fraudulent conveyance.[16]

## DISCUSSION

The FBOP Defendants ask the Court to adopt the position taken by a number of courts which have held that the parent company is the owner of the tax refunds of a consolidated tax group and the individual group members' rights to the tax refunds under a tax allocation agreement is contractual in nature. The courts adopting this view all address the tax refund issue in the context of the parent corporation's

---

[15] Count VIII seeks a declaration that the FDIC "holds valid general unsecured claims against FBOP and the Trustee[ ] in an amount equal to the [Escrowed] Refund[s]." R. 35 at 70 (¶ 482).

[16] *See* R. 35 (Counts IX through XVIII). Prior to the case being transferred to the undersigned judge, Judge Holderman denied the Senior Secured Creditors' motion to dismiss the FDIC's fraudulent conveyance claims. *See* R. 110.

bankruptcy, and conclude that the tax refunds are property of the bankrupt estate within the meaning of 11 U.S.C. § 541(a), such that the subsidiary's recovery of its contractual share of the tax refunds stands on the same footing as the recovery of any other unsecured creditor of the parent company.[17] But not every court agrees. The FDIC asks the Court to adopt the position of a competing line of cases, which hold on similar facts either that the subsidiary banks have a property right in the tax refunds or that the issue cannot be decided as a matter of law because the tax allocation agreement on which the question turns is ambiguous. Included in this group are the only published, and hence precedential, appellate decisions on the issue.[18]

---

[17] *See Cantor v. Fed. Deposit Ins. Corp. (In re Downey Fin. Corp.)*, 593 Fed. App'x 123 (3d Cir. 2015) (non-binding precedent pursuant to 3rd Circuit I.O.P. 5.7); *Fed. Deposit Ins. Corp. v. Siegel (In re IndyMac Bancorp, Inc.)*, 554 Fed. App'x 668 (9th Cir. 2014) (non-binding precedent pursuant to 9th Cir. R. 36-3); *Imperial Capital Bancorp, Inc. v. Fed. Deposit Ins. Corp. (In re Imperial Capital Bancorp, Inc.)*, 492 Bankr. 25 (S.D. Cal. 2013); *Resolution Trust Corp. v. Franklin Sav. Corp. (In re Franklin Sav. Corp.)*, 182 Bankr. 859 (D. Kan. 1995); *Rodriguez v. Fed. Deposit Ins. Corp. (In re United W. Bancorp, Inc.),* 558 Bankr. 409 (Bankr. D. Colo. 2016); *Waldron v. Fed. Deposit Ins. Corp. (In re Venture Fin. Grp., Inc.)*, 558 Bankr. 386 (Bankr. W.D. Wash. 2016); *Sharp v. Fed. Deposit Ins. Corp. (In re Vineyard Nat'l Bancorp)*, 508 Bankr. 437 (Bankr. C.D. Cal. 2014); *Team Fin. Inc. v. Fed. Deposit Ins. Corp. (In re Team Fin., Inc.)*, 2010 WL 1730681 (Bankr. D. Kan. Apr. 27, 2010).

[18] *See Fed. Deposit Ins. Corp. v. AmFin Fin. Corp.*, 757 F.3d 530 (6th Cir. 2014); *Zucker v. FDIC (In re BankUnited Fin. Corp.)*, 727 F.3d 1100 (11th Cir. 2013); *FDIC v. Zucker (In re NetBank, Inc.)*, 729 F.3d 1344 (11th Cir. 2013); *see also Ghei v. Fed. Deposit Ins. Corp. (In re First Reg'l Bancorp)*, 560 Bankr. 772, 785 (C.D. Cal. 2016); *Sosne v. Fed. Deposit Ins. Corp.*, 2016 WL 775176 (E.D. Mo. Feb. 29, 2016); *Lubin v. Fed. Deposit Ins. Corp.*, 2011 WL 825751 (N.D. Ga. Mar. 2, 2011); *Fed. Deposit Ins. Corp. v. BSD Bancorp, Inc. (In re BSD Bancorp, Inc.),* Case No. 94-1341, Doc. # 2, slip op. (C.D. Cal. Feb. 28, 1995) (R. 174-1).

Although the Court is not writing on a blank slate, this case is unique in one respect. While the FBOP Defendants do not contest that FBOP is insolvent, no bankruptcy petition has been filed. Instead, FBOP transferred its property to the Trustee pursuant to the Assignment. An assignment for the benefit of creditors "passes legal and equitable title to the debtor's property from the debtor to the assignee." *In re Computer World Solutions, Inc.*, 479 Bankr. 483, 486-87 (Bankr. N.D. Ill. 2012). The "assignee (or trustee) holds property for the benefit of a special group of beneficiaries, the creditors." *Ill. Bell Tel. Co. v. Wolf Furniture House, Inc.*, 509 N.E.2d 1289, 1292 (Ill. App. 1987). "A debtor may choose to make an assignment for the benefit of creditors, which is an out-of-court remedy, rather than to petition for bankruptcy, because assignments are less costly and completed more quickly." *First Bank v. Unique Marble & Granite Corp.,* 938 N.E.2d 1154, 1158 (Ill. App. 2010). "[T]he assignment is valid without the consent of any of the assignor's creditors." *Consol. Pipe & Supply Co. v. Rovanco Corp.*, 897 F. Supp. 364, 370 (N.D. Ill. 1995).

While an assignment for the benefit of creditors generally is recognized under Illinois law as a valid alternative to bankruptcy, there is a further wrinkle here. Prior to FBOP's execution of the Assignment, it entered into a series of transactions by which it pledged its assets as security to the Senior Secured Creditors and the Sub-Debt Holders. The FDIC alleges that FBOP chose the out-of-court remedy of an assignment for the benefit of creditors to avoid the scrutiny a bankruptcy court would apply to these pre-assignment security pledges. *See In re Computer World Solutions, Inc.*, 479 Bankr. at 486 ("the Bankruptcy Code does not provide for bankruptcy court

supervision of assignees or their attorneys"). In support of that allegation, the FDIC cites to the Assignment, which allegedly provides, among other things, that the Trustee cannot challenge the validity of the pre-assignment security pledges.[19] While the FDIC alleges claims in this lawsuit to set aside the security interests as fraudulent conveyances, it argues that if the security interests are not set aside and the Court finds that FBOP owns the tax refunds, then the Senior Secured Creditors and the Sub-Debt Holders (who previously were unsecured creditors of FBOP), as well as FBOP's Chairman and other high level officers of the Banks and FBOP, all will be enriched at the expense of the Banks, which will be unable to recover any of the tax refunds that are owed to them under the TAA.

## I.    CHOICE OF LAW

Because the Court has federal question jurisdiction over the FDIC's complaint,[20] federal choice of law rules apply. *See Berger v. AXA Network LLC,* 459 F.3d 804, 809-10 (7th Cir. 2006). "[T]he right to receive a tax refund constitutes an interest in property." *United States v. Sims (In re Feiler)*, 218 F.3d 948, 955 (9th Cir. 2000). "Unless some federal interest requires a different result," the federal choice of law rule for an issue regarding an interest in property, even when the parties are in

---

[19] *See* R. 146 at 18 n.12 (citing ¶ 11 of the Amended Complaint, which alleges that the Trustee "has failed to, and upon information and belief, lacks the standing to, challenge the liens granted by FBOP after the Banks failed"). The FDIC also suggests that the Trustee is an interested party. *See id.* (alleging that, "upon information and belief, the Senior Secured Parties are funding the Trustee-Assignee by consenting to the Trustee-Assignee's use of cash collateral").

[20] *See* 12 U.S.C § 1819(b)(2)(A) ("Except as provided in subparagraph (D) [not applicable here], all suits of a civil nature or in equity to which the [FDIC], in any capacity, is a party shall be deemed to arise under the laws of the United States.").

federal court under federal question jurisdiction, is state law. *Butner v. United States*, 440 U.S. 48, 55 (1979). The determination of whether to create a special federal common law rule depends on the nature and importance of the government interest at issue and the effect of applying state law. *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 728 (1979). The federal government performs a substantial regulatory/oversight function over banks. Arguably, therefore, this case involves a situation that might justify a special federal rule of decision. *See, e.g., The Official Comm. of Unsecured Creditors of the Columbia Gas Transmission Corp. v. Columbia Gas Sys. Inc. (In re Columbia Gas Sys. Inc.)*, 997 F.2d 1039, 1055-58 (3d Cir. 1993) (applying federal common law rather than state property law to hold that customers of owner of natural gas pipeline had property interest in money collected by owner from upstream suppliers and owed to customers).[21]

Nevertheless, "[d]eveloping a federal common law rule is the exception rather than the rule. Federal law should coincide with the relevant state law unless state law would undermine the objectives of the federal statutory scheme and there is a distinct need for nationwide legal standards." *Id.* at 1055 (citing *Kimbell Foods, Inc.*, 440 U.S. at 728). The Court does not need to decide at this time whether a federal common law rule should be applied because, as will be seen, the Court concludes that state law properly interpreted and applied does not undermine the federal banking

---

[21] The court in *In re First Central Financial Corp.* rejected *In re Columbia Gas Systems, Inc.* and the application of federal common law to a claim raising the tax refund ownership question. But that case did not involve federally regulated banks. *See* 269 Bankr at 501 ("The Tax Allocation Agreement at issue pertains exclusively to state law policies regarding the regulation of its insurance companies, and therefore . . . New York law, not federal common law, is applicable in this case.").

regulatory scheme. Therefore, the Court will apply state law for purposes of the present motions. The issue may be reconsidered, however, should any future motions present a conflict between state law and a national interest. The Court also notes that, while state law is controlling, federal precedent applying that law may and should be considered, particularly because this case involves property created by federal law (tax refunds). *See In re Innis*, 331 Bankr. 784, 786 (Bankr. C.D. Ill. 2005) ("That a debtor's rights in a tax refund are determined under state law is not subject to dispute. However, because a federal tax refund is a creature of federal tax law, rights created thereunder cannot be ignored.") (citations omitted).

## II. RULES OF CONTRACT INTERPRETATION

The combining of corporate income and losses to produce a consolidated group tax liability raises issues about allocating tax benefits and burdens among group members that are not resolved by federal tax laws. FBOP and the Banks entered into the TAA to address those unresolved issues. Both parties agree, however, that no provision of the TAA explicitly deals with the question of who owns the tax refunds. Because of the absence of an express contractual resolution of the ownership issue, the FDIC argues that the Court should take into account what the rule would be in the absence of an agreement on the tax refund ownership question, which both parties refer to as the "default rule." The FBOP Defendants, on the other hand, argue that the default rule should not be considered because the answer to the ownership question is found by implication from the language of the TAA. The Court agrees with the FDIC.

Even if the Court assumes, as the FBOP Defendants argue, that the TAA contains language from which FBOP's ownership of the tax refunds can be implied, basic principles of contract interpretation teach that the Court must consider the default rule, particularly where a literal interpretation of the contract language might "wreak[ ] unintended consequences" on the parties. *Wal-Mart Stores, Inc. Assocs.' Health & Welfare Plan v. Wells*, 213 F.3d 398, 402 (7th Cir. 2000). That was the holding of the Seventh Circuit in the *Wal-Mart* case, in which the court examined the language of an ERISA plan document. The question was whether the plan document had to be construed according to its "clear" import, which would be contrary to the default rule and lead to "anomal[ous]" results. *Id.* at 402. Because "[t]he plan document[ ] neither advert[ed] to the anomaly [that resulted from a literal interpretation] nor expressly repudiate[d] [the default rule]," the court concluded as a matter of "sound application of principles of contract interpretation" that the plan document did "not alter the background [default rule]." *Id.* at 402-03 (holding that "contracts—which for most purposes ERISA plans are—are enacted against a background of common-sense understandings and legal principles that the parties may not have bothered to incorporate expressly but that operate as default rules to govern in the absence of a clear expression of the parties' intent that they not govern").

The "default rule" contract analysis of *Wal-Mart* was validated by *U.S. Airways, Inc. v. McCutchen*, 133 S. Ct. 1537 (2013), in which the United States

Supreme Court referred to the default rule as a "gap-filling" principle, and explained that

> [t]he words of a [contract] may speak clearly, but they may also leave gaps. And so a court must often look outside the [contract's] written language to decide what an agreement means. In undertaking that task, a court properly takes account of background legal rules—the doctrines that typically or traditionally have governed a given situation when no agreement states otherwise.

*Id.* at 1549 (internal quotation marks and citations omitted). Like the Seventh Circuit, the Supreme Court emphasized that ignoring default or gap-filling rules in interpreting contracts "is likely to frustrate the parties' intent and produce perverse consequences." *Id.*

While *McCutchen* and *Wal-Mart* involved ERISA plans and hence applied federal common law contract interpretation principles, Illinois contract principles[22] are the same:

> Generally, the duty owed to a plaintiff is measured by the terms of the contractual obligation as reflected within the "four corners" of the contract. Yet, it is presumed that parties contract with knowledge of the existing law, and the statutes and laws in existence at the time a contract is executed are considered part of the contract. The rationale for this rule is that the parties to the contract would have expressed that which the law implies had they not supposed that it was unnecessary to speak of it because the law provided for it.

---

[22] The TAA does not contain a choice of law clause. The FBOP Defendants argue that the Court should apply Illinois law because FBOP and the Trustee are both citizens of Illinois. *See* R. 145 at 20. The FDIC does not appear to dispute application of Illinois law, and therefore the Court will assume that Illinois is the appropriate state law to apply. *See McFarland v. Gen. Am. Life Ins. Co.*, 149 F.3d 583, 586 (7th Cir. 1998) (where the parties do not dispute that Illinois law applies the court "need not investigate whether another forum's law would be more appropriate").

*Fox v. Heimann*, 872 N.E.2d 126, 136 (Ill. App. 2007) (internal quotation marks and citations omitted); *see also Bd. of Regents v. Wilson,* 326 N.E.2d 216, 220 (Ill. App. 1975) ("Contracts are presumed to have been entered into in the light of existing principles of law, (citation omitted) and the existing law is presumed to be a part of every contract (citation omitted) and contracts should be so understood and construed unless otherwise clearly indicated by the terms of the agreement.") (internal quotation marks and citation omitted); *see generally* 11 Williston on Contracts § 30:19 (4th ed.) ("[C]ontractual language must be interpreted in light of existing law, the provisions of which are regarded as implied terms of the contract, regardless of whether the agreement refers to the governing law. This principle applies to the common law in effect in the jurisdiction as well as to . . . statutes [and] . . . regulations, including provisions which affect the validity, construction, operation, effect, [and] obligations . . . of the contract.").

An example of an Illinois case applying gap-filling rules, which also involved a tax issue, is *U.S. Trust Co. of N.Y. v. Jones*, 111 N.E.2d 144 (Ill. 1953). There, the Illinois Supreme Court analyzed the question of whether the tax under consideration should be paid out of the trust corpus or out of distributable income. The language of the trust document suggested that the tax was to be paid out of the trust corpus. But the court declined to interpret the trust language literally in light of revenue laws, which would apply in the absence of that language and would require the taxes to be paid out of distributable income. Like the Seventh Circuit in *Wal-Mart* and the Supreme Court in *McCutchin*, the Illinois Supreme Court sought "to avoid the

unreasonable and impractical" consequences of a literal interpretation of the language of the document. *Id.* at 146. Avoiding unintended consequences is as much a part of contract interpretation as the "four corners" rule, as Judge Learned Hand explained in words quoted by the Illinois Supreme Court:

> The issue involves the baffling question which comes up so often in the interpretation of all kinds of writings: how far is it proper to read the words out of their literal meaning in order to realize their overriding purpose? * * * When we ask what (was) "intended," usually there can be no answer, if what we mean is what any person or group of persons actually had in mind. Flinch as we may, what we do, and must do, is to project ourselves, as best we can, into the position of those who uttered the words, and to impute to them how they would have dealt with the concrete occasion.

*Id.* (quoting *United States v. Klinger*, 199 F.2d 645, 648 (2d 1952)) (internal quotation marks omitted).

Applying these contract interpretation principles here means that the Court must consider not only the language of the TAA on which the FBOP Defendants rely, but also the background or "default" rule on which the FDIC relies and which would apply in the absence of an agreement to the contrary. The Court also must consider whether construing the Agreement in contravention of the default rule makes sense in light of the circumstances surrounding the agreement, and ask how the parties are likely to have dealt with the ownership question given those circumstances.[23] "When

---

[23] Illinois courts do not view consideration of the circumstances surrounding the execution of a contract as changing the terms of the agreement or creating an ambiguity where none exists. Instead, they consider those circumstances "*as a part of the agreement*, reflecting the clear intent of the signators." *Farmers Auto. Ins. Ass'n v. Kraemer*, 857 N.E.2d 691, 694 (Ill. App. 2006) (emphasis added); *see also Linn v.*

a contractual interpretation makes no economic sense, that's an admissible and, in the limit, a compelling reason for rejecting it . . . . The presumption in commercial contracts is that the parties were trying to accomplish something rational. Common sense is as much a part of contract interpretation as is the dictionary or the arsenal of canons." *Dispatch Automation, Inc. v. Richards*, 280 F.3d 1116, 1119 (7th Cir. 2002) (internal quotation marks and citations omitted); *see also Baldwin Piano, Inc. v. Deutsche Wurlitzer GmbH*, 392 F.3d 881, 883-84 (7th Cir. 2004) ("Businesses are not *compelled* to make sensible bargains, but courts should not demolish the economic basis of bargains that would be sound if the contract were given a natural reading.") (emphasis in original). If after applying these principles, the language of the TAA is of "such unequivocal clarity as to preclude," *U.S. Trust Co. of N.Y.*, 111 N.E.2d at 146, application of the default tax refund ownership rule, then the Court must interpret the TAA according to the contractual language. *See McCutchen*, 133 S. Ct. at 1549 (when an "express contract term . . . contradicts the background equitable rule . . . the agreement must govern"); *Wal-Mart Stores, Inc. Assocs.' Health & Welfare Plan*, 213 F.3d at 402 (where the contract contains "a clear expression of the parties' intent," then the default rules do not govern). But if the TAA "leaves space" for the default tax refund ownership rule "to operate," by for example "say[ing]

_____

*Clark*, 128 N.E. 824, 828 (Ill. 1920) (rule barring parol evidence "does not exclude evidence of the circumstances of the execution of the contract and of facts in connection with it which may tend to explain its meaning by showing the situation of the parties and all their relations to one another and the subject-matter of the contract"); *Wells Fargo Funding v. Draper & Kramer Mortg. Corp.*, 608 F. Supp. 2d 981, 989 (N.D. Ill. 2009) (holding that contracts "are not interpreted in a vacuum," but instead are to be interpreted in light of "the circumstances surrounding the transaction in order to discern the parties's intent").

nothing specific about that issue," it does not clearly repudiate the rule. *McCutchen,* 133 S. Ct. at 1549. In that case, the Court will presume that the parties contracted with the default rule in mind, which the Court will deem to have been incorporated into the Agreement as if expressly set forth therein. *Fox*, 872 N.E.2d at 136; *Bd. of Regents,* 326 N.E.2d at 220.

## III.  THE FBOP DEFENDANTS' RULE 12(c) MOTION FOR JUDGMENT AS A MATTER OF LAW ON COUNTS I-II

### A.  THE "DEFAULT" RULE REGARDING OWNERSHIP OF TAX REFUNDS

#### 1.  ILLINOIS LAW: TAX REFUNDS OF JOINT FILERS BELONG TO THE TAXPAYER WHO PAID THE TAXES

Under Illinois law,[24] the party who paid the taxes, or, more accurately, bore the economic burden of the taxes, is the owner of any refunds resulting from those taxes. *See, e.g., Graver*, 381 N.E.2d at 1046 (stating that the "majority and better view of the law" is found in *Duden v. United States*, 467 F.2d 924, 929 (Ct. Cl. 1972), where it was held "that wife had no property interest in funds represented by income tax refund check made payable jointly to husband and wife" because "husband was the sole producer of income"); *In re Lock*, 329 Bankr. 856, 859-60 (Bankr. S.D. Ill. 2005) ("The Court is not aware of any Illinois case that contradicts the rule of *Graver*, and, accordingly, finds that under Illinois property law, non-earning spouse who makes no contribution to overpayments resulting in a tax refund is not entitled to the

---

[24] Illinois law determines the applicable default rule for ownership of tax refunds. *See* Section I and footnote 22, *supra; see also Graver v. Ill. Dep't of Pub. Aid*, 381 N.E.2d 1044, 1046 (Ill. App. 1978) ("The majority rule of law in our nation is that local law determines ownership of funds received with respect to income reported on joint federal income tax returns.").

couple's refund check."); *Lincoln Nat'l Bank v. Cullerton*, 310 N.E.2d 845, 848-49 (Ill. App. 1974) (holding that, because "[t]he tax money actually came from all of the shareholders," the shareholders were entitled under state tax statute to seek refunds). This rule is based on common law property principles that are not unique to Illinois. *See Graver*, 381 N.E.2d at 1046 (relying on *Duden*, 467 F.2d at 929, which applied Oregon law); *In re Lock*, 329 Bankr. at 860 n.4 ("Courts applying state law in other jurisdictions have likewise found that a non-income producing spouse is not entitled to a property interest in a joint tax refund check.").[25]

Illinois law also provides that the filing of a joint tax return does not divest the person who paid the taxes of his ownership interest. *See In re Lock*, 329 Bankr. at 860 ("The mere signing of a joint return by a spouse to obtain the benefit of perceived tax advantages does not thereby effect a conversion of funds of that spouse into property of the other. Although joint federal filings are authorized by . . . the Internal Revenue Code, . . . this provision does not propose, nor does it imply, that any property rights are altered by a joint income tax filing.").[26] A similar default rule regarding the effect of joint filing on property rights applies in the consolidated tax

---

[25] *See also United States v. MacPhail*, 149 Fed. App'x 449, 453 (6th Cir. 2005) ("courts have consistently found that a refund should be disbursed in proportion to the amount each spouse paid to the taxes owed," quoting Rev. Rul. 74-611, 1974-2 C.B. 399 ("the wife having paid the entire amount of the tax is entitled to the entire amount of the overpayment")); *Epstein v. United States*, 357 F.2d 928, 937 (Ct. Cl. 1966) ("recovery may be had only if plaintiff can show that he himself had borne the economic burden of the taxes by paying them out of his own pocket and had not collected them from members").

[26] *See also MacPhail*, 149 Fed. App'x at 453 ("'a joint income tax return does not create new property interests for the husband or the wife in each other's income tax overpayment'" (quoting Rev. Rul. 74-611, 1974-2 C.B. 399)).

return context. Thus, "a corporation does not lose any [property] interest it had . . . because of its status in a group of affiliated corporations that file a consolidated tax return." *The Official Comm. of Unsecured Creditors v. PSS Steamship Co.* (*In re Prudential Lines Inc.*)*, 928 F.2d 565, 571 (2d Cir. 1991); *see also Wolter Constr. Co. v. Comm'r of Internal Rev. Serv.*, 634 F.2d 1029, 1038 (6th Cir. 1980) ("consolidated return computations are not . . . based on a consolidated accounting . . . as though the properties of the subsidiaries were owned by the parent"; it "is not the functional equivalent of a merger"). Instead, "[t]he common parent acts as an agent on behalf of all the members of the consolidated group for the convenience and protection of [the] IRS only. The corporations retain their separate identities and the property interests of the subsidiaries are not absorbed by the common parent." *In re Prudential Lines Inc.,* 928 F.2d at 571 (internal quotation marks and citation omitted). Similarly, under Illinois law, a taxpayer is not divested of his property rights in tax refunds by virtue of having used an agent to forward his tax payments to the taxing authority. *See, e.g., Lincoln Nat'l Bank*, 310 N.E.2d at 849 (holding that "a long-standing custom, utilized purely for administrative reasons, [which] permitted the banks themselves to act in behalf of the shareholders as a conduit for payment to the taxing authorities," did not eliminate the property interest of the shareholders in recovering the taxes paid on their behalf); *see also 8x8, Inc. v. United States*, 125 Fed. Cl. 322, 330 (Feb. 29, 2016) ("The money that 8x8 remitted to the IRS belongs to its customers, from whom 8x8 collected it for purposes of having them (and not 8x8) pay the excise tax.").

## 2. THE *BOB RICHARDS* CASE

The FBOP Defendants ignore Illinois law regarding ownership of tax refunds.

Instead, the FBOP Defendants characterize the FDIC's argument for a "default" rule

as being based on the Ninth Circuit's decision in *Western Dealer Management, Inc. v.*

*England (In re Bob Richards Chrysler–Plymouth Corp.),* 473 F.2d 262 (9th Cir. 1973).

In the Court's view, however, the FBOP Defendants' targeting of the *Bob Richards*

case is a straw man. While *Bob Richards* is consistent with the FDIC's position, it

does not actually address the tax refund ownership question. Therefore, attacking

and/or distinguishing the Ninth Circuit's ruling in that case, as the FBOP

Defendants do, does little to advance the FBOP Defendants' arguments.

*Bob Richards* holds that tax refunds of a consolidated tax group should inure

to the benefit of the subsidiary rather than the parent company. In reaching this

conclusion, the Ninth Circuit reasoned as follows:

> Normally, where there is an explicit agreement, or where
> an agreement can fairly be implied, as a matter of state
> corporation law the parties are free to adjust among
> themselves the ultimate tax liability. But in the instant
> case the parties made no agreement concerning the
> ultimate disposition of the tax refund. Absent any differing
> agreement we feel that a tax refund resulting solely from
> offsetting the losses of one member of a consolidated filing
> group against the income of that same member in a prior or
> subsequent year should inure to the benefit of that
> member. Allowing the parent to keep any refunds arising
> solely from a subsidiary's losses simply because the parent
> and subsidiary chose a procedural device to facilitate their
> income tax reporting unjustly enriches the parent.

*Id.* at 264-65.

*Bob Richards* primarily involves a default rule concerning *allocation* and not *ownership* of tax refunds in the consolidated tax filing context. The default allocation rule applied by the *Bob Richards* court is that "a tax refund resulting solely from offsetting the losses of one member of a consolidated filing group against the income of that same member in a prior or subsequent year should inure to the benefit of that member." *Id.* at 265. A number of the cases on which the FBOP Defendants rely (*see* footnote 17, *supra*) hold that the rule enunciated in *Bob Richards* is irrelevant to resolving the tax refund ownership question where the case involves a tax allocation agreement. The Court agrees that the default tax *allocation* rule set forth by the *Bob Richards* court does not apply to this case because the TAA expressly states the allocation rules for determining the extent to which each member of the Consolidated Group is entitled to enjoy the benefit of consolidated tax refunds. *See* R. 145 at 44 (TAA, ¶ 9).[27] If that were the issue in this case, however, the FBOP Defendants would have won the battle but lost the war, because applying the tax allocation rules in the TAA leads to the same result as applying the *Bob Richards* allocation rule, which is that the Banks, not FBOP, are entitled to enjoy the benefit of the tax refunds.[28]

---

[27] The FBOP Defendants have attached the TAA to their motion for judgment on the pleadings. The FDIC does not dispute that the Court can consider the TAA in ruling on the parties' cross-motions for judgment on the pleadings. *See Phillips v. Prudential Ins. Co. of Am.,* 714 F.3d 1017, 1019-20 (7th Cir. 2013).

[28] Section 9 of the TAA states in relevant part as follows:

> Any subsequent adjustments for overassessments . . . resulting from any amendments to, or examinations by the Internal Revenue Service or any state tax agency, of the

Apart from enunciating a default tax allocation rule, *Bob Richards* impliedly held that the tax benefit which the subsidiary bank was entitled to enjoy was a property right. *See Bob Richards,* 473 F.2d at 265 ("Allowing the parent to keep [the] refunds . . . unjustly enriches the parent."). But the *Bob Richards* court was not expressly ruling on the property right question because that question was not put at issue in the case. The default tax refund ownership rule was at issue, however, in later case law applying the *Bob Richards* default allocation rule in situations like *Bob Richards* where a tax allocation agreement did not exist, Those cases apply the *Bob Richards* default allocation rule (*i.e.,* the subsidiary who generated the losses that led to the consolidated tax refunds is entitled to enjoy the benefit of those refunds), but then limit the reach of the default allocation rule by further holding that the subsidiary may only recover refunds *up to the amount of taxes actually paid by it. See, e.g., Jump v. Manchester Life & Cas. Mgmt. Corp.,* 579 F.2d 449, 454 (8th Cir. 1978) (limiting the subsidiary's recovery to the amount required to offset its tax payments because the court did not see any reason under the applicable state law (Missouri) "to divert a refund of tax dollars paid by other members of the affiliated group to reward [the subsidiary] for the fortuitous effect its losses, in combination

---

> tax return filed for the year, *to the extent that such adjustment is attributable to the separate operations of a member of the affiliated group, shall be . . . credited by FBOP to the members of the affiliated group . . .* Any additional credits which cannot be directly attributable to the separate operations of a member of the affiliated group shall be proportioned to the tax currently payable by each member of the affiliated group.

R. 145 at 44 (emphasis added).

with the earnings of other group members, had on the consolidated tax liability of the group").[29]

Because the issue of property rights in the tax refunds was not in dispute in the *Bob Richards* opinion, that case does not stand for the proposition that the existence of a tax allocation agreement renders the default tax refund ownership rule irrelevant. *See Stanek v. St. Charles Cmty. Unit Sch. Dist. No. 303*, 783 F.3d 634, 640 (7th Cir. 2015) (unexamined assumptions of prior cases do not control the disposition of a contested issue). The indisputable proposition that a tax allocation agreement resolves issues of tax allocation does not mean that a tax allocation agreement necessarily also resolves the issue of whether the subsidiary banks have a property right in any tax refunds. *See, e.g., Sosne*, 2016 WL 775176 at *2 ("The TSA includes provisions addressing distribution of refunds, but the TSA does not address ownership of the refunds."); *In re Nelco, Ltd.*, 264 Bankr. at 809 (where court acknowledges its earlier ruling that the applicable tax allocation agreement "did not

---

[29] *See also Nisselson v. Drew Indus., Inc. (In re White Metal Rolling & Stamping Corp.)*, 222 Bankr. 417, 425 (Bankr. S.D.N.Y. 1998) ("The right to the refund is limited, however, to the amount of tax that the loss corporation paid during the carryback year. The loss corporation has no right to the excess, and has no rights against the other affiliated group members who benefit from the carryback."); *In re First Cent. Fin. Corp.*, 269 Bankr. at 489 ("the subsidiary is not entitled to share in consolidated refund[s] in an amount greater than the amount paid by the subsidiary for its tax liability"); *Cohen v. Un-Ltd. Holdings, Inc. (In re Nelco, Ltd.)*, 264 Bankr. 790, 810 (Bankr. E.D. Va. 1999) ("The case law is clear that a member of a consolidated group can participate in a tax refund only to the extent of tax payments made by that member."); *Fed. Deposit Ins. Corp. v. Brandt (In re Fla. Park Banks, Inc.)*, 110 Bankr. 986, 989 (Bankr. M.D. Fla. 1990) ("[B]ecause both Park Bank and the Debtor have losses in 1985, each member should be entitled to recover only taxes it had previously paid. Again, Park Bank would be entitled to the entire refund since only Park Bank paid the refunded taxes.").

address the allocation of tax refunds"). As the court observed in *In re Bancorp,* slip op at 10 (R. 174-1 at 11), "[p]arties to a contract do not override a gap-filling rule simply by reaching explicit agreement on some other matter." The cases on which the FBOP Defendants rely for the proposition that the default rule is irrelevant because of the existence of a tax sharing agreement are essentially circular: they reason that the default rule does not apply because the tax sharing agreement resolves the ownership question, when the very purpose for considering the default rule is to decide *whether* the tax sharing agreement resolves the ownership question. Accordingly, the Court rejects the FBOP Defendants' argument based on these cases that the parties' explicit agreement in the TAA concerning how to allocate tax refunds negates the need to interpret the TAA on the ownership question using gap-filling rules like the Illinois tax refund ownership rule.

### 3. FEDERAL COMMON LAW ARGUMENT

The FBOP Defendants also argue that the default rule should be ignored because *Bob Richards* applies federal common law, and the Supreme Court has held that "there is no free-ranging federal common law to provide gap-filing rules in favor of the FDIC-R." R. 166 at 9 n.5. As already noted, however, Illinois' default tax refund ownership rule does not depend on the *Bob Richards* case. Instead, it is based on state law property principles. In any event, the Court does not agree that the *Bob Richards* case is an example of the inappropriate application of federal common law. The Supreme Court has defined federal common law as "the judicial 'creation' of a special federal rule of decision" that "'displace[s] state law.'" *Atherton v. Fed. Deposit Ins. Corp.*, 519 U.S. 213, 218 (1997) (citation omitted); *see also O'Melveny & Myers v.*

*Fed. Deposit Ins. Corp.,* 512 U.S. 79, 87 (1994) (creation of federal common law rule "alter[ ]s" otherwise applicable law). The FBOP Defendants do not cite any state law they contend the *Bob Richards* court displaced or altered. While the *Bob Richards* court did not specifically cite a source of law, its holding is based on the general equitable principle of preventing unjust enrichment. *See* 473 F.2d at 264-65; *see also 8x8, Inc.*, 125 Fed. Cl. at 327 (purpose of provision in tax code providing that a tax collector may not secure a refund of taxes it collected from taxpayers and remitted to the IRS on their behalf where it has neither repaid the taxpayers nor obtained the taxpayers' consent, was to "preclude what would otherwise result in unjust enrichment"). The FBOP Defendants may disagree with the *Bob Richards* court's application of unjust enrichment principles to the consolidated tax filing context, but it has not shown that, by applying those principles, the court was creating federal common law to displace state law.

### 4. *UNITED DOMINION* ARGUMENT

The FBOP Defendants also argue that *Bob Richards*, and by extension, the default rule, is contrary to the Supreme Court's decision in *United Dominion Industries, Inc. v. United States*, 532 U.S. 822 (2001). *United Dominion* involved a particular type of carry-back loss called a product liability loss ("PLL"), which, under the Internal Revenue Code ("IRC"), is calculated by taking the total of a taxpayer's product liability expenses ("PLEs") up to the amount of its NOL, which means that "a taxpayer with a positive annual income, and thus no NOL, may have PLEs but can have no PLL." *Id.* at 825. The question in *United Dominion* was whether a

consolidated group's PLL could be calculated by aggregating PLLs separately determined company-by-company, or whether it instead must be calculated on a consolidated, single-entity basis. The Supreme Court rejected the aggregate-of-separate PLLs approach on the theory that the IRC and applicable Treasury regulations define net operating losses exclusively as *consolidated* net operating losses. Given this statutory definition, the Court observed, it was "fair to say, as United Dominion says, that the concept of separate NOL 'simply does not exist.'" *Id.* at 830 (quoting Brief for Petitioner).

The FBOP Defendants rely on this quoted sentence to argue that the FDIC's position in this case based on the default rule relies on the erroneous premise that the tax refunds stem from the Banks' separate NOLs when in fact separate NOLs do not exist. *United Dominion,* however, addressed how to calculate the tax liability owed by a consolidated group to the IRS, while this case concerns the entirely different issue of ownership rights in tax refunds as between members of a consolidated tax group. Moreover, *United Dominion* in any event "does not stand for the blanket proposition that [all deductions are] determined at the consolidated return level." *Brunswick Corp. v. United States,* 2008 WL 5387086, at *8 (N.D. Ill. Dec. 22, 2008). Instead, it stands for the much narrower proposition "that courts considering whether to look at the consolidated return level or the subsidiary level should look to the applicable IRC provisions and regulations." *Id.* In this case, there

are no applicable IRC provisions and regulations.[30] The rules for allocating tax liability among members of the Consolidated Group are found in the TAA. And the TAA, unlike the IRC, does recognize separate NOLs. In short, the Supreme Court's decision in *United Dominion* has no bearing on this case.

In addition to the above, the question of separate versus consolidated NOLs is beside the point, because the issue here is *not* whether the Banks have a property interest in their NOLs. *See The Asher Candy Co. v. MAFCO Holdings, Inc., (In re Marvel Entm't Grp., Inc.*), 273 Bankr. 58, 85 (D. Del. 2002) (cited by the FBOP Defendants) (citing *United Dominion* for the proposition that, "[i]n the context of the consolidated tax filing group, the hypothetical stand-alone NOLs that were calculated for the purposes of the Tax Sharing Agreement were not property of the debtor because they were a legal fiction"). While the Banks' NOLs may have led to the refunds, and also factor into the computation under the TAA for allocating the refunds, the issue here is whether the Banks had a property interest in the tax refunds themselves, not the items that gave rise to those refunds or determined their allocation among members of the Group. As the bankruptcy court stated in *In re Indymac Bancorp, Inc.,* 2012 WL 1037481 (Bankr. C.D. Cal. Mar. 29, 2012), a debate about whether the NOLs themselves represent a property interest is "a sideshow and not material to resolution of this dispute." *Id.* at 22; *see also In re Feiler*, 218 F.3d at 956 ("Whether the NOLs themselves are considered property is something of a red

---

[30] *See Capital Bancshares, Inc. v. Fed. Deposit Ins. Corp.*, 957 F.2d 203, 206 (5th Cir. 1992) (the Code "is silent as to whether 'a tax saving must or should inure to the benefit of the parent company or of the company which has sustained the loss that makes possible the tax saving'") (quoting *Bob Richards,* 473 F.2d at 264).

herring[ ] . . . [because] the property [the debtors] gave up was the tax refund—the NOLs are simply an accounting method for figuring their entitlement to the refund under the present tax code.").

### 5. UNJUST ENRICHMENT ARGUMENT

The FBOP Defendants' final argument against the Court's consideration of a default rule regarding tax refund ownership is that unjust enrichment is not present here because FBOP seeks to use the tax refunds to pay its creditors rather than keep the money for itself. But both the Banks and FBOP are insolvent and have creditors. Moreover, if the FDIC's allegations regarding FBOP's transfer of security interests to the Senior Secured Creditors and Sub-Debt Holders turn out to be true, then this argument seems somewhat disingenuous. The FDIC alleges that FBOP used the tax refunds to structure a settlement with these other creditors that not only gave a preference to those creditors at the expense of the Banks, but also personally enriched FBOP's Chairman and high level Bank and FBOP officers to the detriment of the Banks. None of the cases on which the FBOP Defendants rely involved allegations of pre-bankruptcy shenanigans similar to those alleged here.[31]

In any event, even if the pre-Assignment transactions between FBOP and the Senior Secured Creditors and Sub-Debt Holders are not taken into account, FBOP's

---

[31] The FBOP Defendants argue that the FDIC's allegations seek to portray "legitimate efforts between FBOP and its lenders to settle a $250 million lawsuit over commercial loans" as "a conspiracy to cheat the FDIC-R." R. 156 at 12. Regardless of whether the FDIC's characterization of the transactions at issue is accurate, it is based on reasonable inferences from the facts alleged in the complaint. And, as previously noted, the Court must accept the well-pled facts and all reasonable inferences therefrom as true for purposes of ruling on a motion for judgment on the pleadings. *See Alexander*, 994 F.2d at 336.

use of the tax refunds to satisfy its other creditors is irrelevant. If FBOP is not the owner of the tax refunds, then it will be unjustly enriched by retaining those funds, regardless of FBOP's intention of making the funds available for distribution to its other creditors.[32] An argument similar to the FBOP Defendants' unjust enrichment argument here was made by the parent bank holding company in *Capital Bancshares.* In that case, the parent company argued it would not be unjustly enriched if the court allowed it to keep tax refunds generated by its subsidiary because it had been forced by "the Bank's unsatisfactory primary capital position . . . to borrow substantial amounts of money from third party lenders for the benefit of the Bank." 957 F.2d at 208. The parent company claimed that "equitable considerations" thus weighed in *its* favor in that it had "assigned a portion of the tax refund claims to the third party lenders" whose loans had "benefitted the Bank, and ultimately the FDIC." *Id.* The court was "not moved by the equities" cited by the parent company, stating that there was no evidence the Bank's board of directors had agreed to the parent company's pledging of *the Bank's* property to the third party lenders. *Id.* Furthermore, the court said, "[e]ven if there had been no loans from third party lenders and had the Bank failed sooner, the Bank could still have generated the same refund had it filed separately with the IRS." *Id.*

---

[32] *See, e.g., In re Nelco, Ltd.*, 264 Bankr. at 810 ("To allow a member of a consolidated group to receive a tax refund when the member did not contribute to the tax payment would result in the unjust enrichment of that member."); *In re White Metal Rolling & Stamping Corp.*, 222 Bankr. at 424 ("principles of unjust enrichment dictate that a loss corporation is entitled to receive the refund generated by the application of its NOL carryback to reduce the amount of income tax that it paid during the carryback year").

The FBOP Defendants' unjust enrichment argument is similarly unpersuasive. Moreover, the cases cited by the FBOP Defendants are not to the contrary. Instead, those courts reject equitable arguments raised by the subsidiary only after first holding that the subsidiary did not have a property interest in the tax refunds. As a result, they merely stand for the truism that, when an unsecured creditor receives less than the full amount of a debt the insolvent corporation had promised to pay it, that "is not injustice, it is bankruptcy." *In re First Cent. Fin. Corp.*, 377 F.3d at 217. That same argument has no force whatsoever if the tax refunds are found to be property of the subsidiary. *See Pearlman v. Reliance Ins. Co.*, 371 U.S. 132, 135-36 (1962) ("The Bankruptcy Act simply does not authorize a trustee to distribute other people's property among a bankrupt's creditors.").

**B.    THE TAA**

Turning to the TAA, the Court begins its analysis, as dictated by Illinois contract interpretation principles, with the presumption that the TAA incorporates the default tax refund ownership rule pursuant to which the Banks are the owners of the tax refunds to the extent that they bore the economic burden of the taxes on which the refunds are based. In construing whether the TAA overrides this presumption, the Court will consider not only the language of the TAA but the circumstances surrounding the parties' execution of that Agreement and a common sense understanding of the parties' likely intent.

### 1. SURROUNDING CIRCUMSTANCES SUPPORT THE DEFAULT TAX REFUND OWNERSHIP RULE

The circumstances surrounding the execution of the TAA include the economics of consolidated tax filing and the reasons why, in light of those economics, the parties would enter into the TAA. Consolidated tax filing is beneficial to an affiliated group of companies because it permits a company with income to offset that income with the losses of an affiliated company without income. Typically, as here, members of a consolidated tax group will enter into a tax allocation agreement to establish the terms on which a company with net income will compensate an affiliated company with net operating losses for the use of those losses to reduce the tax liability of the income-producing company. Consequently, although an income-producing member's tax liability may be less under the consolidated filing as a result of its ability to use the off-setting losses of another member of the group, the income-producing member does not experience any net benefit from filing a consolidated tax return because it has to pay the loss member for use of the loss. On the other hand, the loss member with no positive net income is better off having filed as part of a consolidated tax group because it receives compensation from the income-producing group member through the tax sharing agreement for losses otherwise of no use to it.

The FDIC argues that typically banks that are part of a consolidated tax group are income-producing members, while the parent bank holding company and its non-banking subsidiaries are loss members. From a group perspective, therefore, consolidated tax filing in the banking context facilitates transfers of money from the banks to the parent and the parent's non-banking subsidiaries through tax allocation

agreements that require the banks to compensate the parent and the non-banking subsidiaries for use of those entities' net operating losses. *See* R. 153 at 10. What actually happened here in the last year in which the Banks were operating before the FDIC took over is the reverse of the typical situation; that is, the Banks had net operating losses of their own, which they were entitled under the law to use to generate tax refunds by filing amended tax returns for past years in which they had net income and paid taxes. Given the economics of what was expected when the Banks entered into the TAA, however, it makes little sense for the Banks to have agreed in the TAA to give up their property rights in tax refunds to which they otherwise would have been entitled had they not entered into the TAA. Because the Banks did not receive a net benefit from the consolidated tax filing, they had no incentive to give up their property rights. *See Wells Fargo Funding,* 608 F. Supp. 2d at 989 ("Why would DKMC's payment of the settlement amount—which only covered fifteen loans—absolve the guarantors of their obligations under their Guaranty Agreements of other loans not being settled? Such largesse on Wells Fargo's part would make no commercial sense—at least none that the defendants can point to[.]"). To construe the TAA as transferring the Banks' property interest in tax refunds to FBOP, the Court essentially would have to hold that the Banks entered into an agreement that not only provided them with no benefits but also made them worse off when the unexpected later happened and they experienced net operating losses, which, had they filed separately, would have led to tax refunds directly payable to them. *See Lubin,* 2011 WL 825751, at *6 (citing to "[t]he economic reality of the

arrangement between Bancshares and the Bank" in ruling against the parent company on the tax refund ownership question).

In addition to economics, the FDIC points out that the Federal Reserve Act requires that an extension of credit from a banking institution to its non-banking parent company must be secured by collateral at the time of the transaction. And another provision of the Act requires that extensions of credit from a bank to its parent company must be made on terms that would be provided in comparable transactions, which would include provisions at the inception for the payment of interest at an appropriate rate. *See* 12 U.S.C. § 371c-1. "[A]n interpretation which renders a contract lawful is preferred over one which renders it unlawful." 11 WILLISTON ON CONTRACTS § 32:11. But the Court does not need to decide whether banking laws in fact would be violated if the TAA is interpreted as transferring the Banks' ownership rights in the tax refunds to FBOP, because it at least *arguable* that the banking laws would be. *See In re NetBank, Inc.*, 729 F.3d at 1351 n.8 (stating that the absence of provisions for interest and collateral was significant to deciding whether ownership of refunds was transferred to parent company by tax allocation agreement given that, "under 12 U.S.C. § 371c, banks are restricted in their ability to engage in certain transaction with affiliates—including issuing a loan or extension of credit without ensuring sufficient collateral protections"); *In re BSD Bancorp.*, slip op. at 11-12 (stating that, "[f]or a debtor-creditor relationship to arise between Bancorp [the parent] and Bank, then, there would presumably have to be some

further agreement through which Bancorp supplied collateral meeting the requirements of § 371c(c)(l)").[33]

In fact, the Federal Reserve has suggested that it might conclude an unlawful extension of credit resulted from a situation where a bank is not immediately paid the tax refunds received by the parent company to which the subsidiary was entitled under a tax allocation agreement. *See* Interagency Policy Statement on Income Tax Allocation in a Holding Company Structure, 63 Fed. Reg. 64757-01 at 64758, 1998 WL 804364(F.R.) ("1998 Policy Statement") ("If a refund is not made to the institution within [a reasonable] period, the institution's primary federal regulator may consider the receivable as either an extension of credit or a dividend from the subsidiary to the parent.").[34] The Federal Reserve cautions that "[a]ny practice that

---

[33] *See also Lincoln Savs. & Loan Ass'n v. Wall*, 743 F. Supp. 901, 908-11 (D.D.C. 1990) (holding that agreement requiring a thrift to make large payments to its parent, ostensibly for the purpose of paying the consolidated group's tax liability, runs afoul of the then-existing regulatory restrictions on a thrift's lending to its parent). In *In re IndyMac Bankcorp, Inc.,* the Ninth Circuit rejected the FDIC's argument that a tax sharing agreement among members of a consolidated group that included banks fell within the ambit of 12 U.S.C. § 371c-1. But the court's only analysis of the issue was the statement that "[a] run-of-the-mill contract claim is not a 'covered transaction' under the federal banking laws cited by the FDIC." 554 Fed. App'x at 670. While the *IndyMac* court acknowledged that "covered transactions" include "extensions of credit," 12 U.S.C. § 371c(b)(7)(A), it gave no indication that it considered the broadly worded definition of that term contained in the Treasury Regulations. *See* 12 C.F.R. § 223.3(o)(1) and (6) ("'Extension of credit' to an affiliate means the making or renewal of a loan, the granting of a line of credit, or the extending of credit in any manner whatsoever, including on an intraday basis, to an affiliate. An extension of credit to an affiliate includes, without limitation: (1) An advance to an affiliate by means of an overdraft, cash item, or otherwise . . . and (6) *any other similar transaction* a result of which an affiliate *becomes obligated to pay money (or its equivalent).*") (emphasis added).

[34] The 1998 Policy Statement "reiterates and clarifies the position the [Federal Reserve Board of Governors] will take as [it] carries out [its] supervisory

45

is not consistent with [its] polic[ies] may be viewed as an unsafe and unsound practice," *id.,* which could prompt either informal or formal corrective action. This means that if the Banks agreed to transfer their property rights in the tax refunds to FBOP, they did so knowing that federal regulatory authorities might consider the agreement to violate banking laws. As the FDIC argues, it does not make sense to say that a "bank would brazenly disregard regulatory guidance . . . and intentionally transfer all of its rights to future tax refunds to its parent in exchange for an unsecured debt obligation." R. 146 at 36.

The FBOP Defendants argue that it cannot be correct that interpreting the TAA as transferring the Banks' ownership rights to FBOP defies common sense because numerous courts have construed similar tax allocation agreements as providing that the banks in those cases did just that. All of those cases, however, address the issue in the bankruptcy context where the court was applying the definition of property under 11 U.S.C. § 541(a). While the definition of property is the same both inside and outside the bankruptcy context, several of the courts in question appeared to justify their interpretation of the agreements in question by the fact that bankruptcy laws were involved.[35] In addition, those courts have found an

---

responsibilities for institutions regarding the allocation and payment of income taxes by institutions that are members of a group filing a consolidated return." 63 Fed. Reg. 64757-01 at 64757, 1998 WL 804364.

[35] *See, e.g., In re United W. Bancorp, Inc.,* 558 Bankr. at 434 (distinguishing *In re BankUnited Financial Corp.*, which found that the tax allocation agreement did not divest the subsidiary of its ownership interest, on the basis that the Eleventh Circuit in that case "made no mention of the Bankruptcy Code at all"); *id.* at 436 (finding the Sixth Circuit's opinion in *AmFin Financial Corp.*—which reversed the bankruptcy court's ruling in favor of the parent company on the ground that the tax allocation

"unambiguous" intent to create a debtor-creditor relationship only by ignoring the default tax refund ownership rule. Under Illinois law, as previously discussed, the default tax refund ownership rule is the background principle against which the parties contracted and is presumed to be part of the agreement. Rather than consider the default tax refund ownership rule, the courts in question appear to apply a different default rule—one that holds that accounting and allocation rules such as those set out in corporate tax sharing agreements create or give rise to a debtor-creditor "legal construct."[36] But a debtor-creditor relationship can only be "created by consent." *In re BankUnited Fin. Corp.*, 727 F.3d at 1108. And given the Banks' ownership interest in the tax refunds under Illinois law, it is hardly sensible to say that the Banks consented to give up their ownership rights in favor of a contractual debt. "When there is a choice among plausible interpretations, it is best to choose a reading that makes commercial sense, rather than a reading that makes the deal one-sided." *Baldwin Piano, Inc.*, 392 F.3d at 883; *see also Sutter Ins. Co. v. Applied*

agreement was ambiguous on the ownership question—"not especially persuasive" because the Sixth Circuit "did not directly address the central bankruptcy issues," noting that § 541 was "not even mentioned" by that court); *see also In re Team Fin., Inc.*, 2013 WL 492854, at *5 (holding that it was irrelevant that "interpreting the tax allocation as according ownership interest in parent company would amount to an unsafe and unsound banking practice and a sanctioned affiliate transaction," because "what ultimately matters in this proceeding is whether the agreement confers a substantial ownership interest on [the parent] that its creditors are entitled to have preserved as estate property") (emphasis added).

[36] *See, e.g., In re Indymac Bancorp, Inc.*, 2012 WL 1037481, at *14 (holding that "right to receive fungible 'payments' using a formula calculated as if the Bank were a separate tax filer" is "meaningfully different from the right to receive specific refunds upon receipt," and is considered under the law to "evidence[ ] a debtor-creditor relationship," and concluding "that none of [the FDIC's arguments] succeeds in defeating the *basic legal construct* that results under the TSA") (emphasis added).

*Sys., Inc.*, 393 F.3d 722, 726 (7th Cir. 2004) ("'[W]here a contract is susceptible to one of two constructions, one of which makes it fair, customary, and such as prudent men would naturally execute, while the other makes it inequitable, unusual, or such as reasonable men would not be likely to enter into, the interpretation which makes a rational and probable agreement must be preferred.'") (quoting *NutraSweet Co. v. Am. Nat'l Bank & Trust Co. of Chi.*, 635 N.E.2d 440, 445 (Ill. App. 1994)). Thus, even if the debtor-creditor construct applied here—which is arguable[37]—the applicable contract interpretation principles point to the default tax refund ownership rule over the debtor-creditor construct because there is no reason to conclude that the Banks would have agreed to give up their ownership interest in the tax refunds.

---

[37] In Illinois, "a debtor-creditor relationship is created when a party (the creditor) voluntarily transfers his property to another (the debtor)." *Bill Marek's The Competitive Edge, Inc. v. Mickelson Group, Inc.*, 806 N.E.2d 280, 287 (Ill. App. 2004) (citing *Katz v. Belmont Nat'l Bank of Chi.*, 491 N.E.2d 1157 (Ill. 1986); *In re Thebus*, 483 N.E.2d 1258 (Ill. 1985); and *Gen. Motors Corp. v. Douglass,* 565 N.E.2d 93 (Ill. App. 1990)). If the funds in question were received from a third party, no debt is created. *See Bill Marek's The Competitive Edge, Inc.*, 806 N.E.2d at 287 ("[T]here was no creditor-debtor relationship between plaintiff and defendant. Plaintiff never voluntarily transferred funds to defendant. Rather, defendant mistakenly received plaintiff's funds from a third party."); *Roderick Dev. Inv. Co. v. Cmty. Bank of Edgewater*, 668 N.E.2d 1129, 1135 (Ill. App. 1996) (holding that the relationship between the parties was not one of debtor-creditor "because the plaintiff never voluntarily transferred funds to the Bank"; instead, the Bank received the funds to which the plaintiff claimed entitlement from a third party). While the issue has not been addressed by the parties, it seems to the Court that the Illinois debtor-creditor default rule is inapplicable here because FBOP did not receive the tax refunds from the Banks; it received them from a third party, the IRS.

## 2. THE TAA DOES NOT CLEARLY REPUDIATE THE DEFAULT TAX REFUND OWNERSHIP RULE

The FBOP Defendants cite to a number of provisions of the TAA which they argue demonstrate an intent to create a debtor-creditor relationship. The Court will consider each of these.

### a. TAX ALLOCATION AND PAYMENT PROVISIONS

The FBOP Defendants rely on provisions of the TAA intended to address the allocation of tax benefits and the payment of tax liability, arguing that an implied debtor-creditor relationship can be inferred from those provisions. The relevant contractual provisions include §§ 1, 2, and 4-7. Section 1 provides that each Group member is to calculate the amount of taxes it would have incurred had it filed a separate tax return. Section 2 provides that each Group member is to adjust its separate tax liability based on a set of rules set out in §§ 4-7, which govern the circumstances under which a Group member is or is not entitled to be compensated for a tax benefit attributable to that member's operations. For the most part, these rules benefit the member who is identified with the income or losses that led to the tax savings. The separate adjusted tax liabilities of each Group member are then totaled. If the Consolidated Group's actual tax liability is less than the aggregate separate tax liabilities (a consolidated tax savings), then § 2(b) provides that the tax savings is allocated among the Group members taking into account the rules set forth in §§ 4-7. If the consolidated tax savings cannot be specifically identified and attributed to a particular member of the Group, then § 2(b) provides that the tax savings is allocated among the Group members in proportion to the tax currently

payable by each member as calculated on a separate return basis. If the Group's consolidated tax liability is greater than the aggregate separate basis tax liability of the Group's members (a consolidated tax loss), then § 2(a) provides that the excess liability is attributed to FBOP.[38] Section 9 provides that the allocation of tax benefits and liabilities provided for in the preceding sections of the Agreement is to be effected through credits between and among members of the Group made on intercompany accounts. Section 10 provides that Group members are to make their payments of their share of the Consolidated Group's tax liability to FBOP, and FBOP is then responsible for forwarding a single Consolidated Group tax payment to the IRS.

Nothing in these allocation and payment provisions suggests that the parties had the tax refund ownership issue in mind. Only two of these provisions even mention refunds. The first is § 9, which, as noted in the discussion about the *Bob Richards* case, deals with the *allocation* of tax refunds among members of the Consolidated Group. The Court does not perceive anything about the allocation rules in § 9 that would mandate the conclusion that the Banks gave up their property right to receive the tax refunds.

The second provision that refers to refunds is § 3. The FBOP Defendants argue that § 3 "squarely distinguishes between actual tax refunds paid to FBOP by a taxing

---

[38] A loss scenario is unlikely to occur because the very reason for filing a consolidated return is that it almost always will result in tax savings, not additional tax liability. The FDIC asserts that an excess consolidated tax liability, which FBOP would have been required to pay under § 2(a), in fact "never happened," and that the tax refunds at issue here "are not attributable to any taxes paid by FBOP." R. 146 at 29. The FBOP Defendants do not appear to contest that assertion.

authority and FBOP's independent contractual obligations to reimburse Subsidiaries for refunds that would have been due and owing based upon the Subsidiaries' stand-alone tax attributes." R. 145 at 7. But no such distinction is drawn in that provision. Instead, § 3 states that:

> Amounts determined to be payable separately as federal and state income taxes by the Subsidiary having taxable income under Section 1, and subject to any adjustment under Section 2 or the application of Section 7b, shall upon notice to the Subsidiary be payable [to] FBOP. Amounts determined to be refunded separately as federal and state income taxes to the Subsidiary under Section 1, and subject to any adjustment under Section 2, shall be paid [by] FBOP no later than the date it would receive the refund from the applicable federal or state taxing authority.

R. 145 at 42 (¶ 3).

According to the FBOP Defendants, § 3 provides that if a Bank overpaid its estimated taxes to FBOP, then FBOP had a contractual obligation to refund the overpayment to that Bank no later than the date on which the Bank would have expected to receive a refund from the IRS had it filed on a stand-alone basis. Assuming that is a correct interpretation of § 3,[39] the requirement that FBOP refund

---

[39] The actual language of § 3 reverses the "to" and "by" that appear in brackets in the language quoted above; that is, the first sentence actually reads "by FBOP" and the second sentence actually reads "to FBOP." As both parties agree, § 3 does not make much sense if interpreted as written with the bracketed words reversed. The FBOP Defendants argue that the inverted prepositions are a typographical error. The FDIC responds that the TAA has used the phrase "to FBOP" in both the first and second sentences of § 3 in multiple versions applicable over the course of ten years, and that, in late 2007, the phrase "to FBOP" was changed to "by FBOP," but *only* in the first sentence. R. 146 at 29 n.61. According to the FDIC, "[i]t is not clear why this change was made." *Id.* It seems more than likely, however, that prior to 2007 the TAA contained a single typographical error in that the second "to FBOP" should have read "by FBOP." Then, in 2007, an attempt to correct that error was made, but the

an overpayment of estimated taxes paid by one of the Banks to FBOP does not say anything about actual tax refunds from the IRS. Instead, § 3 refers to (1) payments by the Banks to FBOP, which are to be "refunded" *by FBOP* (not the IRS), and, (2) *hypothetical* refunds from the IRS that could have been anticipated had the Banks filed taxes on a separate basis. Several of the opinions on which the FBOP Defendants rely find similar provisions "particularly telling" as to the creation of a debtor-creditor relationship because "the amount due from [the parent company] to the [subsidiary banks] under the [provision in question] may be significantly different from the amount of any refunds received and may even be due when no refunds are paid to [the parent]." *In re Indymac Bancorp, Inc.,* 2012 WL 1037481, at *15. The Court does not agree with this assessment because § 3, just like the rest of the TAA, "speaks only to the allocation of liability in the event of an adjustment," and "says nothing about the ownership of [tax] refund[s]." *AmFin Fin. Corp.*, 757 F.3d at 534.

The relationship between the concept embodied in § 3 and actual tax refunds is explained in the 1998 Policy Statement, which, as previously noted, sets forth the position of the Federal Reserve Board of Governors regarding the allocation and payment of income taxes by banks that are members of a consolidated tax group. It is

---

correction was erroneously applied to the first sentence of § 3, resulting in the current version which now contains two errors instead of only one. The parties disagree over whether the Court can rewrite § 3 to reflect what is likely the parties' intent. That question need not be resolved, however, because even if the Court ruled in favor of the FBOP Defendants by holding that it can rewrite § 3 to reflect what the parties likely meant to say, the Court still would not conclude that § 3 supports the FBOP Defendants' debtor-creditor argument.

obvious from a comparison of the text of the Policy Statement and the text of the TAA that § 3 of the TAA is patterned after the Policy Statement. Therefore, it is helpful to consider the full text of the relevant portion of the Policy Statement:

**Tax Refunds From the Parent Company**

An institution incurring a loss for tax purposes should record a current income tax benefit and receive a refund from its parent in an amount no less than the amount the institution would have been entitled to receive as a separate entity. The refund should be made to the institution within a reasonable period following the date the institution would have filed its own return, *regardless of whether the consolidated group is receiving a refund*. If a refund is not made to the institution within this period, the institutions' primary federal regulator may consider the receivable as either an extension of credit to or a dividend from the subsidiary to the parent. A parent company may reimburse an institution more than the refund amount it is due on a separate entity basis. Provided the institution will not later be required to repay this excess amount to the parent, the additional funds received should be reported as a capital contribution.

If the institution, as a separate entity, would not be entitled to a current refund because it has no carryback benefits available on a separate entity basis, its holding company may still be able to utilize the institution's tax loss to reduce the consolidated group's current tax liability. In this situation, the holding company may reimburse the institution for the use of the tax loss. If the reimbursement will be made on a timely basis, the institution should reflect the tax benefit of the loss in the current portion of its applicable income taxes in the period the loss is incurred. Otherwise, the institution should not recognize the tax benefit in the current portion of its applicable income taxes in the loss year. Rather, the tax loss represents a loss carryforward, the benefit of which is recognized as a differed tax asset, net of any valuation allowance.

Regardless of the treatment of an institution's tax loss for regulatory reporting and supervisory purposes, a parent company that receives a tax refund from a taxing authority obtains these funds as agent for the consolidated group on

behalf of the group members. [footnote citing to 26 C.F.R. 1.1502-77(a)] Accordingly, an organization's tax allocation agreement or other corporate policies *should not purport to characterize refunds attributable to a subsidiary depository institution that the parent receives from a taxing authority as the property of the parent.*

63 Fed. Reg. at 64758-64759, 1998 WL 804364 (emphasis added).

The Policy Statement's explanation refers to the contractual duty on the part of the parent company to make retroactive adjustments to the amount of a bank's share of the consolidated group's tax liability regardless of whether a tax refund is actually received by the consolidated group (the requirement embodied in § 3), while at the same time also admonishing that tax allocation agreements should *not* purport to characterize actual tax refunds "receive[d] from a taxing authority," which are attributable to the operations of the subsidiary, as the property of the parent. Thus, the Federal Reserve Board does not perceive any inconsistency between provisions like § 3 and a bank's ownership interest in tax refunds. Nor does this Court. Under Illinois law, the Banks do not have an ownership interest in the funds they forwarded to FBOP for purposes of making their tax payments.[40] Section 3, however, gives the Banks a contractual right to an adjustment for those estimated tax payments. That contractual right to an adjustment exists even if no tax refunds are ever paid by the government. But the Banks are not seeking the return of estimated

---

[40] *See Gen. Motors Corp.,* 565 N.E.2d at 100 ("a relation of debtor and creditor was created . . . when [General Motors] voluntarily . . . transferred money to [the defendant]"); *Kerwin v. Balhatchett* 147 Ill. App. 561, 565 (1909) (holding that, when the plaintiff gave the defendant money to pay certain debts of the plaintiff and to account to her for the balance, the relationship of debtor and creditor was created and trover for the conversion of the funds would not lie).

tax payments for which no actual tax refunds were paid by the government. They are seeking actual tax refunds paid by the IRS to FBOP. And the existence of a contractual right where no tax refunds are paid does not negate an intent by the Banks to retain their ownership interest in actual tax refunds paid by the IRS. Section 3 neither speaks to that issue, nor reasonably suggests a contractual intent to override the default tax refund ownership rule by which the Banks would have retained their ownership interest.[41]

---

[41] That the concept of ownership interests in tax refunds can co-exist legally with contractual provisions like § 3 related to settling intracorporate tax obligations is confirmed by a simple analogy to tax withholding in the employor-employee context. In *In re Thebus*, 483 N.E.2d 1258, the Illinois Supreme Court held that an employer who failed to remit to the government money withheld from its employees' paychecks for payment of taxes was not liable for conversion because "the employees have no interest in the money the respondent withheld from their wages, so there has been no conversion of employees' funds." *Id.* at 1261 ("[T]he general rule is that conversion will not lie for money represented by a general debt or obligation. It must be shown that the money claimed, or its equivalent, at all times belonged to the plaintiff and that the defendant converted it to his own use."). The *Thebus* court cited to *U.S. Fidelity & Guaranty Co. v. United States,* 201 F.2d 118 (10th Cir. 1952), for the proposition that the employee had no interest in the withheld tax payment money. *See id.* at 120 ("when an employer withholds the tax from an employee's wage and pays him the balance the employee has been paid in full, he has received his full wage"). In reaching this conclusion, the Tenth Circuit noted, however, that the employee has a right to tax refunds arising out of the tax payments that were to be made with the withheld funds, even if the employer failed to pay the withheld funds to the government. *Id.* at 119-20 (the employee is entitled to receive "a credit or refund from the government based on this payment of taxes on his behalf by the employer"). Just as an employee retains his property right to tax refunds even though he lost his ownership interest in funds withheld by his employer for purposes of making the tax payments that gave rise to the tax refunds, so too can the Banks retain their ownership interest in tax refunds, even though they had only a contractual interest in a refund of the estimated tax payments they made to FBOP. The only difference here is the addition of a contractual right to the funds paid to FBOP for tax purposes, which is not present in the employee-employer context with regard to the taxes withheld from the employee's paycheck. The adding of a contract

### b. DEBTOR-CREDITOR TERMINOLOGY

The Court also does not think the so-called "debtor/creditor" terminology used in the TAA, *see, e.g., In re Downey Fin. Corp.*, 593 Fed. App'x at 127; *In re United W. Bancorp, Inc.*, 558 Bankr. at 425; *In re Indymac Bancorp, Inc.*, 2012 WL 1037481, at *13, overrides the default tax refund ownership rule. Because the TAA is primarily a contract about allocating tax liabilities and benefits, accounting for those liabilities and benefits among Group members not surprisingly required the parties to use words such as "credit" or "reimburse." As the FDIC notes, the allocation provisions in the TAA that use the debtor-creditor language in question "say nothing about tax refunds actually received from the IRS that are attributable solely to taxes paid by the Banks in previous years and losses suffered by the Banks in the current year." R. 174 at 10; *see Lubin*, 2011 WL 825751, at *5 (concluding that debtor-creditor language of tax agreement "does not override the presumptive principal-agent relationship").

"Moreover, because words derive their meaning from the context in which they are used, a contract must be construed as a whole, viewing each part in light of the others." *Gallagher v. Lenart*, 874 N.E.2d 43, 58 (Ill. 2007). Thus, the "letter" of a written instrument must be "controlled by its spirit and purpose, bearing in mind that the terms employed are servants and not masters of an intent." *U.S. Trust Co. of N.Y.*, 111 N.E.2d at 147. This means that "courts are sometimes required to restrict the meaning of words," and "[p]articular expressions will not control where the whole

---

right as to A (tax payments), however, does not negate the original property right as to B (tax refunds).

tenor or purpose of the instrument forbids a literal interpretation of the specific words." *Id.* at 147-48*; see also* 11 WILLISTON ON CONTRACTS § 31:7 (4th ed.) ("few courts [ ] will give the words of a contract their literal meaning if it appears from the surrounding circumstances that a literal construction or interpretation will defeat or frustrate the intentions of the parties"). Thus, the Court agrees with the Sixth Circuit when it said that "straining to imbue the commonplace terms 'payment' and 'reimbursement' with specialized and unambiguous meaning falls flat." *AmFin Fin. Corp.,* 757 F.3d at 535; *see also In re BankUnited Fin. Corp.*, 727 F.3d at 1108 (rejecting argument that similar language showed intent to create a debtor-creditor relationship in light of absence of provisions that would provide "some means of protection for the creditor that would help guarantee the debtor's obligation, such as a fixed interest rate, a fixed maturity date, or the ability to accelerate payment upon default").

### c.    ABSENCE OF TRUST PROVISIONS

For similar reasons, the Court also rejects the FBOP Defendants' argument that the absence of language in the TAA creating an express trust in favor of the Banks over the refunds (such as provisions restricting FBOP's use of the tax refunds, requiring that the funds be placed in an escrow upon their receipt, or obligating FBOP to maintain them in a segregated account, *see, e.g., In re Downey Fin. Corp.*, 593 Fed. App'x at 127; *In re United W. Bancorp, Inc.,* 558 Bankr. at 427; *In re IndyMac Bancorp, Inc.*, 554 Fed. App'x at 670; *In re Team Fin. Inc.*, 2010 WL 1730681 at *5), shows a clear intent to create a debtor-creditor relationship. The

FDIC is not arguing that an express trust was created by the TAA. Instead, the FDIC's argument is that the Banks did not intend, by entering into the Agreement, to transfer their property rights in tax refunds, and consequently that a resulting trust should be applied over the tax refunds. *See AmFin Fin. Corp.,* 757 F.3d at 537 ("the FDIC never argued that the TSA created an *express* trust; rather, the FDIC urges the court to find an *implied* resulting trust") (emphasis in original). As the Eleventh Circuit stated, "the absence of language requiring a trust or escrow [does not have] much persuasive value. That factor is offset entirely by the similar absence of any language indicative of a debtor-creditor relationship—*e.g.*, provisions for interest and collateral." *In re NetBank, Inc.*, 729 F.3d at 1352. Moreover, under Illinois law, money "need not be held in a segregated account" for it to be subject to a conversion claim, so long as it is "sufficiently identifiable" such as "where a specific amount is transferred to the recipient from an outside source." *Gates v. Towery*, 435 F. Supp. 2d 794, 801 (N.D. Ill. 2006). Thus, the Banks' failure to insist on a provision in the TAA that would have required the segregation or escrowing of tax refunds does not necessarily mean that the Banks intended to give up their property interests in those funds.

In addition, contrary to the FBOP Defendants' suggestion, the TAA specifically provides that FBOP was *not* free to do whatever it wanted with the tax refunds. Section 9 requires FBOP to distribute tax refunds to the Banks according to the

allocation rules set out in that paragraph.[42] Thus, the Court "find[s] no words in the [TAA] from which it could reasonably be inferred that the parties agreed that the [parent] Company would retain the tax refunds as a company asset and, in lieu of forwarding them to the Bank[s], would be indebted to the Bank[s] in the amount of the refunds." *In re BankUnited Fin. Corp.*, 727 F.3d at 1108. As the Eleventh Circuit found in the *BankUnited* case, the Court finds that the absence of language requiring FBOP to turn tax refunds over to the Banks does not negate FBOP's duty to do so when the Agreement provides that FBOP was to distribute tax refunds among members of the Consolidated Group according to the amount due each member after application of the pertinent allocation rules.[43] The distributive obligation imposed on

---

[42] Although the FBOP Defendants repeatedly state that FBOP was free to forgo receipt of an actual refund and instead receive a future tax credit in its place, they fail to cite any provision of the TAA that gives FBOP such decision-making authority, and the Court's own review has not found any. In cases on which the FBOP Defendants rely for this argument, the tax allocation agreement at issue contained specific language to that effect. *See, e.g., In re Downey Fin. Corp.*, 593 Fed. App'x at 127 n.5 (where tax allocation agreement provided that parent company had "the right, 'in its *sole discretion*,' . . . (iii) to file, prosecute, compromise or settle any claim for refund; and (iv) to determine whether any refunds to which the consolidated group may be entitled shall be paid by way of refund or credited against the tax liability of the consolidated group.") (emphasis in original). No comparable language can be found in the TAA. And even if the TAA gave FBOP this authority, it is not particularly relevant here because this case does not involve a situation where FBOP elected not to receive the tax refunds. *See, e.g., In re NetBank, Inc.*, 729 F.3d at 1351 ("We need not decide what NetBank's obligation to reimburse the Bank would be if NetBank elected not to receive a refund because those are not the facts in front of us.").

[43] The FBOP Defendants argue that *In re BankUnited Financial Corp.* is distinguishable because the tax sharing agreement at issue there appointed one of the banks as the principal operating entity for the consolidated group and required that bank to pay the parent company the total tax liability of the subsidiaries. The other subsidiaries would then reimburse the principal bank for their share of the tax liability. The agreement also provided that the principal bank would pay the other

59

FBOP by § 9 necessarily implies that FBOP did not have the right to keep the tax refunds. Perhaps the Banks should have ensured that provisions were included in the TAA that expressly stated what was implied. But the Court cannot infer solely from the absence of such provisions that the Banks intended to give up their ownership interest in tax refunds.[44]

### d.     PRINCIPAL-AGENT ISSUE

The FBOP Defendants also make a number of arguments based on the TAA and agency law, none of which the Court finds persuasive. To begin with, the Court rejects the FBOP Defendants' reliance on the absence of language in the TAA creating a principal-agent relationship between FBOP and the Banks. *See, e.g., In re*

---

subsidiaries any tax refund to which they were entitled. The Eleventh Circuit held that, although there was no requirement in the agreement that the parent company pay the tax refunds to the principal bank, such a requirement was implicit in the fact that the principal bank had a contractual obligation to distribute those refunds to the other subsidiaries. That the agreement in *In re BankUnited Financial Corp.* used one of the group members as an intermediary for collection and distribution does not change the ultimate and relevant fact that the agreement required the tax refunds to be distributed among the entities that paid the taxes. Similarly, § 9 of the TAA does the same here. That distribution requirement was the reason the Eleventh Circuit inferred an obligation by the parent to pay the refunds to the principal bank, not the fact that the entity with the contractual duty to make the distribution was the principal bank rather than the parent company itself.

[44] *See* RESTATEMENT (SECOND) OF CONTRACTS § 204 & cmt. b, (stating that if the parties "fail to foresee the situation which later arises," or "fail to manifest" their intentions "because the situation seems to be unimportant or unlikely, or because discussion of it might be unpleasant or might produce delay or impasse," the court may supply a term "which is reasonable in the circumstances."); *see also Alliance for Water Efficiency v. Fryer,* 2014 WL 5423272, at *6 (N.D. Ill. Oct. 22, 2014) ("'[A] contract includes, not only the promises set forth in express words, but, in addition, all such implied provisions as are indispensable to effectuate the intention of the parties and as arise from the language of the contract and the circumstances under which it was made.'" (quoting *Sacramento Navigation Co. v. Salz*, 273 U.S. 326, 329 (1927)).

*Downey Fin. Corp.*, 593 Fed. App'x at 126. The FDIC does not argue that the Banks' property interest arises from an agency relationship established by the TAA; its argument is that the Banks' property interest arises from the default tax refund ownership rule. Moreover, any argument that the TAA affirmatively gives FBOP the right to control all tax matters, *see, e.g., In re IndyMac Bancorp, Inc.*, 554 Fed. App'x at 670, is not only irrelevant but also factually untrue.[45]

The FBOP Defendants also argue that a transfer in ownership rights to tax refunds can be inferred from the fact that the "actual refunds from the IRS were paid to and in the name of FBOP." R. 145 at 12. But it is beyond dispute that the reason the IRS paid the refunds to and in the name of FBOP was because of the procedural requirements of 26 C.F.R. § 1.1502-77, which make the parent company the agent of the subsidiary group members for purposes of dealing with the IRS. And every court

---

[45] The provisions on which the FBOP Defendants rely to show that FBOP had complete control over all tax matters of the Consolidated Group relate primarily to the administrative process by which tax payments are collected and then remitted to the IRS. FBOP has no discretion regarding which member of the Group ultimately gets to enjoy the benefit of tax attributes or has to pay the tax liabilities, or whether any Group member must be compensated or paid a refund, and if so, how much. Those matters are resolved by the rules set forth in the Agreement. Further, several provisions give the Banks substantial substantive control. *See* R. 145 at 45 (¶ 15) (stating that "[t]he allocation of taxes and tax benefits provided for in this Agreement shall be reviewed by the Subsidiary's Auditors in connection with their annual audit," and that, "[s]ubject to any subsequent adjustments provided for in Section 9 above, [the Auditors'] approval shall be final and conclusive as respecting the rights and obligations of each of the members of the affiliated group in the allocation of taxes and/or tax benefits."); *id*. at 46 (¶ 17) (giving the Banks' Chief Financial Officers the "discretion" to authorize cash payments for tax benefits in lieu of credits and to apply credits against any outstanding loans owed to FBOP). FBOP's right to amend the TAA unilaterally also is limited and applies only to matters that either are outside of both parties' control or do not affect the Banks' substantive rights. *See, e.g.,* R. 145 at 47 (Adoption Agreement, ¶ 3).

that has considered the issue has adopted the view of the *Bob Richards* court that those procedural requirements do not establish a transfer of ownership interests in the tax refunds to the parent company.[46]

Further, to make clear that FBOP received tax refunds from the IRS only in its capacity as agent for the Banks pursuant to 26 C.F.R. § 1.1502-77, the TAA refers to that regulation in § 11, which provides:

> It is understood and acknowledged that in accordance with the consolidated federal and state income tax regulations consented to, FBOP is the sole agent for the affiliated group respecting the payment of federal and state income taxes *and the claiming of refunds.*

R.145 at 45 (emphasis added). The FBOP Defendants argue that this provision does not establish a general agency relationship between the Banks and FBOP because it merely incorporates the limited procedural agency rule of the federal regulation. But the FBOP Defendants miss the point of the FDIC's argument based on § 11. The FDIC does not claim that the Banks' ownership interest in the tax refunds arises out of an agency relationship created by either 26 C.F.R. § 1.1502-77 or § 11 of the TAA. Instead, the FDIC is saying that § 11 confirms the applicability of the default, gap-filling tax refund ownership rule. *See In re NetBank, Inc.,* 729 F.3d at 1351 (resolving ambiguity in similar agency language of tax allocation agreement by reference to circumstances surrounding execution of the agreement and other provisions in the

---

[46] *See Bob Richards,* 473 F.2d at 265 ("The only reason for the tax refunds not being paid directly to the subsidiary is because income tax regulations require that the parent act as the sole agent, when duly authorized by the subsidiary, to handle all matters relating to the tax return. . . . But these regulations are basically procedural in purpose and were adopted solely for the convenience and protection of the federal government.").

agreement);[47] *see also Lubin*, 2011 WL 825751, at *6 ("the language of the Tax Agreement is clear that an agency relationship was intended, particularly when Bancshares 'receives a tax refund from a taxing authority'").

Finally, the FBOP Defendants also suggest that by virtue of the TAA, FBOP assumed the Banks' tax liability vis a vis the IRS. *See* R. 145 at 12, 24 ("FBOP remained liable to the IRS for the entirety of the Consolidated Group tax liability, without regard to whether FBOP had, in fact, received estimated tax payments from its Subsidiaries."). But FBOP remained liable for the entire amount of the taxes owed by the Consolidated Group because the applicable statutory and regulatory provisions made FBOP liable, just as they make *all members of the Group* liable for the entire tax liability of the Group. This statutory liability is not relevant to the contractual issue of whether the parties intended to transfer the Banks' ownership interests in the tax refunds to FBOP.

### 3. THE TAA AFFIRMATIVELY REFLECTS A CONTRACTUAL INTENT TO MAINTAIN THE DEFAULT TAX REFUND OWNERSHIP RULE

The FDIC argues that the FBOP Defendants not only rely on sections of the TAA that address only the allocation of tax liability and benefits, but they also ignore explicit provisions in the TAA that affirmatively demonstrate that the parties did *not* intend to override the default tax refund ownership rule. The Court agrees.

---

[47] The FBOP Defendants argue that the language appointing the parent as the agent of the banks in *NetBank* is "meaningfully distinct or simply absent from the TAA," R. 145 at 23 n.17, while failing to explain in what way that is so. In any event, the Eleventh Circuit's ruling, as noted, did not turn on this language, which the court found to be ambiguous.

### a.    No Less Favorable Principle

To begin with, the parties state in the TAA that it is their intent "that in no event will [the Banks] be required to contribute a share of the consolidated tax liability for the year in an amount in excess of that which [they] would have incurred for that particular year on the basis of separate federal and state income tax returns." R. 145 at 41 (Sixth Whereas clause). Indeed, the idea that the Banks would not pay any more taxes under the TAA than if they had filed separately is "at the core," *In re NetBank, Inc.*, 729 F.3d at 1350, of the TAA. If the Banks are denied their appropriate share of the tax refunds, they will have paid more in taxes than had they filed separately, thereby defeating the "paramount purpose," *In re BankUnited Fin. Corp.*, 727 F.3d at 1108, of that Agreement.

Further, the TAA states "that any permanent benefit accruing to the affiliated group by reason of the filing of a consolidated return shall be enjoyed by the member to which the benefit is attributed or otherwise shared in proportion to the respective amounts of tax liability incurred on the basis of separate returns for the year, . . . regardless of the possibility that the benefit . . . may not have been enjoyed under separate federal and state income tax returns." *Id.* (Sixth Whereas clause). This stated intent specifically applies to the *recovery of taxes paid in prior years." Id.* (Fourth Whereas clause) (emphasis added). The "permanent benefit" of net operating losses—which would have led to the "recovery of taxes paid in prior years" if the subsidiary that suffered the loss had filed taxes separately—would not be enjoyed by the member to which the benefit is attributed (the Banks) if that member is held to have only a contractual right in the tax refunds and the party owing the member that

contractual right (FBOP) is unable or unwilling to fulfill its contractual obligation. *See In re First Reg'l Bancorp*, 560 Bankr. at 785 ("An implied tax-sharing agreement that would require the Bank to relinquish its rights to the Refund that is attributable to the Bank's own losses directly conflicts with Debtor's obligation to 'do nothing to benefit itself financially at the expense of the financial condition of' the Bank."); *In re BSD Bancorp.*, slip op. at 16 (same).[48] The FBOP Defendants argue that interpreting the Agreement as creating a debtor-creditor relationship is *not* inconsistent with these provisions because the Banks' rights under the tax allocation agreement are the same—those rights are just contractual in nature rather than a property interest. But that argument ignores the function of the court in interpreting a contract, which is to give effect to the parties' intent. Thus, the question is not whether it is possible to reconcile these provisions with a debtor-creditor relationship but whether a debtor-creditor relationship was likely intended in light of those provisions. The Court can think of no reason why that would be the case.

### b. THE 1998 POLICY STATEMENT

The TAA does not just contain basic principles that are fundamentally inconsistent with an intent to give up property rights in favor of a contractual right. The TAA also contains language that affirmatively indicates an intent *not* to give up property rights in tax refunds. The language in question is found in the Fifth Whereas clause, where the parties state their intention of accounting for the separate

---

[48] The FBOP Defendants try to distinguish *In re First Reg'l Bancorp* and *In re BSD Bancorp* by arguing that they did not involve tax allocation agreements. But the portion of those opinions on which the FDIC relies involve the courts assuming that a tax allocation agreement did in fact exist.

tax liabilities and benefits of each group "consistent with . . . the Policy Statements of the Board of Governors of the Federal Reserve regarding the allocation of taxes between members of an affiliated group." R. 145 at 41 (Fifth Whereas Clause). The Policy Statements of the Board of Governors of the Federal Reserve include the 1998 Policy Statement.[49] And, as previously noted (where the language is quoted in full),

---

[49] The Court rejects the FBOP Defendants' argument that "the TAA's general mention" of policy statements of the Board of Governors of the Federal Reserve "is not a clear and specific reference to the 1998 Policy Statement." R. 156 at 30. The 1998 Policy Statement clearly falls within the Fifth Whereas clause's reference to "Policy Statements of the Board of Governors of the Federal Reserve regarding the allocation of taxes between members of an affiliated group." *See* 1998 Policy Statement, 63 Fed. Reg. 64757-01 at 64758, 1998 WL 804364 ("The Federal Deposit Insurance Corporation, *the Board of Governors of the Federal Reserve System*, the Office of the Comptroller of the Currency, and the Office of Thrift Supervision ('the Agencies') are issuing this policy statement to provide guidance to banking organizations and savings associations *regarding the allocation and payment of taxes among a holding company and its subsidiaries*.") (emphasis added). The FBOP Defendants rely for their argument on the *Indymac* bankruptcy court opinion, but the relevant language in the tax allocation agreement there did not include any reference to "Policy Statements" of the Federal Reserve. *See In re Indymac Bancorp, Inc.*, 2012 WL 1037481, at *36 (provision in question referred to "penalties for violating the rules of the OTS or the FDIC"). The FBOP Defendants also point out that the Fifth Whereas clause appeared in previous versions of the TAA before the 1998 Policy Statement was even issued. They argue that the language in the 1998 Policy Statement referencing property rights in tax refunds did not appear in the versions of the Policy Statement that were in effect when the previous versions of the TAA were entered into, and therefore that the reference in the current TAA to Policy Statements cannot be read to include the 1998 Policy Statement. That argument, however, falters on the principle that contractual intent does not refer to the parties' actual subjective intent. *See Empro Mfg. Co. v. Ball-Co Mfg., Inc.*, 870 F.2d 423, 425 (7th Cir. 1989) ("'intent' in contract law is objective rather than subjective"). Understood this way, the parties' objective intent as stated in the Fifth Whereas clause was to adhere to the policies for tax allocation agreements propounded by the Board of Governors of the Federal Reserve. This intent did not change in any of the iterations of the TAA, even if the Policy Statements of the Board of Governors of the Federal Reserve did. The fact that FBOP may not have had a subjective understanding or awareness of the contents of the 1998 Policy Statement is irrelevant. By signing the TAA with the Fifth Whereas clause in it, FBOP expressed

the 1998 Policy Statement expressly states that tax allocation agreements between banks and their parent bank holding companies "should not purport to characterize refunds attributable to a subsidiary depository institution that the parent receives from a taxing authority as the property of the parent." 63 Fed. Reg. at 64759, 1998 WL 804364.

The Eleventh Circuit considered similar contract language,[50] and held that the parties to that tax allocation agreement did not intend by entering into the agreement to divest the banks of their ownership interest in tax refunds. *In re NetBank, Inc.,* 729 F.3d at 1351. The FBOP Defendants argue that *In re NetBank* is inapposite because the provision in the tax allocation agreement at issue in that case expressing an intent to comply with the 1998 Policy Statement appeared in the contract itself, rather than in a preliminary "Whereas" clause. According to the FBOP Defendants, statements contained in preliminary recitals in a contract do not create enforceable contractual obligations unless there is language in the contract specifically incorporating the recitals into the agreement. But the Eleventh Circuit's analysis of the 1998 Policy Statement did not turn on the conclusion that compliance with it was a contractual obligation of the parties to the tax allocation agreement. Rather, the Eleventh Circuit relied on the provision as an indicator of the parties' contractual intent regarding the ownership issue. *See id.* at 1350 & n.7 (holding that

---

a contractual intent to follow the Policy Statements of the Board of Governors of the Federal Reserve Board, and that objective manifestation of intent is what controls.

[50] *See In re NetBank, Inc.*, 729 F.3d at 1350 ("[T]he TSA itself expressly provides: 'This Agreement is intended to allocate the tax liability in accordance with the [Policy Statement].'").

"the cardinal rule of contract interpretation" (under Georgia law, in that case) "is to ascertain the intention of the parties," and the contract provision referencing the Policy Statement was "a clear expression . . . that the intent of the parties was to comply with the Policy Statement").

Similarly, here, the Court must "give effect to all the relevant contractual language to resolve the question of the parties' intent," and "[t]his includes the contract recitals." *Hagene v. Derek Polling Constr.,* 902 N.E.2d 1269, 1274 (Ill. App. 2009). "The contract recitals create a context through which the operational portion of the contract can be better understood, because they indicate the relevant circumstances to its execution." *Id.* (internal quotation marks and citations omitted). The Court looks to the recitals "not as a statement of obligation in itself but as an aid to construing an obligation elsewhere in the contract." *Cress v. Recreation Servs., Inc.*, 795 N.E.2d 817, 838 (Ill. App. 2003). Indeed, "[i]t would be illogical to ignore the recitals that are included on the same page as the body of the [contract] and are so indicative of the surrounding circumstances relevant to its execution." *First Bank & Tr. Co. of Ill. v. Vill. of Orland Hills*, 787 N.E.2d 300, 3011 (Ill. App. 2003).

The FBOP Defendants also argue that *In re NetBank* is distinguishable because it incorporated the actual language from the 1998 Policy Statement in the agreement itself. *See* R. 145 at 23 n.17. But that is inaccurate. The language of the 1998 Policy Statement about not characterizing tax refunds attributable to a subsidiary bank as the property of the parent corporation was not included directly in the *NetBank* agreement. Instead, the *NetBank* agreement incorporated other parts

of the 1998 Policy Statement. And what the FBOP Defendants do not acknowledge is that most if not all of those same items from the 1998 Policy Statement that were incorporated into the *NetBank* agreement also are incorporated in the TAA.[51] Ultimately unable to distinguish *In re NetBank*, the FBOP Defendants simply call that case an "outlier in tax refund jurisprudence." R. 166 at 20. The Court disagrees. The only other appellate decisions to address the tax refund ownership issue are the Third, Ninth, and Sixth Circuits. The Sixth Circuit cited favorably to the Eleventh Circuit's decision in *NetBank. See AmFin Fin. Corp.*, 757 F.3d at 534-35. Moreover, while the Third and Ninth Circuits ruled in favor of the FBOP Defendants' position, those decisions are both unpublished, non-precedential opinions, while the three appellate decisions finding in favor of the FDIC's position are not.

The FBOP Defendants also repeat a number of arguments addressed by the *Indymac* bankruptcy court for discounting the 1998 Policy Statement. For instance, the *Indymac* bankruptcy court agreed with the argument that the 1998 Policy Statement is actually *consistent* with interpreting a tax allocation agreement as transferring the subsidiary bank's ownership rights to the parent company. *See* 2012 WL 1037481, at *40 n.28. According to the *Indymac* bankruptcy court, the Policy

---

[51] The provisions that were incorporated in the *NetBank* agreement, 729 F.3d at 1348, which are also found in the TAA, include the requirements that (1) tax remittances from the banks to the parent company should not exceed the amount that each bank would have paid in taxes had it filed separately (TAA, § 1)); (2) tax payments from the banks to the parent company should not be made significantly before the banks would have been obligated to pay the taxing authority had it filed as separate entity (TAA, § 10); and (3) should the banks incur a tax loss, they should receive a refund from the parent company in an amount no less than the amount the banks would have received as a separate entity, regardless of whether the consolidated group as a whole was receiving a refund (TAA, § 4).

Statement encourages tax allocation agreements, and, as a result, the "single, precatory sentence" in that Statement admonishing that such agreements not purport to characterize tax refunds as the property of the parent "must be interpreted in the context of the Policy Statement as a whole and its general purpose." *Id.* The court said that, "[s]o interpreted, the only logical meaning of this provision is that the agencies might consider it an unsafe or unsound practice for a parent to keep all of a group's refunds free and clear without a corresponding reimbursement obligation to the subsidiary." *Id.* This Court does not find the *IndyMac* bankruptcy court's reasoning persuasive. An interpretation of the tax allocation agreement in which the parent owned the tax refunds with only a corresponding reimbursement obligation to the subsidiary that is contractual in nature is most certainly inconsistent with the 1998 Policy Statement's admonition against characterizing tax refunds as property of the parent. The two positions cannot be reconciled by the simple expedient of "interpreting" the language of the 1998 Policy Statement to mean something other than what it plainly says.

Nor does the Court agree with the *Indymac* bankruptcy court's related conclusion that accepting the plain meaning of the 1998 Policy Statement "ignores and nullifies those provisions in the Policy Statement, among others, describing the parent's obligation to 'reimburse' the subsidiary and to do so even if the parent never receives refunds," *id.,* as the Court already has explained in its discussion of § 3 of the TAA. Moreover, contrary to the *Indymac* bankruptcy court's suggestion, the fact that the language of the Policy Statement was not changed even after several courts

interpreted tax allocation agreements as transferring ownership rights in tax refunds to the parent company, is not persuasive evidence of the meaning of the Policy Statement. *See id.* ("the Court finds this silence in the face of established law to be as instructive as any words used in the Policy Statement"). The language of the Policy Statement is not ambiguous; it clearly and unambiguously states that tax allocation agreements should not give parent bank holding companies ownership rights in tax refunds that would otherwise belong to its subsidiary banks. The Court does not need to look to a purported subsequent failure to alter the language of the Policy Statement to construe the sentence in the Policy Statement about not characterizing tax refunds as property of the parent company according to its plain import.[52]

### 4.    PAROL EVIDENCE ISSUES

Although neither party has requested that the Court convert the present motions for judgment on the pleadings into motions for summary judgment, both parties have either submitted or discussed extrinsic evidence concerning the meaning

_____

[52] The FBOP Defendants also argue (1) that the 1998 Policy Statement is parol evidence, which cannot be considered to contradict the "unambiguous language" of the tax allocation agreement, and (2) that the 1998 Policy Statement is "non-binding." These arguments were accepted by the *IndyMac* bankruptcy court, *see* 2012 WL 1037481 at *39, but are inapplicable here, because the TAA states that the parties intended to comply with the 1998 Policy Statement, unlike the tax allocation agreement in the *Indymac* case, which did not refer to the Policy Statement at all. Therefore, the 1998 Policy Statement is not inadmissible parol evidence in this case and its non-binding nature is irrelevant to the contract interpretation question. Moreover, the Court agrees in any event with the Eleventh Circuit, which stated that even if the 1998 Policy Statement were not specifically referenced in the tax allocation agreement, it should still be considered as part of the circumstances surrounding the parties' execution of the agreement. *See In re NetBank, Inc.*, 729 F.3d at 1350 ("When considering the background against which the TSA was entered into, we consider particularly the [1998 Policy Statement].").

of the TAA. The extrinsic evidence referred to by the FDIC includes emails, financial reports prepared by FBOP, and Call Reports[53] filed by the Banks. With respect to the latter two categories, the FDIC alleges that:

> Each of the Banks filed quarterly . . . [Call Reports] with the Federal Financial Institutions Examination Council[54] covering the period from September 2008 through September 2009. [R. 35 (¶ 172).] In the Call Reports, the Banks represented to their regulators, including the OCC, that the Banks' deferred tax assets were the Banks' property and included such assets as part of their capital. [*Id.* (¶ 176)].

> On October 14, 2008, FBOP applied for TARP funds . . ., which TARP Application was executed by FBOP's Chairman, Michael E. Kelly . . . . In the course of submitting the TARP application, FBOP represented to the OCC that the Banks' deferred tax assets, including the right to claim tax refunds, were the Banks' property and were included as such in determining the Banks' capital ratios[, and] . . . that the Banks' deferred tax assets, including the right to claim tax refunds, were not FBOP's property. [*Id.* (¶¶ 169-171)].

> In November 2008, Mr. Daniel Mandarino, the Vice President of FBOP, sent the OCC portions of the Banks' records to support the Banks' inclusion of deferred tax asset "carry forwards" in their regulatory capital ratios. FBOP knew the content of the records Mr. Mandarino sent to the OCC. Those records reflected that the Banks owned the tax refunds and did not reflect that the Banks' deferred tax assets were in the nature of a receivable FBOP owed to the Banks. [*Id.* (¶ 167)].

> In November 2008, Mr. Dunning, the Chief Financial Officer of FBOP, sent the OCC portions of the Banks' records describing the deferred tax assets included in the Banks' capital as of September 30, 2008. FBOP knew the content of the records Mr. Dunning sent to the OCC. The Banks' records reflected that the Banks owned the tax

---

[53] *See* R. 35 (¶ 173) ("A bank, in its Call Reports, represents its financial condition, capital ratios, income, and certain risk factors to its regulators. Banks are required to file Call Reports under 12 U.S.C. § 1817(a)(3).").

[54] *See* R. 35 (¶ 174) ("The Federal Financial Institutions Examination Council includes, among others, the FDIC, the Board of Governors of the Federal Reserve, and the OCC.").

refunds. The Banks' records did not reflect that the Banks' deferred tax assets were in the nature of a receivable owed by FBOP to the Banks. [*Id.* (¶ 168)].

On November 5, 2008, based upon, among other things, the representations made by FBOP, the OCC sent FBOP a letter (the "OCC Waiver"), in which the OCC permitted the Banks it regulated to include in their capital ratios all deferred tax assets that they could reasonably expect to use to offset future taxable income in the ensuing four years, even if those deferred tax assets exceeded ten percent (10%) of their Tier 1 capital. The OCC scheduled the OCC Waiver to expire at the earlier of the second quarter of 2009 or FBOP's receipt of TARP funds. [*Id.* (¶ 164)].

But for the Banks' inclusion of their deferred tax assets in their capital and the OCC Waiver, California Bank, FBOP's largest subsidiary Bank, would have been deemed critically undercapitalized as early as September 30, 2008. [*Id.* (¶ 234)].

Under Illinois law, the parties' course of performance is admissible to help to resolve contractual ambiguities. *See Kinesoft Dev. Corp. v. Softbank Holdings Inc.*, 139 F. Supp. 2d 869, 890-91 (N.D. Ill. 2001) (citing *Barney v. Unity Paving, Inc.*, 639 N.E.2d 592, 595-96 (Ill. App. 1994) ("It is a firmly established principle of contract interpretation that courts should give great weight to the parties' interpretation of the contract because the parties are in the best position to know what was intended by the language employed."); *Chi. & N.W. Ry. Co. v. Peoria & Pekin Union Ry. Co.*, 360 N.E.2d 404, 407 (Ill. App. 1977) (in case of ambiguity, court relied on parties' course of performance as evidence of their "settled construction"); and *N.Y. Cent. Dev. Corp. v. Byczynski*, 238 N.E.2d 414, 416 (Ill. App. 1968) (in addition to parol evidence, courts can admit evidence of parties' acts or course of performance to interpret what parties intended as to essential matters on which the contract is silent)). Thus, the FDIC's course of performance evidence referenced in the Amended Complaint is

highly relevant and would be admissible to determine the meaning of the TAA if the Court were to find an ambiguity exists on the tax refund ownership question.

The FBOP Defendants also refer to extrinsic evidence in arguing that their interpretation of the TAA is correct. The extrinsic evidence to which they refer is the responses to written questions from Congress submitted by the then-current Director of the FDIC's Receivership Division, Mitchell Glassman. According to the FBOP Defendants, Congress was concerned with whether the government's seizure of the Banks could have been avoided by the enactment of the WHBAA, which became law one week after federal regulators placed the Banks into receivership. Mr. Glassman was asked whether certain deferred tax assets and their resulting refunds could have added to the regulatory capital of the Banks, thereby avoiding the government seizure. Mr. Glassman responded that "Park National's [one of the Banks] deferred tax asset . . . should have been disallowed from regulatory capital," because "[a]ny tax benefit available to carry back to previous years was a receivable from FBOP [and] . . . FBOP did not have the capacity to refund taxes up-streamed . . . in previous years," such that the Park National's "ability to recognize a tax benefit in the near future was doubtful." R. 145 at 34.

The Glassman testimony is not as compelling as the FDIC's course of performance evidence. To begin with, the Court rejects the FBOP Defendants' argument that the Glassman testimony is subject to judicial notice for the truth of the matters asserted. The Court may only take judicial notice of the indisputable fact that the testimony was given and says what it says. *See Indep. Trust Corp. v. Stewart*

*Info. Servs. Corp.*, 665 F.3d 930, 943 (7th Cir. 2012). The Court cannot take judicial notice of the testimony for substantive purposes because the meaning and import of the testimony are in dispute. *See* Fed. R. Evid. 201(b)(2) (for a court to take judicial notice of a fact, the fact must not be "subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned"); *see also Indep. Trust Corp.,* 665 F.3d at 943 (holding that the district court properly did not rely on judicially noticed documents "as proof of disputed facts").

In addition, even if the Court considered the Glassman testimony, and even if the Court also fully credited the FBOP Defendants' explanation of the meaning of that testimony despite credible arguments made by the FDIC to the contrary, Mr. Glassman is not a party to the TAA. His testimony was in relation to the decision of the Banks' regulators to close the Banks, not to the meaning of the TAA or the Banks' and FBOP's intent regarding ownership of tax refunds. The Court therefore sees only minimal relevance to his testimony to the issues in this case. Finally, even if the Glassman testimony could be imputed to the FDIC (a proposition that the FBOP Defendants have not established), at most the testimony would go to the credibility of the FDIC in taking a contrary factual and/or legal position in this matter from the position Mr. Glassman supposedly took before Congress. While that might be marginally helpful to the FBOP Defendants, the Court doubts it would be of sufficient persuasive value to overcome the course of performance evidence to which the FDIC alludes.

Nevertheless, even assuming that the Glassman testimony would be otherwise admissible to determine the meaning of the TAA, the Court has determined that any ambiguity in the TAA can be resolved within the four corners of that document by reference to established rules of contract interpretation. *See USG Corp. v. Sterling Plumbing Grp., Inc.,* 617 N.E.2d 69, 71 (Ill. App. 1993) ("An ambiguity is not created by the mere fact that, as here, the parties do not agree upon an interpretation."). Accordingly, the Court declines to consider either side's extrinsic evidence. If the Court were to hold otherwise, it would have to convert the present motions for judgment on the pleadings into motions for summary judgment, and allow the parties an opportunity for further discovery if needed. This is the approach that was taken in *AmFin Financial Corp.,* where the Sixth Circuit remanded for consideration of extrinsic evidence to resolve the ambiguity created by the tax sharing agreement. The tax allocation agreement in that case, however, did not refer to the 1998 Policy Statement. Moreover, the Sixth Circuit rejected consideration of a default tax refund ownership rule because it believed that rule derived solely from the *Bob Richards* case, which it held did not apply because it was based on federal common law. 757 F.3d at 536. As discussed earlier, this Court does not agree with that view of the *Bob Richards* case and the applicable default rule.[55] This Court finds that the TAA must

---

[55] This Court instead agrees with the concurring opinion in *AmFin Financial Corp.,* which expressed the opinion that the *Bob Richards* decision could not be read "as requiring an 'either-or' choice between federal and state law." 757 F.3d at 538. The concurring opinion stated that the correct protocol was "[f]irst look to the tax-sharing agreement (TSA) to settle the refund issue. But if the TSA is ambiguous, then determine whether an agreement between the parties can be implied under state law. And if that inquiry also proves inconclusive, then the loss belongs to the entity

be construed in light of the Illinois default tax refund ownership rule. The TAA does not clearly override that default rule, which therefore fills in the gaps in that Agreement to provide the applicable ownership rule that the parties intended but failed to express.

## IV. THE FDIC'S RULE 12(c) MOTION FOR JUDGMENT AS A MATTER OF LAW ON COUNTS I-II

The FDIC's cross motion for judgment on the pleadings seeks an order declaring it the owner of the entire amount of the Escrowed Refunds. While the Court has interpreted the TAA as according ownership rights in the tax refunds to the Banks as a matter of law, it cannot tell from the parties' briefs whether it can rule on the current record that the FDIC is entitled to recover the entire amount of the Escrowed Refunds.

To decide how much of the Escrowed Refunds the FDIC may recover, it is necessary to determine, first, what portion of the Escrowed Refunds represent refunds owed to the Banks under the allocation rules in § 9 of the TAA; and second, whether any portion of that amount is in excess of the funds transferred by the Banks to FBOP as their share of the Consolidated Group's tax payments for the years in question. While the FDIC alleges that the Banks are entitled to the entire amount of the tax refunds and that the entire amount of the taxes paid by the Consolidated Group was paid by the Banks,[56] the FBOP Defendants deny these

_____

that generated the tax refund because federal tax law does not change the ownership of the refund." *Id.* at 539-40. This Court's opinion follows a similar path.

[56] *See* R. 35 (¶¶ 2, 21, 28, 129, 429, 459, 479, 562).

allegations in their answers.[57] The FBOP Defendants state in their brief that they admit "*for purposes of this motion only*" that the tax refunds "were paid by the IRS on account of (i) a Consolidated Group NOL for the 2009 tax year and (ii) the return of overpayments made to the IRS by FBOP for the 2008 and 2009 tax years." R.145 at 17 n.12 (emphasis added). They further state that they reserve their rights "to dispute this contention based upon, among other things, the amended tax returns filed by FBOP in 2011 claiming refunds arising from a worthless stock deduction based upon FBOP's investment in the FBOP Banks. (See Compl. ¶ 128.)." *Id.*[58]

The parties' abbreviated statements regarding the amount of the tax refunds to which the FDIC would be entitled if the Court were to rule in its favor on the tax refund ownership question are insufficient for the Court to make a final ruling on that issue. The Court therefore directs the parties to meet and confer on any outstanding factual issues regarding the FDIC's cross-motion for judgment on the pleadings. The parties shall file a joint status report explaining their respective

[57] *See* R. 44 (¶¶ 2, 21, 28, 129, 429, 459, 479, 562); R. 45 (¶¶ 2, 21, 28, 129, 429, 459, 479, 562).

[58] The FBOP Defendants argue that "the Escrowed Refunds are not solely attributable to the losses of the FBOP Banks," R. 166 at 23 n.17, but do not make any argument contradicting the FDIC's assertion that the Banks paid the entire amount of the taxes. The Court infers that the FBOP Defendants do not in fact dispute the latter point; however, the Court will allow the FBOP Defendants to either confirm or deny whether the Court's inference is correct. If it is, then the only relevant question is not, as the FBOP Defendants contend, whether any part of the Escrowed Refunds are solely attributable to the losses of the FBOP Banks, but rather whether any portion of the tax refunds would *not* be payable to the Banks under the allocation rules set forth in § 9 of the TAA. The Court assumes that the FBOP Defendants' contention regarding a portion of the 2009 being attributable to the losses of FBOP, as opposed to the Banks, would if true affect the allocation under § 9, but will leave it to the parties to explain further.

positions, detailing the exact factual issues, if any, that remain in dispute, taking a position as to whether the FDIC's Rule 12(c) motion must be converted into a motion for summary judgment, and proposing a joint plan for resolving disputed fact issues, including discovery if needed with proposed deadlines. If the parties cannot reach agreement on a joint plan, then each side should set forth their respective position with areas of disagreement indicated.

## V. THE FBOP DEFENDANTS' RULE 12(c) MOTION ON THE FDIC'S ALTERNATIVE LEGAL AND EQUITABLE CLAIMS—COUNTS III-VII

The FBOP Defendants argue that judgment in their favor on the FDIC's alternative claims in Counts III through VII is appropriate because those claims are also barred by FBOP's ownership rights in the tax refunds under the TAA. The Court has found that FBOP does not have ownership rights in the tax refunds to the extent that the Banks have a right to those refunds under § 9 of the TAA and the Banks paid the taxes out of which those refunds arise. Therefore, the FBOP Defendants' motion for judgment on the FDIC's alternative counts must be denied. But even if the Court had found in favor of the FBOP Defendants on the ownership issue, the FBOP Defendants would not be entitled to judgment as a matter of law on the FDIC's alternative claims as the Court does not believe a finding that the TAA transferred the Banks' ownership interest in tax refunds to FBOP necessarily precludes those alternative claims.

Even the cases on which the FBOP Defendants rely recognize that a tax allocation "agreement will control the members' rights *in the absence of overreaching or breach of fiduciary duty." In re First Cent. Fin. Corp.*, 269 Bankr. at 490 (emphasis

added) (citing *In re White Metal Rolling & Stamping Corp.*, 222 Bankr. at 423, and *In re Franklin Sav. Corp.*, 159 Bankr. at 29). The cases on which the FBOP Defendants rely holding that there was no evidence of overreaching or breach of fiduciary duty do so based on a full summary judgment record. The FBOP Defendants attempt to fit this case within that framework by arguing that none of the FDIC's allegations relate to overreaching or breach of fiduciary in relation to the creation of the tax agreement. But their argument is based on language in *In re Franklin Savings Corp.*, which referred to not only the creation of the tax agreement but its implementation as well. *See* 159 Bankr. at 31 (holding that "question whether the parent acted 'unfairly,' 'overreachingly,' or 'unconscionably' in the creation or implementation of the tax agreements or in its other dealings with the bank [is] one of fact"). And the FDIC has alleged a number of facts regarding overreaching and breach of fiduciary duty on FBOP's part with respect to the implementation of the TAA.

For instance, the FDIC has alleged that FBOP made material misrepresentations concerning the ownership of tax refunds of the Consolidated Group in regulatory correspondence and stand-alone call reports filed by the Banks, in FBOP's application for TARP funds, and in FBOP's requests for relief from regulatory capital limitations. The FDIC also alleges that FBOP reported (or caused the Banks to report) "deferred tax assets," including tax refunds, as property of the Banks. It was only after the Banks were placed into receivership did FBOP claim that it, and not the Banks, owned the tax refunds. While the FBOP Defendants

contend that their current position is consistent with FBOP's pre-receivership position on the ownership question, the FDIC clearly alleges otherwise:

> A key part of the Banks' survival strategy was based on the Banks' inclusion of deferred tax assets in their regulatory capital. Banking regulations limit a bank's ability to include in capital deferred tax assets that are not based on carryback refunds but are dependent on future income. Because of this, FBOP and the Banks applied for a waiver from the OCC. In so doing, and in the course of filing its TARP Application, FBOP represented that the Banks' anticipated carryback refunds belonged to the Banks. The OCC relied upon FBOP's representations and issued the requested waiver. The Banks also submitted Call Reports to their federal regulators in which they recorded deferred tax assets on their balance sheets that included the full value of their anticipated carryback refunds in their Tier 1 capital. The Banks were required to disclose intercompany debts in their Call Reports. The Banks never reported any tax-related "receivables" due from FBOP. FBOP never reported any tax-related "payables" due to the Banks in its own regulatory filings. Given FBOP's financial condition, any "receivable" owed by FBOP had to be disclosed and discounted. An impaired debt that the Banks could not reasonably expect to collect from FBOP could not have been lawfully included in the Banks' regulatory capital.

R. 146 at 16 (FDIC Brief In Opposition to FBOP Motion) (citing Amended Complaint throughout and 12 C.F.R. § 325.5(g)(2)(ii)). According to the FDIC, the Banks could not record deferred tax assets on their balance sheets that included the full value of their carryback refunds unless they believed they had the exclusive right to such refunds. Thus, the FDIC contends, if the FBOP Defendants' current argument is accepted (*i.e.,* that the tax assets recorded on the Banks' balance sheets actually reflected a severely impaired intercompany debt rather than the Banks' exclusive right to carryback refunds), that would mean FBOP intentionally overstated the

Banks' capital position to federal regulators. And, if it did, then it is plausible to argue FBOP engaged in misconduct related to the implementation of the TAA.

In addition, the FDIC's allegations regarding FBOP's settlement agreements with the Senior Secured Creditors and Sub-Debt¶ Holders[59] separate this case from the cases cited by the FBOP Defendants where the courts addressed alternative theories similar to those pled by the FDIC here. The FDIC has alleged facts which, if true, shows that "the reasonable expectations of the parties as to how the agreements would operate has been altered since the agreements were executed." *In re Franklin Sav. Corp.*, 159 Bankr. 32-33. While the FBOP Defendants assert that many of the complaint's allegations "are nothing more than conclusions concocted by the FDIC-R to fit the yarn it attempts to spin," that argument is obviously not appropriate at this stage of the proceedings. The FDIC is entitled to have its day in court on those issues.

The Court also rejects the FBOP Defendants' argument that the FDIC's alternative claims are barred by the parol evidence rule. These claims do not involve questions of contract interpretation, and accordingly the parol evidence rule is not applicable. Thus, even if the Court were to agree with the FBOP Defendants' interpretation of the TAA, the FDIC would be entitled to proceed on its alternative

---

[59] *See* R. 146 at 8 (citing to R. 35 (Complaint), ¶¶ 9, 341-76 & 417) (alleging that FBOP's primary assets were its equity interests in the Banks; that once the Banks failed, FBOP's creditors—including, JPMC and BMO—faced the high likelihood of a fractional recovery on the debts owed to them by FBOP; and that, given this reality, FBOP and its unsecured creditors developed a two-part strategy: first, FBOP would claim ownership of the tax refunds, and, second, in order to divert the full value of the tax refunds to its unsecured creditors, FBOP would grant liens on all of its assets, including future tax refunds, in favor of those creditors, and then liquidate its assets through an assignment for the benefit of creditors).

claims against the FBOP Defendants, in addition to its fraudulent transfer claims against the Senior Secured Creditors and Sub-Debt Holders.

Finally, the FBOP Defendants argue that Count VII must be dismissed because a constructive trust is a remedy, and not a claim, and therefore cannot stand as a separate cause of action. R. 145 at 38. The FDIC is not asserting entitlement to a constructive trust as a separate claim for relief but merely as an equitable remedy. Count VII seeks a declaratory judgment that the FDIC is entitled to that remedy. The FBOP Defendants' argument is without merit.

## VI. THE FBOP DEFENDANTS' RULE 12(c) MOTION ON THE FDIC'S CLAIMS TO RECOVER THE NON-ESCROWED REFUNDS--COUNTS XIX-XXII

The FBOP Defendants argue they are entitled to judgment declaring FBOP the owner of the $10.3 million Non-Escrowed Refunds for the same reasons they are entitled to judgment declaring FBOP the owner of the $265.3 million Escrowed Refunds. Because the Court has found that the FDIC in its capacity of separate receiver for each of the Banks is the owner of the tax refunds, the Court rejects the FBOP Defendants' arguments regarding ownership of the $10.3 million Non-Escrowed Refunds as well.

## VII. THE FBOP DEFENDANTS' RULE 12(C) MOTION ON PBGC'S INTERVENOR COMPLAINT

In addition to the Rule 12(c) cross-motions at issue herein, a third Rule 12(c) motion also is pending before the Court, in which the FBOP Defendants seek judgment on the pleadings on claims brought against them by the Intervenor-Plaintiff, Pension Benefit Guaranty Corporation ("PBGC"). The Court finds that, as a result of the Court's ruling on the tax refund ownership issue, the PBGC's Intervenor

Complaint against the FBOP Defendants is moot. Accordingly, the FBOP Defendants' Rule 12(c) motion seeking judgment on the PBGC's claims also is moot.

C<span style="font-variant:small-caps">ONCLUSION</span>

For the foregoing reasons:

(1) The FBOP Defendants' motion for partial judgment on the pleadings as to Counts I-II, III-VII, and XIX-XXII of the FDIC's complaint, R. 139, is denied;

(2) The FDIC's motion for partial judgment on the pleadings on Counts I and II, R. 150, is entered and continued; and

(3) The FBOP Defendants' motion for judgment on the pleadings as to PBGC's Intervenor Complaint, R. 162, is denied without prejudice as moot.


ENTERED:

_____ *Thomas M. Durkin*
Honorable Thomas M. Durkin
United States District Judge


Dated: May 12, 2017