**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| FEDERAL DEPOSIT INSURANCE, CORPORATION, *as a separate and distinct Receiver of Bank USA, N.A., California National Bank, Citizens National, Bank of Teague, Madisonville State Bank, North, Houston Bank, Pacific National Bank, Park National Bank, and San Diego National Bank,* | ) ) ) ) ) ) ) ) | |
| PLAINTIFF, | ) ) | Case No. 14 CV 4307 |
| vs. | ) ) | Judge Thomas M. Durkin |
| FBOP CORPORATION, *et al.,* | ) ) | |
| DEFENDANTS. | ) ) | |
| PENSION BENEFIT GUARANTY CORPORATION, | ) ) ) | |
| PLAINTIFF-INTERVENOR, | ) ) | |
| vs. | ) ) | |
| FBOP CORPORATION, *et al.,* | ) ) | |
| DEFENDANTS. | ) | |

**MEMORANDUM OPINION AND ORDER**

This litigation involves a dispute over more than $265.3 million in tax refunds currently being held in escrow ("the Escrowed Tax Refunds"). The Federal Deposit Insurance Corporation ("FDIC") claims entitlement to the tax refunds by virtue of its appointment as the separate receiver for each of eight failed banks ("the Banks"). Defendant FBOP Corporation ("FBOP") is the parent company of the

Banks, and received the refunds from the Internal Revenue Service ("IRS") as the appointed agent for a consolidated tax group consisting of itself and its subsidiary corporations (the Banks and approximately 80 non-banking subsidiaries). FBOP assigned whatever interest it had in the Escrowed Tax Refunds to the Trustee of the FBOP Corporation Trust Agreement and Assignment for the Benefit of Creditors (the "Trustee"). FBOP and the Trustee (collectively the "FBOP Defendants") claim ownership of the Escrowed Tax Refunds pursuant to an agreement between FBOP and the Banks concerning the allocation of tax liabilities. The Court refers to its Memorandum Opinion and Order entered May 12, 2017 for further background concerning the dispute between the FDIC and the FBOP Defendants over ownership of the Escrowed Tax Refunds, and this Court's resolution of the FDIC's and the FBOP Defendants' cross-motions for judgment on the pleadings as to that dispute. *See* R. 205 (*Fed. Deposit Ins. Corp. v. FBOP Corp.*, 252 F. Supp. 3d 664 (N.D. Ill. 2017)).

Presently before the Court are the claims of the Pension Benefit Guaranty Corporation ("PBGC") against the FBOP Defendants set forth in PBGC's Intervention Complaint (R. 51). The FBOP Defendants have filed a Rule 12(c) motion for judgment on the pleadings in their favor on PBGC's intervention claims. *See* R. 225. For the reasons that follow, the Court denies the FBOP Defendants' Rule 12(c) motion.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(c) permits a party to move for judgment on the pleadings. *Buchanan-Moore v. Cnty. of Milwaukee*, 570 F.3d 824, 827 (7th Cir. 2009). The pleadings "consist of the complaint, the answer, and any written instruments attached as exhibits." *Housing Auth. Risk Retention Group, Inc. v. Chi. Hous. Auth.*, 378 F.3d 596, 600 (7th Cir. 2004). The primary function of a Rule 12(c) motion is to "dispos[e] of cases on the basis of the underlying substantive merits of the parties' claims and defenses as they are revealed in the formal pleadings." Wright & Miller, FEDERAL PRACTICE AND PROCEDURE, § 1367 (3d ed.) (citing *Alexander v. City of Chicago*, 994 F.2d 333 (7th Cir. 1993)). "A motion for judgment on the pleadings under Rule 12(c) of the Federal Rules of Civil Procedure is governed by the same standards as a motion to dismiss for failure to state a claim under Rule 12(b)(6)." *BBL, Inc. v. City of Angola*, 809 F.3d 317, 325 (7th Cir. 2015). The court must take all well-pleaded allegations in the plaintiff's pleadings to be true, and view the facts and inferences to be drawn from those allegations in the light most favorable to the plaintiff. In addition, the court must consider only the content of the competing pleadings, exhibits thereto, matters incorporated by reference in the pleadings, and any facts of which a district court can take judicial notice. *See* Wright & Miller, FEDERAL PRACTICE *supra,* § 1367. The court cannot consider matters outside these areas without converting the motion into one for summary judgment. *See* Fed. R. Civ. P. 12(d); *Omega Healthcare Investors, Inc. v. Res-Care, Inc.*, 475 F.3d 853, 856 n.3 (7th Cir. 2007). A Rule 12(c) motion is

appropriate only when "it is clear that the merits of the controversy can be fairly and fully decided in this summary manner." Wright & Miller, FEDERAL PRACTICE AND PROCEDURE, § 1369 (3d ed.). If it appears that discovery is necessary to fairly resolve a claim on the merits, then the motion for judgment on the pleadings should be denied. *Id.*

## BACKGROUND

The following facts, construed in the light most favorable to PBGC, are from the pleadings and exhibits thereto in the present case, as well as court documents in two related cases—*FBOP Corp. v. Pension Benefit Guaranty Corp.*, Case No. 11-cv-2782 (N.D. Ill.), *filed* Apr. 26, 2011, and *Pension Benefit Guaranty Corp. v. FBOP Corp.*, Case No. 11-cv-2788 (N.D. Ill.), *filed* Apr. 27, 2011—of which this Court takes judicial notice.[1]

### A.   STATUTORY BACKGROUND

PBGC is a wholly owned United States government corporation, which administers the pension insurance program established by Title IV of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"). *See* 29 U.S.C. §§ 1301-1461. When an underfunded pension plan terminates without sufficient assets to pay all promised benefits, PBGC generally becomes the plan's trustee and pays statutorily guaranteed pension benefits to plan participants and beneficiaries. *See* 29 U.S.C. §§ 1302(a)(2), 1321, 1322, 1344. When PBGC determines that its

---

[1] *See* R. 226 at 14 (FBOP Defendants' Brief in Support of Rule 12(c) Motion) (acknowledging that "the Court may properly consider the Settlement Agreement and filings in the Settled Lawsuit without converting FBOP's Motion into one for Summary Judgment").

possible long-run loss "may reasonably be expected to increase unreasonably" if the plan is not terminated, or if the plan will not be able to pay benefits when due, PBGC is statutorily authorized to initiate termination of a pension plan. *See* 29 U.S.C. § 1342. If PBGC decides to terminate a plan under § 1342 and the plan administrator disagrees with that decision, ERISA authorizes PBGC to apply for a judicial decree that the plan must be terminated. *See* 29 U.S.C. § 1342(c). If the court enters such a decree, it also sets a termination date, *see* 29 U.S.C. § 1348(a)(4), and appoints PBGC as statutory trustee under §§ 1342 and 1348. After a plan is terminated, PBGC makes a final assessment of liability. *See* 29 C.F.R. §§ 4003.1(b)(9), 4068.3. This determination of liability is generally appealable to the agency's Appeal Board, 29 C.F.R. § 4003.1(a), but when PBGC believes that its "ability to assert or obtain payment of liability is in jeopardy," it may issue a demand immediately upon making its liability determination, without providing for appeal rights, 29 C.F.R. § 4068.3(c).

PBGC, as a federal agency, also has a right to offset debts owed to it by plan sponsors or controlled group members[2] against amounts that any other federal agency, including the IRS, owe to the plan sponsors or controlled group members.[3] PBGC's setoff rights are established by regulations, which provide a mandatory

---

[2] Controlled group members generally are entities related through 80% ownership, 29 U.S.C. § 1301(a)(14), and are jointly and severally liable for unfunded benefit liabilities and other liabilities related to the plan, *see* 29 U.S.C. §§ 1307, 1362.

[3] *See* 31 U.S.C. § 3730A.

period to allow the plan sponsor or controlled group member a period of time in which to contest the offset. *See* 29 C.F.R § 4903.

## B. FBOP'S DEMISE AND THE PENSION PLAN

FBOP was the contributing sponsor and plan administrator of the FBOP Corporation Pension Plan ("the Plan"), a defined-benefit pension plan under ERISA. The Plan provides pension benefits to approximately 2,589 current or former FBOP employees and their beneficiaries, the large majority of which were employees of the Banks. In October 2009, banking regulatory authorities closed the Banks and appointed the FDIC as their respective receivers, at which time FBOP employees associated with the Banks were terminated. The Banks constituted the majority of FBOP's assets, and, after their seizure, FBOP began the process of liquidating its remaining assets.

After the FDIC assumed control over the Banks, PBGC determined that the Plan would be unable to pay benefits when due and that PBGC's long-run loss with respect to the Plan could reasonably be expected to increase unreasonably unless the Plan was terminated. Around the same time, FBOP informed PBGC that it anticipated receiving an estimated $200 million federal tax refund in June 2011. As a result, on April 21, 2011, PBGC issued a Notice of Determination ("Notice") that the Plan should be terminated under 29 U.S.C. § 1342(a) and (c). That same day, PBGC sent FBOP the Notice along with a letter demanding payment by April 26,

2011 of the Plan's "unfunded benefit liabilities,"[4] then estimated at $56,650,211 (the "Demand Letter"). Further, by letter dated April 26, 2011, PBGC sent notice to FBOP of the agency's intention by June 25, 2011 to set off the amount of the unfunded benefit liabilities against FBOP's anticipated $200 million income tax refund ("the Setoff Notice"). PBGC explained that it issued the Demand Letter and Setoff Notice before the Plan was terminated because it believed time was of the essence, based on FBOP's indication that it expected to receive the $200 million tax refund in a matter of months.

## C.    THE TERMINATION AND DECLARATORY JUDGMENT ACTIONS

On April 25, 2011, FBOP informed PBGC that it was unwilling to agree to terminate the Plan. PBGC responded that, if FBOP did not agree by the April 26 deadline, PBGC would seek a district court decree terminating the Plan pursuant to 29 U.S.C. § 1342(c)(1). The next day, FBOP filed an action in this district seeking a declaratory judgment that PBGC incorrectly calculated that the Plan assets were not sufficient to pay benefits and incorrectly determined that FBOP had abandoned the Plan, and further seeking a court order to protect FBOP from PBGC's involuntary termination of the Plan. *See FBOP Corp. v. Pension Benefit Guar.*

---

[4] *See* 29 U.S.C. § 1362(b) ("Except as provided in subparagraph (B), the liability to the corporation of a person described in subsection (a) shall be the total amount of the unfunded benefit liabilities (as of the termination date) to all participants and beneficiaries under the plan, together with interest (at a reasonable rate) calculated from the termination date in accordance with regulations prescribed by the corporation."); 29 U.S.C. § 1301(a)(18) ("'amount of unfunded benefit liabilities' means, as of any date, the excess (if any) of—(A) the value of the benefit liabilities under the plan (determined as of such date on the basis of assumptions prescribed by the corporation for purposes of section 1344 of this title), over (B) the current value (as of such date) of the assets of the plan").

*Corp.*, Case No. 11-cv-2782, Dkt. #1 (N.D. Ill.) (hereinafter the "Declaratory Judgment Action"). The following day, on April 27, 2011, PBGC filed an action in this district under 29 U.S.C. § 1342(c) and 1348(a) seeking an order: (1) terminating the Plan; (2) appointing PBGC as statutory trustee of the Plan; and (3) establishing April 21, 2011, as the Plan's termination date. *See Pension Benefit Guar. Corp. v. FBOP Corp.*, Case No. 11-cv-2788, Dkt. #1 (N.D. Ill.) (hereinafter the "Termination Action"). While PBGC's complaint provided an estimate of FBOP's unfunded benefit liabilities, it did not seek a judgment regarding either the amount of those liabilities or PBGC's right to offset those liabilities under federal law.[5]

The Declaratory Judgment Action and the Termination Action were consolidated before Judge Gettleman. Shortly thereafter, FBOP's counsel informed PBGC that its tax return was being audited and receipt of the $200 million tax refund was not expected for a year or more. Accordingly, PBGC issued a letter to FBOP withdrawing without prejudice both the Setoff Notice and the demand for liability contained in the Demand Letter.

On May 18, 2011, FBOP filed an amended complaint in the Declaratory Judgment Action seeking a declaration that the Plan should not be terminated,

---

[5] When PBGC goes to court to terminate a pension plan, it seeks only termination of the plan, the establishment of a termination date, and appointment as statutory trustee. While PBGC typically estimates the amount of the unfunded benefit liabilities to inform the termination decision, that estimate is not a determination of liability, and is subject to refinement. Only *after* termination of the plan does PBGC make an actual determination of unfunded benefit liabilities, which then forms the basis of a set-off claim. Thus, although PBGC cited in the Termination Action its estimate of the Plan's unfunded benefit liabilities as a fact in support of its termination claim, PBGC did not seek a judgment from the district court for those unfunded benefit liabilities, nor even a holding on the exact amount of the shortfall.

injunctive relief barring PBGC from making false statements regarding FBOP and the Plan and requiring PBGC to issue a written retraction of its "prior false statements," a declaration that PBGC was not owed any unfunded benefit liabilities, and injunctive relief barring PBGC from referring the purported debt for a tax refund offset. *See* Declaratory Judgment Action, Dkt. # 14.

On May 20, 2011, PBGC filed an amended complaint in the Termination Action, and, on June 10, 2011, FBOP filed a counterclaim to PBGC's amended complaint in which it asserted nearly identical claims to those asserted in its amended complaint in the Declaratory Judgment Action. *See* Termination Action, Dkt. ## 23, 28.

On June 21, 2011, PBGC filed a motion to dismiss FBOP's claims in the Declaratory Judgment Action and FBOP's overlapping counterclaims in the Termination Action. *See* Termination Action, Dkt. # 30; Declaratory Judgment Action, Dkt. ## 20, 26. The district court granted that motion to dismiss on or about October 5, 2011. *See* Termination Action, Dkt. # 51; Declaratory Judgment Action, Dkt. # 46. The court held that FBOP's claims/counterclaims seeking to declare that the Plan should not be terminated served no useful purpose and would result in piecemeal and duplicative litigation because that claim would be resolved by the Termination Action. The court further held that FBOP's remaining claims against PBGC related to unfunded benefit liabilities and PBGC's Setoff Notice were not properly before the court because, upon learning that FBOP's tax refund was delayed pending resolution of the audit of FBOP's tax returns (which according to

FBOP could take a year or more), PBGC had revoked its unfunded benefit liabilities demand and setoff request. In essence, PBGC had conceded that, at the time of the Termination Action, it was not entitled to setoff, and, as a result, its complaint in the Termination Action did not seek setoff or a certain amount of the unfunded benefit liabilities, the final determination of which had not yet occurred. Accordingly, the court held, FBOP was not "adversely affected by any action of [PBGC]" on which it could bring suit seeking a declaration regarding the unfunded benefit liabilities or to enjoin a potential future setoff.

Over the next eight months, the parties engaged in discovery on PBGC's claim for termination of the Plan. Discovery was followed by efforts to settle the Termination Action, which efforts culminated in the Settlement Agreement executed on or about August 21, 2012. Following execution of the Settlement Agreement, PBGC filed a Stipulation of Dismissal with prejudice of the Termination Action. *See* Termination Action, Dkt. # 164. Shortly thereafter, a status hearing was held in the Declaratory Judgment Action, and that case was then dismissed for want of prosecution. *See* Declaratory Judgment Action, Dkt. # 54.

### D.   THE SETTLEMENT AGREEMENT

The Settlement Agreement ("Agreement") purports "to resolve the [Termination Action, a/k/a the] Lawsuit[,] and all other controversies between [the parties]" (Final Whereas clause) "relating to the Title IV Liabilities" (¶ 3.2), which are defined as "all liabilities under Title IV of ERISA with respect to the Pension Plan" (Article I). *See* R. 226-1 at 3, 4, & 7. PBGC agreed to dismiss the Termination

10

Action with prejudice and release FBOP from any claims against it relating to the Title IV Liabilities. *Id.* at 4 (¶ 2.1). In return, FBOP[6] agreed to the termination of the Plan with a termination date of April 21, 2011 and the appointment of PBGC as statutory trustee of the Plan. *Id.* at 5 (¶ 2.1(a)). In addition, FBOP agreed "not to formally or informally oppose or object in any way to" the following:

- "any referral by PBGC of an offset of the Title IV Liabilities in an aggregate amount of $30 million (the '*Settlement Claim Amount*') to the Financial Management Service, the Internal Revenue Service, the Treasury Offset Program or any other branch of the Department of Treasury that is involved in the offset process pursuant to 26 U.S.C. §6402 and the regulations thereunder, 31 U.S.C. §3720A and the regulations thereunder, or other applicable federal law (a '*Referral*')" (*id.,* ¶ 2.1(b));

- "the Notice of Past-Due, Legally Enforceable Debt, a copy of which is attached as Exhibit B (the '*Notice Letter*'), or to any relief sought thereby by PBGC with respect to the Settlement Claim Amount, or to any notice consistent with the terms of this Settlement Agreement and Exhibit B from the Financial Management Service, the Internal Revenue Service, the Treasury Offset Program or any other branch of the Department of Treasury that is involved in the offset process, including refraining from asserting or submitting evidence that the Settlement Claim Amount is not past-due or legally enforceable" (*id.,* ¶ 2.1(c)); or

- "payment of the Settlement Claim Amount, or any portion thereof, by the Financial Management Service, the Internal Revenue Service, the Treasury Offset Program or any other branch of the Department of

---

[6] Two of FBOP's creditors—JP Morgan Chase Bank, N.A. and BMO Harris Bank, N.A.—also are parties to the Settlement Agreement and undertook obligations similar to those agreed to by FBOP, as discussed herein.

Treasury that is involved in the offset process to PBGC on account of the Referral" (*id.,* ¶ 2.1(d)).

### E.    BFS's "COMPUTER GLITCH"

Following execution of the Agreement and pursuant to the terms thereof, PBGC sent FBOP a notice, *inter alia,* that (1) FBOP had a past-due, legally enforceable debt which it owed to PBGC in the amount of $30 million, and (2) that PBGC intended to refer the debt to the Financial Management Service, an entity within the Treasury Department responsible for tax refund offsets. *See* R. 226-1 at 21 (Ex. B. to Settlement Agreement). PBGC sent a similar notice to the FDIC. *See* R. 51 at 6 (¶ 17). On or about October 12, 2012, PBGC referred its offset claim of $30 million to the Financial Management Service, which has since been renamed the Bureau of the Fiscal Service ("BFS"). *Id.* (¶ 18). PBGC also recorded its offset claim of $30 million in the Treasury Offset Program ("TOP"), a centralized offset program administered by the BFS to collect delinquent debts owed to federal agencies. *Id.; https://www.fiscal.treasury.gov/fsservices/gov/debtColl/dms/top/debt_top.htm.*

PBGC alleges in the Intervention Complaint that the above steps were sufficient to effectuate its $30 million offset claim against the tax refunds the IRS was expected to pay to FBOP. R. 51 at 6 (¶ 19). Yet, on December 12, 2012 and January 2, 2103, PBGC received payments through the TOP on account of its offset claim of only $8,780 and $175 respectively, leaving $29,991,045 due and owing on the Settlement Claim Amount. *Id.* (¶¶ 21-22).

On or about December 31, 2013, the Department of Treasury paid FBOP a federal tax refund in the amount of $252 million. *Id.* (¶ 23). PBGC alleges that before paying FBOP, BFS failed to deduct PBGC's offset claim, and that PBGC did not learn of the failure until PBGC's counsel was informed of it by the FDIC's counsel in March 2014. *Id.* at 7 (¶ 26). According to PBGC, BFS has since acknowledged that it made a mistake by not deducting the full $30 million from the tax refunds prior to their payment to FBOP. *Id.* (¶ 30). The mistake occurred when BFS disbursed the $252 million tax refund to FBOP in five separate paper checks called "Type A" checks. *Id.* at 6-7 (¶ 23). Each of the five Type A checks was paired with a form prepared by the IRS entitled "Manual Refund Posting Voucher." *Id.* at 7 (¶ 24). On each voucher, the box labeled "Yes (Allow TOP offset, BP1-0)" had been checked. *Id.* (¶ 25). The mistake occurred when BFS failed to submit the overpayment through TOP for deduction of the offset amounts before disbursement of the tax refunds (referred to by PBGC as "the Offset Failure"). *Id.* (¶ 26). The sole reason that the offset did not occur as it should have, according to the Intervention Complaint, was that BFS's computer-payment system at the time could not accommodate large dollars amounts. It is alleged that, after the Offset Failure occurred, BFS updated its computer system to ensure that large payments will be processed through TOP. *Id.* (¶¶ 28, 30).[7]

---

[7] In a previous ruling in this case granting PBGC's motion to intervene, Judge Holderman observed that BFS's website confirmed its payment system had a "computer glitch," which would be corrected in a forthcoming software update called "PAM Release 7.0." *See* R. 50 at 4 n.4.

## F. PBGC'S INTERVENOR CLAIMS AGAINST THE FBOP DEFENDANTS

In Count I of the Intervention Complaint, PBGC asserts that it retains the right to offset the $29,991,045 remaining balance of the Settlement Claim Amount against the Escrowed Tax Refunds pursuant to the terms of the Agreement. R. 51 at 8. In Counts II, III, and IV, PBGC asserts that FBOP, the Trustee, and the FDIC respectively will be unjustly enriched if they are allowed to retain the Escrowed Tax Refunds without offset in PBGC's favor for the balance remaining on the $30 million Settlement Claim Amount. *Id.* at 9-12. And in Count V, PBGC alleges that the only reason the responsible federal agency failed to make payment of the balance of the $30 million Settlement Claim Amount to PBGC was that it made a mistake. *Id.* at 12-13.

PBGC seeks an order instructing the Escrow Agent to pay PBGC the balance of the $30 million Settlement Claim Amount before distributing the remaining Escrowed Tax Refunds to any other party. *Id.* at 13 (Request for Relief). By agreement dated May 15, 2015, PBGC and the FDIC reached a settlement of PBGC's intervenor claims against the FDIC. The agreement provides that if the FDIC is determined by court order to be the owner of all or part of the Escrowed Tax Refunds, or if the FDIC enters into a settlement agreement with the FBOP Defendants resolving the ownership of the Escrowed Tax Refunds as between themselves, then the FDIC will pay $12.5 million to PBGC and PBGC's receivership claims against the FDIC will be allowed for $15 million. *See* R. 226-6. As a result of PBGC's settlement with the FDIC, the only intervention claims still pending in this

case are those against the FBOP Defendants. *See* R. 126 (Notice of Dismissal of Intervention Claims Against FDIC). If the FBOP Defendants are determined by court order to be the owner of all or part of the Escrowed Tax Refunds, or if the FBOP Defendants enter into a settlement agreement with the FDIC resolving the ownership of the Escrowed Tax Refunds as between themselves, PBGC asserts it is entitled to recover the remaining $29,991,045 balance on its offset claim or any portion thereof from any portion of the Escrowed Tax Refunds to which the FBOP Defendants become entitled.

## DISCUSSION

The FBOP Defendants argue they are entitled to judgment on the pleadings against PBGC's intervention claims because those claims: (1) are barred by the release in the Settlement Agreement; (2) are barred by the doctrine of *res judicata*; and (3) fail to state any legally cognizable theory of recovery.

### A. THE RELEASE

Article III of the Agreement provides in relevant part as follows:

#### RELEASE

> 3.2    In consideration for the obligations of FBOP, the Agent, and BMO hereunder, as of the Effective Date, PBGC on its own behalf and in every other capacity in which it may now or in the future act . . . unconditionally and forever releases and discharges FBOP, the Non-Bank Controlled Group Members, Agent, Secured Lenders, BMO, and each of their . . . successors, and assigns (collectively referred to hereinafter as the "*Released Parties*") from any and all disputes, controversies, suits, actions, causes of action, claims, assessments, demands, penalties, . . . any minimum funding obligations, any unfunded benefit liabilities, debts, sums of money, and

obligations of any kind whatsoever, upon any legal or equitable theory, whether known or unknown, that PBGC, in any of its capacities, ever had, now has or hereafter can, shall or may have, relating to the Title IV Liabilities (collectively, the "*Released Claims*").

R. 226-1 at 6-7 (¶ 3.2).

The FBOP Defendants argue that the broad language of the Release—by which PBGC released all claims against FBOP and its assigns "relating to the Title IV Liabilities," including "unknown" claims that PBGC "hereafter can, shall or may have"—bars PBGC's claims against them in the Intervention Complaint. The Court rejects the FBOP Defendants' argument for multiple reasons.

### 1. CLAIMS TO ENFORCE THE SETTLEMENT AGREEMENT THAT ARE OUTSIDE THE RELEASE ALTOGETHER

*First,* the Agreement specifically preserves a settling party's "right or obligations under, or ability to enforce, this Settlement Agreement." *Id.* (¶ 3.2(b)).[8] The FBOP Defendants ignore this provision, apparently because PBGC has not specifically alleged a claim for breach of the Agreement. But Count I of the Intervention Complaint seeks a declaration that, *inter alia*, "PBGC retains its right in the Escrowed funds to the extent of the balance of the Offset Claim, and a judgment ordering the Escrow Agent to pay PBGC the balance of the Offset Claim." R. 51 at 12 (Request for Relief, ¶ 1). Regardless of whether PBGC has alleged a "breach" of the Settlement Agreement, the Intervention Complaint clearly seeks

---

[8] *See* R. 226-1 at 7 ("Notwithstanding anything to the contrary in this Settlement Agreement, nothing herein affects . . . any party's rights or obligations under, or ability to enforce, this Settlement Agreement.").

*enforcement* of the Agreement by way of the claim in Count I asserting that PBGC retains its right to a set-off against the Escrowed Tax Refunds. Thus, Count I falls outside of the Release, per paragraph 3.2(b). Quite simply, the Release is irrelevant to Count I of the Intervention Complaint and the substantive issue under that Count of whether FBOP is obligated by the terms of the Settlement Agreement to honor PBGC's right to a set-off against the Escrowed Tax Refunds apart from any action or failure of action by the federal agency responsible for withholding offsets prior to distribution of tax refunds.

The FBOP Defendants apparently contend that PBGC cannot state a substantive claim outside the terms of the Release based on FBOP's obligations under the Settlement Agreement, supposedly because FBOP owes no duties to PBGC under the Agreement other than the duty not to oppose PBGC's offset claim with the federal government:

> FBOP fully performed its obligations under the Settlement Agreement. FBOP terminated its Pension Plan and appointed PBGC as the statutory trustee of the Pension Plan, and FBOP did not oppose or object to PBGC's referral of an offset to the IRS or the Department of Treasury. PBGC received every benefit from FBOP for which it bargained.

R. 226 at 11 (FBOP Defendants' Brief in Support of Rule 12(c) Motion). According to the FBOP Defendants, paragraphs 3.1 and 3.4 of the Agreement expressly and unambiguously limit FBOP's obligations under the Agreement to not opposing the Referral for offset. But Paragraph 3.1 provides that:

> Except as otherwise provided herein, the consideration set forth in this Settlement Agreement shall fully satisfy all obligations of FBOP and the Non-Bank Controlled Group

17

> Members with respect to the Title IV Liabilities, shall fully constitute the recovery from FBOP and the Non-Bank Controlled Group Members afforded to PBGC on account of any and all claims with respect to the Title IV Liabilities, and shall fully satisfy any and all liens asserted and/or assertable by PBGC in any capacity against FBOP and the Non-Bank Controlled Group Members, or against any property of any of them with respect to the Pension Plan.

R. 226-1 at 6 (¶ 3.1). And paragraph 3.4 provides that:

> FBOP's agreement pursuant to Paragraph 2.1 above shall be the sole and exclusive remedy available to PBGC for any claims or liabilities asserted against FBOP or the Released Parties for the Title IV Liabilities.

*Id.* at 7 (¶ 3.4). The FBOP Defendants' argument based on these provisions is a mischaracterization of their terms and the terms of the other paragraphs referenced therein. Paragraph 3.1 states that PBGC is limited to the "consideration set forth in this Settlement Agreement," and paragraph 3.4 states that PBGC's "sole and exclusive remedy" against FBOP is that set out in paragraph 2.1.[9] While much of the language in paragraph 2.1 *does* reference FBOP's obligation not to formally or informally oppose or object to the Referral of the offset to the Treasury Department, not *all* of the language in paragraph 2.1 is limited to the Referral. In particular, FBOP also agreed in subsection (c) of paragraph 2.1

> not to formally or informally oppose or object in any way *to the Notice of Past-Due, Legally Enforceable Debt*, a copy

---

[9] The FBOP Defendants misquote paragraph 3.4, stating that it provides "that *FBOP's non-objection to the Referral of the offset to Treasury* 'shall be the sole and exclusive remedy available to PBGC for any claims or liabilities asserted against FBOP or the Released Parties for the Title IV Liabilities,'" R. 232 at 8 (emphasis added), when the actual language states that "*FBOP's agreement pursuant to Paragraph 2.1 above* shall be the sole and exclusive remedy . . . ." R. 226-1 at 7.

> of which is attached as Exhibit B (the "*Notice Letter*"), or
> *to any relief sought thereby by PBGC* with respect to the
> Settlement Claim Amount . . . .

*Id.* at 5 (¶ 2.1(c)) (emphasis added). The Notice Letter is from PBGC to FBOP, and begins by acknowledging that FBOP and PBGC entered into an agreement terminating the Plan as of April 21, 2011 and appointing PBGC the statutory trustee. *Id.* at 21. The Notice goes on to state that, "[*a*]*s a result*" of the Settlement Agreement, "*FBOP became liable to PBGC for the Plan's unfunded benefit liabilities in the amount of $30,000,000*" and that "[t]his liability *is due and payable to PBGC* as of the termination date of April 21, 2011." *Id.* (emphasis added). In other words, the Notice Letter contains an affirmative statement that FBOP is liable for the $30,000,000 Settlement Claim Amount, independent of any treatment of PBGC's offset claim by the Department of Treasury. And FBOP agreed in paragraph 2.1(c) of the Settlement Agreement "not to formally or informally oppose or object *in any way* to the Notice," which means FBOP agreed "not to formally or informally oppose or object *in any way*" to PBGC's statement in the Notice that FBOP *is* liable for the $30,000,000 Settlement Claim Amount. The Court does not perceive any substantive distinction between agreeing to not oppose a statement of liability and conceding such liability. Thus, by virtue of paragraph 2.1(c) of the Settlement Agreement, FBOP has conceded that it is liable for the $30,000,000 Settlement Claim Amount, and cannot argue otherwise in this or any other proceeding.

Given paragraph 2.1(c), FBOP's assertion that it did not agree in the Settlement Agreement that it was liable for any unfunded benefit liabilities but only agreed to not oppose PBGC's referral of its claim of unfunded benefit liabilities

to the Department of Treasury, is simply wrong. To be sure, the Notice Letter informs FBOP that if PBGC does not receive payment from FBOP in the amount of $30,000,000 by 60 days after the letter, then PBGC would refer the debt of $30,000,000 to the Financial Management Service for tax refund offset in the amount of the debt. *Id.* at 21-22. But that stated course of action does not change the fact that the Notice Letter acknowledges FBOP's liability for the debt apart from whether an offset through the federal government occurs. And the Agreement includes as an obligation of FBOP that it will not oppose or object *in any way*, not only to the Notice Letter, but also to "*any relief* sought thereby by PBGC with respect to the Settlement Claim Amount." *Id.* at 5 (¶ 2.1(c)). The claims in the Intervention Complaint constitute relief sought by PBGC "with respect to the Settlement Claim Amount" of $30,000,000. PBGC therefore has stated a valid claim against FBOP to enforce FBOP's obligation under the Settlement Agreement to not object to *any* relief sought by PBGC with respect to the Settlement Claim amount. That would include the relief sought by PBGC in this lawsuit to recover the Settlement Claim Amount from the Escrowed Tax Refunds on the theory that PBGC is the rightful owner of those tax refunds to the extent of the unpaid balance on the Settlement Claim Amount.[10] That claim is for enforcement of the very rights PBGC obtained from the Settlement Agreement and is not barred by the Release.

---

[10] PBGC's argument that it is the owner of the Escrowed Tax Refunds in the amount of the balance of the Settlement Claim Amount is supported by federal law, which provides that the Secretary of Treasury does not have discretion but *must* offset a tax refund and pay the amount of the debt directly to the agency owed the money. *See* 31 U.S.C. § 3720A (stating that once the Secretary of Treasury is

### 2. RELEASE LANGUAGE "RELATING TO THE TITLE IV LIABILITIES"

*Second*, even if PBGC's intervention claims fall under the Release rather than under the obligations and duties set forth in the Settlement Agreement, the Release only applies to claims "relating to the Title IV Liabilities [all liabilities under Title IV of ERISA with respect to the Pension Plan]." Judge Holderman previously rejected the argument that the genesis of PBGC's intervention claims relate to the unfunded pension liabilities of the Banks. Judge Holderman found that PBGC's claim instead is "for a portion of the tax refund which, under federal law, neither the Banks nor FBOP should ever have received." R. 50 at 6. This Court agrees.

The Intervention Complaint alleges that the BFS *approved* the offset for the Settlement Claim Amount. If that allegation is true, federal law makes PBGC the owner of the tax refunds in the outstanding amount of the offset claim,[11] and its current claim to recover those tax refunds is not a claim to recover Title IV Liabilities but a claim to recover money already belonging to it which was inadvertently paid by the custodian of those funds to the wrong party. The FBOP Defendants' argument that the funds sought to be recovered by PBGC constitute

---

notified of a "past-due, legally enforceable debt" owed to a federal agency, "the Secretary of the Treasury *shall* determine whether any amounts, as refunds of Federal taxes paid, are payable to such person," and "[i]f the Secretary of the Treasury finds that any such amount is payable, he *shall* reduce such refunds by an amount equal to the amount of such debt, *pay the amount of such reduction to such agency*, and notify such agency of the individual's home address.") (emphasis added).

[11] *See* footnote 10.

funds "related to the Title IV Liabilities" because PBGC's current claim in the Intervention Complaint to recover the funds can be traced to PBGC's original claim related to the Title IV Liabilities, carried to its logical conclusion, leads to illogical results. Under the FBOP Defendants' argument, if the Treasury Department had not made a mistake but instead paid the offset amount to PBGC by check, and FBOP then intercepted that check in the mail and deposited it into FBOP's own account using a forged endorsement, PBGC would be barred by the Release from suing FBOP for tortiously converting PBGC's property (the checks from the Treasury Department made payable to PBGC) because that property originally came into existence as a result of PBGC's assertion of Title IV Liabilities owed by FBOP. The Court refuses to apply such an absurd interpretation of the language "relating to the Title IV Liabilities." *See, e.g., Hagene v. Derek Polling Constr.,* 902 N.E.2d 1269, 1275 (Ill. App. 2009) (court "will not interpret the settlement contract in such a way to defeat a claim not then in the minds of the parties" where "[t]o do so would . . . lead to an absurd and unjust result").

### 3. RELEASE LANGUAGE RELATING TO FUTURE, UNKNOWN CLAIMS

*Third*, even if the Court were to agree that PBGC's intervention claims are outside of FBOP's duties and obligations under the Settlement Agreement and also fall within the language "relating to the Title IV Liabilities," the Court still disagrees that judgment on the pleadings in FBOP's favor is appropriate based on the Release's general language regarding future, unknown claims. "Because a release is a contract, its construction and interpretation are governed by rules of

law applied in contract cases." *Continental Ill. Nat'l Bank & Trust Co. of Chi. v. United States,* 1987 WL 4823, at *3 (N.D. Ill. 1987). "Where the terms of the release are clear and explicit, the court must enforce them as written and construction of the release is a question of law." *Constr. Sys. v. FagelHaber, LLC,* 35 N.E.3d 1244, 1251 (Ill. App. 2015); *see also Miller v. Lawrence,* 2016 IL App (1st) 142051, ¶ 26, 61 N.E.3d 990, 997 (Ill. App. 2016) ("Where a contract is clear and explicit, a court must enforce it as written, and the meaning of the contract, as well as the intention of the parties, must be gathered from the document without the assistance of extrinsic aids."). The "Released Claims" include "any and all disputes . . . of any kind whatsoever, upon any legal or equitable theory, whether known or unknown, that PBGC, in any of its capacities, ever had, now has or hereafter can, shall or may have, relating to the Title IV Liabilities." R. 226-1 at 6-7. The FBOP Defendants argue that PBGC's intervention claims based on the "computer glitch" fall within this very broad language.

But "exculpatory/release agreements releasing parties from future liability are not favored . . . . [S]uch agreements are strictly construed against the benefiting party and must spell out the intention of the parties with great particularity." *Stratman v. Brent,* 683 N.E.2d 951, 961 (Ill. App. 1997) (internal quotation marks and citation omitted). "The scope and effect of the release are controlled by the intention of the parties, and this intent is determined not only from the express language of the release but also from the circumstances surrounding its execution." *Constr. Sys.,* 35 N.E.3d at 1252. Releases frequently are "carefully worded as to

bring within their sway *all* present and future claims whether known or unknown." *Krilich v. Am. Nat'l Bank & Trust of Chi.*, 778 N.E.2d 1153, 1168 (Ill. App. 2002) (emphasis in original) (O'Malley, J., specially concurring in part and dissenting in part). But "[e]ven such sweeping language . . . is not dispositive," *id.*, for "no form of words, no matter how all encompassing, will foreclose scrutiny of a release, or prevent a reviewing court from inquiring into surrounding circumstances to ascertain whether it was fairly made and accurately reflected the intention of the parties." *Ainsworth Corp. v. Cenco Inc.*, 437 N.E.2d 817, 821 (Ill. 1982).

"Under Illinois law, a release will not be construed to defeat a valid claim that was not contemplated by the parties at the time the agreement was executed, and general words of release are inapplicable to claims that were unknown to the releasing party. . . . Thus, where the releasing party is unaware of other claims, general releases are restricted to the specific claims contained in the release agreement." *Constr. Sys., Inc.*, 35 N.E.3d at 1252. This means that future claims not in existence at the time of the release's execution will be included in the release only if there is "a clear expression of intent to that effect." *Chubb v. Amax Coal Co.*, 466 N.E.2d 369, 372 (Ill. App. 1984). A clear expression of intent requires more than boilerplate general language. "When a release is broadly worded . . . to cover all claims, 'known and unknown,' the plaintiff is giving up the right to sue that [it] might otherwise have on claims related [to the subject of the release] that could arise under any law. The waiver is valid [only] if it is knowing and voluntary." *Wagner v. NutraSweet Co.*, 95 F.3d 527, 533 (7th Cir. 1996); *see Gallagher v. Lenart*,

874 N.E.2d 43, 56 (Ill. 2007) (a release is a form of "waiver," as distinguished from a "forfeiture," and "arises from an affirmative act, is consensual, and consists of an intentional relinquishment of a known right") (internal quotation marks and citation omitted). In applying the knowing waiver rule to future claims not yet known, the court must "attempt[ ] to reach a fair and reasonable interpretation of a contract," and in doing so "is not confined to a strict and literal construction of its language if such construction would frustrate the intention of the parties, as expressed in the contract as a whole." *Guenther v. Snap-On Tools Corp.*, 1996 WL 84182, at *5 (N.D. Ill. Feb. 22, 1996) (citing *Weidner v. Szostek*, 614 N.E.2d 879, 881 (Ill. App. 1993)).

To the extent that the question of intent can be resolved based on the four corners of the Agreement without resort to extrinsic evidence, the Court would conclude that PBGC unequivocally did *not* intend to release a future claim arising out of a "computer glitch" scenario like the one that occurred here. A knowing waiver involves either known claims or claims "that are in general terms *predictable*." *Wagner*, 95 F.3d at 533 (emphasis added) (citing *Fair v. Int'l Flavors & Fragrances, Inc.*, 905 F.2d 1114, 1115-16 (7th Cir. 1990)). And the "computer glitch" error at issue here is not the sort of predictable claim one would assume was contemplated by the parties to the Settlement Agreement. Indeed, an intention by PBGC to release a future claim that arose not out of the Treasury Department's denial of its offset claim, but one that arose instead out of the Treasury Department's granting of that claim but failure to do what it was supposed to have

done as a result of that grant, seems wholly irrational. *See Krilich*, 778 N.E.2d at 1166-68 ("Krilich's receipt of substantially greater assets upon the joint venture's dissolution than any other joint venturer is a circumstance that suggests a rational reason why Krilich might agree to release the other joint venturers, but there is no circumstance surrounding the agreement that suggests a rational reason why the other joint venturers would release Krilich from liability").

To support a contrary interpretation of the parties' intent with respect to the Release, the FBOP Defendants argue that "[t]he terms of the Release and Settlement Agreement in this case show that PBGC knew or considered the possibility that the Department of Treasury would fail to make the offset." R. 226 at 17. But the only terms to which the FBOP Defendants cite are those that reference the offset procedure generally. And their assertion that the "risk as to whether PBGC would receive or was entitled to receive the offset amount was central to the negotiations and is reflected in the very limited non-objection compromise language of the Settlement Agreement," R. 232 at 9, glosses over a crucial distinction. The "risk" regarding whether PBGC would receive the offset that PBGC obviously undertook was the risk that the Treasury Department would *deny* the offset claim. That risk, however, is not the one that came to fruition and on which PBGC is now suing. The Intervention Complaint alleges (and the FBOP Defendants do not seem to deny) that the Treasury Department *granted* the offset claim. And there is nothing but the FBOP Defendants' conclusory assertions in their brief to support the contention that PBGC understood that it also was assuming the risk that the

Treasury Department would *grant* the offset claim but then fail to effectuate it properly.

The FBOP Defendants contend that PBGC's contrary "averment that the Settlement Agreement 'does not contemplate a situation where FBOP is paid a federal income tax refund without deduction of the Offset Claim solely as a result of mistake by another federal agency,' is nothing more than a thinly veiled attempt by PBGC to rewrite the unambiguous Settlement Agreement." R. 226 at 17 (citation omitted). But the FBOP Defendants do not cite to any part of the Settlement Agreement that unambiguously evinces that the parties did in fact contemplate that situation. Instead, the FBOP Defendants point out that PBGC's right to an offset was contested by FBOP, and they argue that is why the only consideration given by FBOP for the release of PBGC's claims was FBOP's silence with respect to PBGC's right to a setoff. But that argument actually proves PBGC's position. The subject on which FBOP agreed to be silent was, as the FBOP Defendants say, PBGC's *right* to a setoff. And  the intervention claims are not based on a right to a setoff but instead on a right to recover money paid to FBOP because of a mistake made by the responsible federal agency, which already found that PBGC had a right to a setoff. PBGC's intervention claims seek only to implement that decision in its favor.

The FBOP Defendants also rely on the argument that PBGC recognized that if it did not exercise its offset right it might lose the ability to collect its debt. While this statement is true, all it means is that PBGC recognized that the debt might be uncollectible if PBGC's entitlement to the unfunded benefits liability was not

resolved prior to the tax refunds being paid to FBOP, which is why PBGC received as part of the Settlement Agreement a resolution of its entitlement to the unfunded benefit liabilities in the Settlement Claim Amount of $30 million.

The FBOP Defendants argue they did not agree as part of the Settlement Agreement that PBGC was entitled to any unfunded benefit liabilities. But that argument flies in the face of the actual terms of the Settlement Agreement, which, as previously discussed, does provide that FBOP agreed that PBGC was entitled to the $30 million Settlement Claim Amount through FBOP's agreement not to oppose or object to the Notice of Past-Due, Legally Enforceable Debt. PBGC calculated the unfunded benefit liabilities as being more than $56 million, so the acknowledgement by FBOP of a $30 million liability in lieu of a $56 million liability constitutes a settlement by PBGC for less than the amount to which it thought it actually was entitled. If FBOP's agreement not to dispute the acknowledgement in the Notice of a $30 million liability had no meaning, as FBOP seems to contend, then why would PBGC have reduced its claim from $56 million to $30 million? And why would PBGC release FBOP from any and all claims related to the unfunded benefit liabilities in exchange *solely* for, as the FBOP Defendants argue, a promise by FBOP "to stand mute and let PBGC attempt to assert a right of offset"" R. 226 at 19. Common sense dictates that PBGC intended to and actually did bargain for more. *See Constr. Sys.*, 35 N.E.3d at 1252, 1254 (holding that there was, "at a minimum, a genuine issue of material fact" regarding whether the plaintiff intended to release a legal malpractice claim that resulted in a claimed loss of $1.3

million in exchange for a $20,000 reduction in legal fees; such an intention was "highly unlikely," notwithstanding a release "broadly drafted to include phrases such as 'without limitation' and general language purportedly barring any claims, 'known and unknown,' in connection with legal services provided by [the defendant]").

The FBOP Defendants argue that all PBGC obtained from FBOP by the Settlement in exchange for PBGC's Release was FBOP's silence, that PBGC "may not have received what it hoped to receive, but that was through no fault of FBOP," and that "a deal's a deal." R. 226 at 19. This argument is all but an admission that PBGC did not contemplate giving up a claim based on a computer error that caused the tax refund checks to be issued to FBOP without deduction of PBGC's offset. The FBOP Defendants in effect are arguing that they should receive a windfall based on an intersection between a broadly worded general release and the unanticipated and random occurrence of an unintended act of a third party. But, as noted, a release is an intentional relinquishment of a known right, not an unpredictable random event. *See Hagene,* 902 N.E.2d at 1274 (declining to interpret release in such a way as to confer a windfall on the defendant). The Court concludes that a release of "all claims," even future unknown claims arising out of a "computer glitch" affecting not PBGC's entitlement to an offset but effectuation of that entitlement, is not the sort of predictable future claim that PBGC likely intended its release to cover. At the very least, an intent to include that claim in the release cannot be found in the unambiguous language of the Release considered by itself or

in the context of the Agreement as a whole. Whether the parties in fact bargained for PBGC to receive nothing more than, as the FBOP Defendants say, to have FBOP "stand mute" cannot be resolved without reference to evidence outside the four corners of the Agreement itself, and hence the FBOP Defendants are not entitled to judgment as a matter of law based on the Release.

### 4. ENFORCEABILITY OF RELEASE CLAUSE

*Finally,* "[e]ven where the parties intend to release a specific claim, the release of that claim will not be enforced if there has been fraud, duress, mutual mistake, or, at least in some cases, unconscionability." *Carlile v. Snap-On Tools*, 648 N.E.2d 317, 322 (Ill. App. 1995). In addition, a clause limiting liability will not be enforced under Illinois law if "it is contrary to public policy, *or there is something in the parties' relationship militating against its enforcement*." *Sanjuan v. Am. Bd. of Psychiatry & Neurology, Inc.,* 1994 WL 66077, at *3 (N.D. Ill. Mar. 3) (emphasis added) (citing *Mulliken v. Lewis*, 615 N.E.2d 25, 29 (Ill. App. 1993)), *aff'd*, 40 F.3d 247 (7th Cir. 1994), as amended, Jan. 11, 1995. PBGC has alleged facts regarding a "computer glitch" outside PBGC's control that militates against enforcement of the Release insofar as PBGC's narrow claim in the Intervention Complaint is concerned. To enforce the broad language of the Release against such an unexpected, wholly fortuitous event would allow FBOP to reap a huge, undeserved windfall. At the very least, judgment on the pleadings would be inappropriate without further inquiry regarding facts that would militate against enforcement of the Release in these circumstances.

## B.   RES JUDICATA

The FBOP Defendants also assert that PBGC's claims are barred by the doctrine of *res judicata* based on Judge Gettleman's dismissal order in the Termination Action. *See* R. 226-2. As an initial matter, PBGC argues that *res judicata* is an affirmative defense and that the Trustee's failure to plead it constitutes a waiver. The Court need not decide the waiver issue, however, because it finds that, in any event, *res judicata* does not apply to bar PBGC's intervention claims against the FBOP Defendants.

Because the earlier judgment on which the FBOP Defendants' *res judicata* defense is predicated is a judgment rendered by a federal court, federal claim preclusion principles apply. *Cannon v. Burge,* 752 F.3d 1079, 1101 (7th Cir. 2014). "Claim preclusion, which operates to conserve judicial resources and promote finality, applies when a case involves the same parties and the same set of operative facts as an earlier one that was decided on the merits." *Berstein v. Bankert,* 733 F.3d 190, 225 (7th Cir. 2013). The Court is puzzled by the FBOP Defendants' assertion of *res judicata*. Apart from whether Judge Gettleman's order dismissing the Termination Action constitutes a decision on the merits (an issue which neither party addresses[12]), "[t]he doctrine of 'claim preclusion generally does not bar a subsequent lawsuit for issues that arise after the operative complaint is filed' in the

---

[12] For instance, Illinois courts applying *res judicata* principles have held that a dismissal with prejudice pursuant to a settlement agreement does not operate as a final judgment on the merits for purposes of *res judicata,* because "'an agreed order is not a judicial determination of the parties' rights, but rather is a recordation of the agreement between the parties.'" *Goodman v. Hanson*, 945 N.E.2d 1255, 1269 (Ill. App. 2011) (quoting *Kandelepas v. Economou,* 645 N.E.2d 543 (Ill. 1994)).

first lawsuit." *Heard v. Tilden*, 809 F.3d 974, 979 (7th Cir. 2015) (quoting *Ellis v. CCA of Tenn. LLC*, 650 F.3d 640, 652 (7th Cir. 2011)). PBGC's allegation that it is entitled to tax refunds that should have been paid to it but for a "computer glitch" that happened *after* the Termination Action was settled, "in no way arises from the operative facts of the previous lawsuit." *Id.* (citing *Supporters to Oppose Pollution, Inc. v. Heritage Grp.*, 973 F.2d 1320, 1326 (7th Cir. 1992) ("Traditional principals of preclusion allow additional litigation if some new wrong occurs.")). PBGC's current claim based on the failure of the offset to take effect could not have been raised in the Termination Action because that failure had not yet occurred. Therefore, *res judicata* does not apply.[13]

---

[13] Because the operative fact that gives rise to PBGC's current intervention claims had not yet happened when the Termination Lawsuit was settled, the Court need not rely on PBGC's more general argument that the Termination Action and the Intervention Complaint do not involve the same cause of action because the only claim that could be and was brought by PBGC in the Termination Action was the claim to terminate the Plan. Nevertheless, the Court would agree with PBGC on that point as well. The FBOP Defendants attempt to argue otherwise by asserting that the Termination Action sought unfunded benefit liabilities allegedly owed by FBOP of approximately $51.8 million and the right to offset FBOP's unfunded benefit liabilities against any tax refund owed to FBOP. *See* R. 226 at 9 (citing Ex. C, ¶¶ 1, 22, 33). But the paragraphs of the complaint in the Termination Action to which the FBOP Defendants cite do not support their assertion. Instead, the FBOP Defendants conflate PBGC's allegations in the Termination Action regarding the unfunded benefit liabilities to show the asset shortfall of the Plan for purposes of justifying termination of the Plan—with a *demand* for those liabilities. The sole relevance of PBGC's allegations in the Termination Action regarding its estimate of the unfunded benefit liabilities was to show there was a significant shortfall in the Plan's assets, which supported PBGC's assertions about the risk of an unreasonable increase in liability of PBGC's pension insurance fund, justifying termination of the Plan. Similarly, PBGC's allegations in the Termination Action regarding its right under federal law to offset unfunded benefit liabilities against tax refunds owed to FBOP by the IRS was solely for the purpose of showing that the district court should order the involuntary termination of the Plan to avoid the risk that PBGC

### C.   FAILURE TO STATE A COGNIZABLE THEORY OF RELIEF

Finally, the FBOP Defendants argue that PBGC's claims against them for (1) declaratory judgment (Count I), (2) unjust enrichment (Counts II and III), and (3) mistake (Count V) fail to state legally cognizable theories for relief.

As to Count I, the FBOP Defendants argue that there is no case or controversy between the parties, that PBGC seeks an "advisory opinion," and that PBGC should be suing the Department of Treasury instead. PBGC's request for a declaratory judgment seeking a ruling from this Court that it is entitled to the Escrowed Tax Refunds to the extent of the unpaid balance of the offset claim is no different from the FBOP Defendants' claims against the FDIC, which seek a declaratory judgment that FBOP is the owner of the Escrowed Tax Refunds. Therefore, the Court rejects the FBOP Defendants' "case or controversy" and "advisory opinion" arguments. And the argument that PBGC should have sued the Treasury Department, which allegedly is responsible for the mistaken payment to FBOP, is a red herring. Regardless of the Treasury Department's role in causing this dispute, the dispute itself is between the FBOP Defendants, who claim ownership of the Escrowed Tax Refunds, and PBGC, which claims ownership of that portion of the Escrowed Tax Refunds attributable to the unpaid portion of PBGC's offset claim.

---

might lose its ability to collect the debt it anticipated FBOP would owe it once a final determination of unfunded benefit liabilities was made. Those allegations were not for the purpose of, and the Termination Action did not seek, a judicial determination regarding PBGC's right to an offset.

The FBOP Defendants' contention that PBGC has failed to state a claim for unjust enrichment also is without merit. To establish a claim for unjust enrichment, PBGC must show that the FBOP Defendants have "unjustly retained a benefit to [PBGC's] detriment, and that [the FBOP Defendants'] retention of the benefit violates the fundamental principles of justice, equity, and good conscience." *HIP Health Care Servs. v. Mt. Vernon Hosp.,* 545 N.E.2d 672, 679 (Ill. 1989). Where the benefit was transferred to the defendant by a third party (here, the Department of Treasury), a claim for unjust enrichment is recognized "(1) where the benefit should have been given to the plaintiff, but the third party mistakenly gave it to the defendant instead; (2) where the defendant procured the benefit from the third party through some type of wrongful conduct; or (3) where the plaintiff for some other reason had a better claim to the benefit than the defendant." *Nat'l Union Fire Ins. Co. of Pittsburgh v. DiMucci*, 34 N.E.3d 1023, 1043 (Ill. App. 2015). "No showing of fault or illegality is required." *Chi. Title Ins. Co. v. Sinikovic*, 125 F. Supp. 3d 769, 779 (N.D. Ill. 2015).

The Court finds that PBGC has adequately alleged an unjust enrichment claim based on facts independent of any alleged breach of contract. The Court further finds that, contrary to the FBOP Defendants' arguments, PBGC does not need to allege unlawful or improper conduct on the part of FBOP to maintain this claim, and PBGC has adequately alleged facts sufficient to satisfy the requirement that FBOP's retention of the Escrowed Refunds without paying PBGC the unpaid

balance of the Settlement Claim Amount violates "fundamental principles of justice, equity, and good conscience."[14]

Finally, the FBOP Defendants' argument that PBGC must allege a mutual mistake by the parties to the Settlement Agreement in order to state a claim for "mistake" is based on an incorrect reading of PBGC's mistake claim. PBGC's mistake claim is not a contract-based claim, for which a unilateral mistake is insufficient to state a claim. Rather, PBGC asserts that it has a cause of action to recover the Department of Treasury's overpayment of tax refunds to FBOP under the common law doctrine of payment by mistake of fact. R. 231 at 25 (citing *inter alia United States v. St. Augustine College*, 1991 WL 222099, at * 4 (N.D. Ill. Oct. 21, 1999)). Whether, under this theory, PBGC can stand in the shoes of the Department of Treasury, which is the entity that made the mistaken overpayment but is not a party to this action, was recognized as a potential issue by the FBOP Defendants in their reply brief, but was not adequately addressed with citation to legal authority relating to that standing question. The Court therefore will leave it for another day. *See Vaughn v. King*, 167 F.3d 347, 354 (7th Cir. 1999) ("It is not the responsibility of this court to make arguments for the parties.").

## CONCLUSION

For the foregoing reasons, the FBOP Defendants' renewed motion for judgment on the pleadings, R. 225, is denied.

---

[14] To the extent that the FBOP Defendants' argument is that the unjust enrichment claims are not legally cognizable because of the Release in the Settlement Agreement, that argument already has been addressed in a previous section of this opinion.

ENTERED:

_____ *Thomas M Durkin*

Honorable Thomas M. Durkin
United States District Judge

Dated: November 27, 2017